IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                        )
LUSIK USOYAN, *et al.*,                 )
                                        )
          Plaintiffs,                   )
                                        )
          v.                            )     Case No. 1:18-CV-01141-CKK
                                        )
THE REPUBLIC OF TURKEY,                 )
                                        )
          Defendant.                    )
                                        )
_____ )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT REPUBLIC OF TURKEY'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     SUMMARY OF THE ARGUMENT ........................................................... 3

III.    STATEMENT OF FACTS ............................................................................ 7

        A.  The Protest at Sheridan Circle ....................................................... 7

        B.  The First Assault On The Protesters ............................................. 11

        C.  U.S. Law Enforcement Efforts To Restore Order Despite the Aggression of Turkish Agents ........................................................................................................ 13

        D.  TSD Crosses the Street Into Sheridan Circle To Assault The Protesters ................... 16

        E.  The Assault on Lacy MacAuley ..................................................... 19

        F.  Additional Violence and Aggressive Tactics of the TSD During The Turkish Visit ... 21

        G.  The History of TSD's Use of Violence Abroad to Intimidate and Silence Protest and Political Dissent ........................................................................................................ 23

        H.  The Protesters are Neither Terrorists, Nor are They "Anti-Turkey" ........................... 24

        I.      The Expert Analysis of Dr. Ronald M. Layton Demonstrates that there was No Actual Threat to Erdogan, a Fact That is Reflected by the TSD's Behavior ................................ 27

IV.     ARGUMENT ................................................................................................. 34

        A.  Turkey's Burden Under the Legal Standard ................................. 34

        B.  The U.S. Law Cited by Turkey Upholds Plaintiffs' Right to Protest. .......................... 36

            1.  Defendant's Reliance on 18 U.S.C. §§ 112 and 878 is Misplaced Because Those Statutes Exempt First Amendment Protests ................................................................. 36

            2.  The Protesters Were Engaged in Peaceful Demonstration Covered by the First Amendment and Were Not in Violation of 18 U.S.C §§ 112 and 878 .......................... 40

        C.  Turkey Is Liable Under 28 U.S.C. § 1605(a)(5) for the Violent Torts Committed by the TSD on U.S. Soil ......................................................................................................... 43

            1.  The TSD engaged in Tortious Conduct in the United States ................................... 44

            2.  The Discretionary Function Exception does not Immunize Turkey's Tortious Conduct Because the TSD Committed Serious Crimes ................................................. 45

        D.  The FTCA Contains a Corollary Principle to *Letelier*, but Even More Drastically Limits the Application of the Discretionary Function Exception ...................................... 49

E.  Even if the FTCA's Discretionary Function Exception Applied, the TSD's Conduct Fails the Two-Step *Macharia* Test as Adopted by the D.C. Circuit in a FSIA Case ......... 55

   1.  TSD Ignored the Statutory Directive Prohibiting their Assault on the Protesters, and the Majority of the TSD Exercised No Discretion ......................................................... 55

   2.  These Are Not the Type of Actions Congress Sought to Protect ............................. 59

F.  Turkey Is Liable Under 28 U.S.C. § 1605B .................................................................. 61

   1.  The Sheridan Circle Beating Was A Violent Criminal Act Under D.C. and Federal Law .................................................................................................................................. 61

   2.  The Sheridan Circle Beatings are Part of a Pattern of Political Violence To Intimidate Opponents Of The Erdogan Regime In The U.S. And Abroad .................... 64

   3.  The Events of the Sheridan Circle Beating and Effects thereafter "Transcended National Boundaries." ................................................................................................... 71

G.  The "International Comity" Defense Has Not Existed Since the Passage of the FSIA in 1976 ................................................................................................................................. 75

H.  Plaintiffs Do Not Argue that 42 U.S.C. § 1985 Provides an Independent Basis for Jurisdiction. ...................................................................................................................... 78

V.     CONCLUSION .............................................................................................................. 78

## TABLE OF CASES AND AUTHORITIES

**Cases**

*Abecassis v. Wyatt*, 7 F. Supp. 3d 668 (S.D. Tex. 2014) ................................................ 65

*Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934 (D.C. Cir. 2008)................................ 34

*Baker v. Carr*, 369 U.S. 186 (1962)................................................................ 72, 77

\* *Berkovitz v. United States*, 486 U.S. 531 (1988) ....................................... 48, 53, 55, 56

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) ................ 65, 66

*Boos v. Barry*, 485 U.S. 312 (1988)................................................................38-39, 50-51

\* *CISPES (Committee in Solidarity with People of El Salvador) v. Federal Bureau of Investigation*, 770 F.2d 468 (5th Cir. 1985) ................................................ 36, 37, 38

*Cope v. Scott*, 45 F.3d 445 (D.C. Cir. 1995)................................................................54-55

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)........................................................ 52

\* *Doe v. Fed. Democratic Republic of Eth.*, 189 F. Supp. 3d 6, 27 (D.D.C. 2016), *aff'd on other grounds*, 851 F.3d 7 (D.C. Cir. 2017) ................................................................ 48

*Feldman v. FDIC*, 879 F.3d 347 (D.C. Cir. 2018)........................................................ 34

*Gates v. Syrian Arab Republic*, 646 F. Supp. 2d 79 (D.D.C. 2009), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)........................................................................................ 73

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................ 52

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................ 38

*Hartman v. Moore*, 547 U.S. 250 (2006)........................................................51-52

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) (en banc)................................ 74

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)................................................ 39

*In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998)........................................................ 35

*Johnson v. District of Columbia*, 528 F.3d 969 (D.C. Cir. 2008)........................................ 52, 53

*Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37 (D.D.C. 2019)........................................ 43, 61, 74

\* *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980)............................................. passim

*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009).................................................... 53

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) ...................................................... 47, 49

\* *Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016)........................................... passim

\* *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921-22 (D.C. Cir. 1987), *vacated in part on other grounds, MacArthur Area Citizens Ass'n v. Republic of Peru*, 823 F.2d 606 (D.C. Cir. 1987) ............................................................................ passim

\* *Macharia v. United States*, 238 F. Supp. 2d 13 (D.D.C. 2002) ........................................... 54, 58

*Medina v. United States*, 259 F.3d 220 (4th Cir. 2001) ................................................ 53

*Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117, 126 n.3 (D.D.C. 2018), *vacated in part on other grounds, Miango v. Embassy of the Democratic Republic of the Congo*, 2019 U.S. Dist. LEXIS 90801 (D.D.C. 2019)............................................................. 45, 47

*Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019) ................................................. 66

*Mohammadi v. Republic of Iran*, 947 F. Supp. 2d 48, 81 n.4 (D.D.C. 2013)................................ 48

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ....................................................... 38

*New York Times, Co. v. Sullivan*, 376 U.S. 254, 270 (1964)............................................................

*Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918) ........................................................ 77

*Orosco v. Holder*, 396 F. App'x 50 (5th Cir. 2010) ..................................................... 46

*Ovessi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009)...................................... 74

*Owens v. Republic of Sudan*, 374 F. Supp. 2d 1 (D.D.C. 2005) ............................................ 72, 74

*Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006) .......................................................... 51

*Phx. Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, (D.C. Cir. 2000) ............... 4, 34, 35, 57

*Prakash v. Am. Univ.*, 727 F.2d 1174 (D.C. Cir. 1984)................................................... 35

*Quaker Action Grp. v. Morton*, 516 F.2d 717 (D.C. Cir. 1975) ..................................... 52

*Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187 (D.C. Cir. 1986) ....... 53, 56

*Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014) ........................................ 75, 77

*Risk v. Halvorsen*, 936 F.2d 393 (9th Cir. 1991) ................................................................ 47

*Seals v. McBee*, 898 F.3d 587 (5th Cir. 2018) .................................................................... 37

*Shuler v. United States*, 531 F.3d 930 (D.C. Cir. 2008) ...................................................... 57

*Simon v. Republic of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008), *rev'd in part on other grounds sub nom.*, *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009) ............................................................. 72

*United States v. Gaubert*, 499 U.S. 315 (1991) ................................................................. 49

\*   *United States v. Narin* (D.C. Sup. Ct. July 17, 2017) ("Indictment") ................................... 11

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1 (D.D.C. 2013) ............ 76-77

\*   *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) ........................................................................................................... passim

*United States v. Schatzle*, 901 F.2d 252 (2d Cir. 1990) ...................................................... 47

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) ....................................... 65

*Williams v. District of Columbia*, 268 F. Supp. 3d 178 (D.D.C. 2017) ................................... 52

\*   *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) ............................. 64, 65, 66

**Statutes**

\*   18 U.S.C. § 2331 ............................................................................................... passim

18 U.S.C. § 112 ................................................................................................. passim

18 U.S.C. § 878 ................................................................................................. 36, 40

\*   28 U.S.C. § 1605(a) ........................................................................................... passim

\*   28 U.S.C. § 1605B ........................................................................... 60, 77, 74, 77

42 U.S.C. § 1985 ............................................................................................... 77-78

D.C. Code § 22–402 ............................................................................................. 63

D.C. Code § 22-404 ............................................................................................. 63

D.C. Code § 5331.02, *et seq.* ............................................................................... 10, 36

Turkish Penal Code (Türk Ceza Kanunu/TCK), Law no: 5237 of 26 September 2004 ............... 26

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ................................................................ 61

H. Res. 354, 115th Cong. (1st Sess.) (June 6, 2017) ........................................... 13, 42

Restatement (Third) of the Foreign Relations Law of the United States § 454 n.3 ..................... 48

U.S. CONST. ART. I § 7 ......................................................................................... 77

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 77

Fed. R. Civ. P. 15(a) ............................................................................................ 78

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 77

**Regulations**

39 C.F.R. § 7.96(g)(2)(i) ....................................................................................... 10, 36

**News Articles**

"*Ecuador complains to Turkish embassy about treatment of protesters at Quito event*,"
   CUENCAHIGHLIFE (Feb. 8, 2016) https://cuencahighlife.com/ecuador-complains-turkish-
   embassy-treatment-protesters-quito-event/ ............................................................ 23

"*Turkey's South Africa embassy's personnel attacks protesters*," AHVAL
   https://ahvalnews.com/turkey-south-africa/turkeys-south-africa-embassys-personnel-attacks-
   protesters ................................................................................................... 23

Allison Pecorin, *Protests Were Growing in DC Even Before 2017*, NBC WASHINGTON (July 14,
   2017 at 3:19 PM),  https://www.nbcwashington.com/news/local/Audit-Reveals-Protests-are-
   on-the-Rise-in-DC-432944863.html ....................................................................... 8

Ermine Kart, "*Ecuador conveys 'unease' over use of force by Turkish president's guards*,"
   HURRIYET DAILY NEWS (Feb. 7, 2016) http://www.hurriyetdailynews.com/ecuador-conveys-
   unease-over-use-of-force-by-turkish-presidents-guards-94852 .............................................. 23

376 U.S. 254, 270 (1964) Harriet Sinclair, "*Turkish Embassy Bodyguards Beat Up Americans in Washington, Video Shows*," NEWSWEEK (May 18, 2017), https://www.newsweek.com/police-involvement-brawl-outside-turkish-embassy-dc-was-pretty-dicey-chief-611166 ................... 12

Human Rights Watch, "Turkey: Events of 2018," https://www.hrw.org/world-report/2019/country-chapters/turkey ........................................................................................ 26

Mark Hensch, "*DC police chief: 'We will not tolerate' attack on Turkish protesters*," THE HILL (May 17, 2017), https://thehill.com/homenews/news/333881-dc-police-chief-attack-on-protesters-at-turkish-embassy-brutal ................................................................................ 13, 42

Nahal Toosi, "*D.C. think tank gets a taste of Turkish conflict right outside its doors*," POLITICO (Mar. 31, 2016) https://www.politico.com/story/2016/03/erdogan-turkey-reacts-criticism-brookings-speech-221430 ..................................................................................................... 23

Phil Stewart, *U.S. to arm Syrian Kurds fighting Islamic State, despite Turkey's ire*, Reuters (May 9, 2017 at 1:59 p.m.) https://www.reuters.com/article/us-mideast-crisis-usa-kurds-idUSKBN18525V ............................................................................................................ 8, 25

Vince Chadwick, "*Battle of the Erdogan Bodyguards*," POLITICO (Oct. 7, 2015), https://www.politico.eu/article/battle-of-erdogan-bodyguards-security-belgium-police/ ........ 23

## I.    INTRODUCTION

On May 16, 2017, a handful of individuals—men, women, and children—gathered to engage in the constitutionally-protected activity of political demonstration on U.S. soil. Despite the misdirection in Defendant the Republic of Turkey's Motion to Dismiss, the fact remains that Turkey deployed its foreign security forces to brutally assault and injure these protesters. Defendant's security forces engaged in this violent, criminal behavior, not because there was any threat to President Erdogan, but because the current Turkish administration wanted to send a chilling message back to Turkish citizens and to other protesters: no dissent shall be tolerated. Because American law provides civil remedies for victims of such political violence by foreign sovereigns, and because Plaintiffs have proven their entitlement to such remedies, Turkey's Motion must be dismissed.

This lawsuit arises from the events that took place in Sheridan Circle on May 16, 2017, which happened in a very short time frame:

**Prior to 4:00 p.m.**: Officers of the District of Columbia Metropolitan Police Department ("MPD") escorted a small group of protesters (the "Protesters") from a larger demonstration at Lafayette Square to Sheridan Circle, across the street from the Turkish Chief of Mission Residence ("CMR"). Memorandum in Support of Defendant Republic of Turkey's ("Turkey") Motion to Dismiss (the "Motion" or "MTD") at Def.'s Ex. 9, ¶ 2. The MPD stationed the Protesters approximately 50 feet from the sidewalk in front of the CMR, and approximately 137 feet away from the point where President Erdogan would eventually arrive. Pls.'s Ex. 1. On the sidewalk and grounds abutting the CMR, a large group of about 40 to 60 Erdogan supporters had assembled. Intermingled in this pro-Erdogan grouping were reporters, cameramen, and individuals who appeared to be associated with the Turkish American Steering Committee ("TASC") (collectively

"Erdogan Supporters"). At some point, members of the Turkish Presidential Security Detail ("TPSD"), members of the Turkish National Police ("TNP") (collectively, "Turkish Security Detail" or "TSD"), Turkish Diplomats and "others awaiting the Turkish President's arrival exited the Residence to assess the situation." MTD at 23.

**4:05 p.m.**: Erdogan Supporter Sinan Narin throws a punch at a Protester, Jalal Kheirabadi. Def.'s Ex. 6, at File No. SC01 at 0:48-0:54; see also https://www.youtube.com/watch?v=pjC3KxX7MJA (English translation provided at Pls.'s Ex. 7). Seconds later, Erdogan Supporter Alpkenan Dereci, Def.'s Ex. 6, at File No. SC02 at 0:14-0:22, and members of the TSD rush into the street to punch and kick Kheirabadi and others. Def.'s Ex. 6, at File No. SC02 at 0:27-0:50.  Under attack, the Protesters defend themselves against the TSD and pro-Erdogan crowd. Def.'s Ex. 6, at File No. SC02 at 0:22-0:46.

**4:07 p.m.**: MPD and U.S. Secret Service ("USSS") agents restore order at Sheridan Circle and separate the Protesters and Erdogan Supporters on different sides of the two-lane street. Def.'s Ex. 6, at File No. SC03 0:10-0:13; 0:31-35.

**Between 4:07 p.m. and 4:11 p.m.**: MPD officers arrive on motorcycles, which are stationed on the CMR side of the street. Pls.' Ex. 2 at 0:00-2:55. MPD creates a cordon using the motorcycles and the bodies of the MPD officers to contain the Erdogan Supporters on their side of the street. *Id.*

**4:11 p.m.**: Erdogan's vehicle pulls into the front driveway of the CMR, located off 23rd Street NW, and comes to a stop approximately 137 feet from Sheridan Circle. Pls.' Ex. 1; Def.'s Ex. 6, at File No. SC051:08-1:28.

**4:13 p.m.**: Approximately twenty members of the TSD and at least five civilians simultaneously rush across the street and attack the Protesters in Sheridan Circle. Def.'s Ex. 6, at

File No. SC02 at 2:35-3:00; SC08 at 0:22-0:42. MPD officers and USSS agents intervene to protect the Protesters. Def.'s Ex. 6, at File No. SC02 at 2:35-3:00; SC08 at 0:22-0:42.

**4:14 p.m.**: After punching and kicking the Protesters, knocking one Plaintiff unconscious and others to the ground, TSD agents rip up the Protesters' signs without detaining anyone or searching for weapons. Def.'s Ex. 6, at File No. SC08 at 1:42-1:58; Pls.' Ex. 5 at 11-12. The Protesters, including Plaintiffs Lusik Usoyan, John Doe I, and John Doe II, suffer injuries as a result of the attack.

**6:17 p.m.**: Plaintiff Lacy MacAuley protests at the intersection of Massachusetts Avenue NW and California Street NW, flanked by four MPD officers. Def.'s Ex. 6, at File No. SC02 at 7:14-7:52. As MacAuley is loudly protesting Erdogan on a public street, at least four TSD officers jump out of a passing motorcade on its way to the Turkish Embassy, and race down the street to grab MacAuley. Def.'s Ex. 6, at File No. SC02 at 7:52-8:15. They seize MacAuley's wrist and arm, steal her protest sign, and forcefully cover her mouth with a hand. Def.'s Ex. 6, at File No. SC02 at 8:05-8:18; Pls.' Ex. 5 at 14.

While this was not a random outburst by the TSD, but part of a larger pattern of behavior conducted by the Turkish government to silence dissent and intimidate Turkish dissidents in Turkey and abroad through acts of violence, this case is about the actions of the TSD on May 16, 2017 in Sheridan Circle.

## II.    SUMMARY OF THE ARGUMENT

Defendant Turkey, faced with the incontrovertible video evidence that on May 16, 2017 its security forces brutalized a small group of peaceful protesters to suppress their First Amendment rights, engages in plentiful post-hoc rationalization and speculation in its Motion. However, Turkey must present evidence to challenge the factual allegations of a complaint. *See e.g.*, *Phx.*

*Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 41 (D.C. Cir. 2000). Aside from selectively edited video of the Sheridan Circle incident (even edited, the video provides a thorough indictment), Turkey has not produced any evidence of the decision making by the TSD at Sheridan Circle, such as a statement from any of the dozens of Turkish officials present that day. Furthermore, Turkey's security expert, Michael White, did not speak to any Turkish official, agent, or employee who was present.

Turkey's Motion hinges on the false premise that Erdogan faced a threat from the Protesters when he arrived at the CMR. However, Turkey's own videographic evidence, as well as reports by the Department of Justice, the Department of State, the U.S. Secret Service, and local law enforcement, all show that the Protesters were exercising their First Amendment rights when they were set upon by the TSD. Erdogan was never under threat, aside from the risk of hearing a vigorous protest of his policies. It is clear from the evidence that the TSD acted to end this protest.

Moreover, these same sources show that the TSD agents universally behaved as if there were no security threat to Erdogan. Among additional, otherwise inexplicable conduct, the TSD (i) shouted sexual epithets at the Protesters and beckoned them to come across the street and fight, (ii) allowed Erdogan to arrive at the area purportedly seething with alleged threats, (iii) allowed Erdogan to stand outside his car and observe the melee despite purportedly being in handgun and IED range, (iv) punched and kicked Protesters even after they were lying on the ground and/or unconscious, and then (v) took the time to tear up the Protesters' signs. All of this occurred in lieu of searching the Protesters for the phantom weapons Turkey now in hindsight articulates as a cause for the TSD's assault.

Turkey's pretext relies on several easily disprovable falsehoods. First, Turkey conflates the distance between the sidewalk in front of Sheridan Circle and the sidewalk in front of the CMR

(roughly fifty feet) with the distance between Sheridan Circle and Erdogan's arrival point, which was over twice the distance (over 130 feet). This error, which Turkey's declarant Michael White fully adopted in his analysis, fatally undermines his conclusions regarding a threat from a handgun or IED, as well as Turkey's entire narrative regarding the threats to Erdogan. Plaintiffs will stipulate however that the arrival point, and therefore Erdogan, remained within audible range of the protest, which was the TSD's actual concern.

Second, both Turkey and Michael White neglect the fact that the line of sight from Sheridan Circle to the arrival point was obscured and uphill. In addition, 23rd Street NW, which sat adjacent to the arrival point at the CMR, had been closed by U.S. law enforcement. Thus, between Sheridan Circle and the arrival point sat a wall of MPD, Secret Service, Department of State Diplomatic Security agents and their vehicles, the TSD, the Erdogan Supporters, a concrete wall running around part of the CMR, and hedgerows and trees, which at the distance between Sheridan Circle and the arrival point would render a handgun or IED threat negligible.

Plaintiffs' expert Dr. Ron Layton, based on his 26 years in the Secret Service and his many senior positions, including Deputy Assistant Director of the Office of Protective Operations (responsible for the protection of all visiting heads of state in the United States), concludes that there no threat to Erdogan on May 16, 2017, and that the TSD's conduct confirms this conclusion.

In addition to the flawed factual foundation, several critical legal errors undermine Turkey's Motion. First, Turkey cites an apparent breach of 18 U.S.C. §§ 112 and 878 by the Protesters, and apparent justification for the TSD violence. But 18 U.S.C. § 112(d) explicitly protects against the suppression of First Amendment rights. Next, under the noncommercial tort exception (28 U.S.C. § 1605(a)(5)), Turkey's own cited authority confirms that the discretionary function exception it pleads as an affirmative defense does not apply to serious crimes, such as

those committed by the TSD agents. Thus, even if there had been a threat, Turkey would not be immune under 28 U.S.C. § 1605(a)(5). The TSD rampage through Sheridan Circle is not conduct of the "nature and quality that Congress intended to shield from tort liability," a conclusion further supported by the unanimous joint Resolution passed by the United States House of Representatives, which condemned the acts of the armed Turkish officials who "beat, kicked, and choked unarmed demonstrators" and "blatantly suppressed the First Amendment rights of United States citizens."

Turkey also concedes every element of Plaintiffs' 28 U.S.C. § 1605B claims except for the definition of "international terrorism." Plaintiffs' (and Defendant's) evidence prove that the TSD's attack on Plaintiffs meets the tripartite definition of "international terrorism" at 18 U.S.C. § 2331 in that it (1) was a violent crime (for which they were indicted), (2) was meant to intimidate opponents of the Erdogan regime in Turkey and abroad, and (3) transcended national boundaries because, among other reasons, Turkey continues to provide safe haven to the perpetrators of the attack.

Turkey's post-hoc rationalization spins the video to tell a story of the level-headed intervention of the TSD, which saved Erdogan from a group of terrorist sympathizers whose criminal aggression overwhelmed the bumbling Metropolitan Police Department, U.S. Secret Service, and Department of State Diplomatic Security agents. The image of multiple TSD agents savagely kicking a 5'6" 120 pound woman lying on the ground—who they had already knocked unconscious—quickly dispels that story. But there is no group better placed to judge the actions of the TSD on May 16, 2017 than the members of U.S. law enforcement on the scene that day. The official record created on May 16, 2017 by the Metropolitan Police Department, U.S. Secret Service, and Department of State Diplomatic Security resulted in fifteen criminal indictments

directed against the TSD and their comrades in arms, several pro-Erdogan civilians who also rushed into Sheridan Circle—this is the true story.

As Plaintiffs' expert Dr. Steven Cook, ENI Enrico Mattei Senior Fellow for Middle East and Africa Studies at the Council on Foreign Relations, explains, Turkey often labels political dissidents as terrorists as a means of deterring political dissent in Turkey and abroad. Dr. Cook confirms that the Sheridan Circle attack was the most recent incident in the history of violence and intimidation against political opponents by the TSD.

Finally, Turkey's perfunctory invocation of "international comity" finds no support in the FSIA, which the Supreme Court has ruled is a "comprehensive" source of immunity defenses for foreign sovereigns. In 1976, the signing into law of the FSIA did away with the need for courts to carry out such analysis and subsequent attempts by foreign sovereigns to have cases dismissed under "international comity" have been repeatedly rejected by this Court.

The allegations of the Complaint and the evidence submitted both by Turkey and Plaintiffs show that this Court has subject matter jurisdiction in this case, and that Turkey is liable for its attack on Plaintiffs. As a result, Turkey's Motion should be denied.

## III.    STATEMENT OF FACTS

### A.    The Protest at Sheridan Circle

The First Amendment to the United States Constitution guarantees the right to demonstrate on public ground and Washington, D.C. is no stranger to such protests. The sheer volume of protests in D.C. has given the MPD and the USSS exceptional institutional experience in managing interactions between protesters and visiting foreign dignitaries.[1] Pls.' Ex. 3, Declaration of Dr.

---

[1] In 2016 alone, the MPD handled approximately 1,224 protests. Allison Pecorin, *Protests Were Growing in DC Even Before 2017*, NBC WASHINGTON (July 14, 2017 at 3:19 PM),

Ronald M. Layton ("Layton Decl.") at ¶¶ 30-33; 38-39; 63. Both the USSS and MPD are trained to respect and facilitate protesters' rights under the First Amendment. Pls. Ex. 3, Layton Decl. at ¶ 38-39.

On May 16, 2017, in Lafayette Square, a few miles from Sheridan Circle, a large group of protesters gathered together across the street from the White House to publicly express their opposition to the policies and practices of Turkey's leader, President Recep Tayyip Erdogan ("President Erdogan" or "Erdogan"). Others gathered in support of the current Turkish administration. Inside the White House, Erdogan met with President Trump as part of an Official Working Visit by Erdogan to the United States. *Visits By Foreign Leaders of Turkey*, Office of the Historian, U.S. Dept. of State, https://history.state.gov/departmenthistory/visits/turkey. Turkish Minister of Foreign Affairs Mevlüt Çavuşoğlu accompanied Erdogan on his visit to Washington, D.C.

This meeting was of particular importance to Erdogan, who sought to reverse the United States' recent decision to arm with heavy weapons the Kurdish militias known as the People's Protection Units ("YPG"), an indispensable military partner of the U.S. in the fight against ISIS in Syria. Phil Stewart, "*U.S. to arm Syrian Kurds fighting Islamic State, despite Turkey's ire,*" REUTERS (May 9, 2017) https://www.reuters.com/article/us-mideast-crisis-usa-kurds-idUSKBN18525V. This decision was a major political loss for Erdogan and its reversal was one of his highest priorities in his relationship with the United States. A failure to win concessions from the White House would cause a loss of face for Erdogan in Turkey. Pls. Ex. 4, Declaration of Dr. Steven A. Cook ("Cook Decl.") at ¶ 61. Accordingly, the eyes of the Turkish people were

---

https://www.nbcwashington.com/news/local/Audit-Reveals-Protests-are-on-the-Rise-in-DC-432944863.html

focused on the action of the Turkish delegation that day in May. *See* Pls. Ex. 4, Cook Decl. at ¶ 9. President Erdogan's meeting with President Trump, however, failed to deliver the sought-after concessions. Pls. Ex. 4, Cook Decl. at ¶ 64.

As the Lafayette Square demonstrations wrapped up, a smaller group of Protesters numbering not more than twenty children, women, and men, several of them elderly, decided to continue the demonstration at the CMR. MPD officers escorted the Protesters for approximately fifteen blocks from Lafayette Circle to Sheridan Circle, which is located approximately 87 feet from the CMR and approximately 137 feet from President Erdogan's arrival point. *See* Def.'s Ex. 9, ¶ 2; Pls.' Ex. 1.



Source: Google Maps. *See* Pls.' Ex. 1.

Across the street, on the sidewalk and street abutting the CMR, a large group of about 40 to 60 Erdogan Supporters, private citizens, had assembled approximately 53 feet away from Sheridan Circle. *See* Pls.' Ex. 1. Turkish officials and the TSD joined the crowd after the Protesters arrived. MTD at 23. The TSD, a paramilitary force armed with handguns and trained in physical combat, ignored all relevant standards of professionalism for a security service by joining with the Erdogan Supporters in their midst to engage in counter-protest behavior. Def.'s Ex. 9, ¶ 2; Pls. Ex. 3, Layton Decl. at ¶¶ 51, 70. The TSD agents and their associates, the Erdogan Supporters, outnumbered the Protesters by approximately two-to-one. Compl. ¶ 32; Pls.' Ex. 5 at 1.

Before they were attacked, the Protesters were lawfully assembled on federal land. Although located in the District of Columbia, Sheridan Circle is federally owned land that is designated as a National Park. DC.gov: DCGIS Open Data: Property and Land, "*Reservation Boundaries,*" http://opendata.dc.gov/datasets/reservation-boundaries?geometry=-77.065%2C38.91%2C-77.024%2C38.916. Pursuant to 39 C.F.R. § 7.96(g)(2)(i), permits are not required to protest or demonstrate on federal land unless the demonstration involves more than 25 people. The protest at Sheridan Circle contained fewer than 25 people, and thus, no permit was required. *See* Def.'s Ex. 6, at File No. SC03 at 0:10-0:13; SC07 2:33-2:39; Pls.' Ex. 5 at 1. To the extent that any Protesters strayed from Sheridan Circle, they were stepping onto property of the District of Columbia, where individuals are allowed to assemble and protest on public streets, sidewalks or parks whether or not they have a permit or an approved assembly plan. *See* D.C. Code § 5331.02, *et seq*. The Protesters shouted slogans, waved flags representing the YPG, and displayed posters bearing statements such as "Free Selahattin Demirtas." Def.'s Ex. 6, at File No. SC03 0:10-0:13; 0:31-35.[2]

## B.    The First Assault On The Protesters

The first assault on the Protesters began at approximately 4:05 p.m. What began as an impassioned protest turned violent when one of the civilian Erdogan Supporters, Sinan Narin, threw a punch towards a Protester, Jalal Kheirabadi. Def.'s Ex. 6, at File No. SC01 at 0:48-0:54.

---

[2] Mr. Demirtas is a Turkish national of Kurdish descent who was one of the co-chairs of the pro-Kurdish Peoples Democratic Party, a lawfully existing Turkish political party. *See* Press Release issued by the Registrar of the European Court of Human Rights, attached as Plaintiffs' Exhibit 6. Demirtas has been imprisoned by the Turkish state since November 2016, for purportedly supporting a terrorist organization. Pls.' Ex. 6 at 2-3; Pls.' Ex. 4, Cook Decl. at ¶ 41. The European Court of Human Rights ("ECHR"), to whose jurisdiction Turkey is subject, has ordered Turkey to free Mr. Demirtas, finding that his detention had the "ulterior purpose of stifling pluralism and limiting freedom of political debate." Pls.' Ex. 6 at 7. To date, Mr. Demirtas remains incarcerated because President Erdogan refuses to honor the ECHR's ruling.

Narin later admitted in an interview that "he hit first" and "the fight started with me." https://www.youtube.com/watch?v=pjC3KxX7MJA (English translation provided at Pls.'s Ex. 7). Additional Erdogan Supporters joined in the act, pushing a female Protester to the pavement. Def.'s Ex. 6, at File No. SC02 at 0:14-0:17. Next, Erdogan Supporter Alpkenan Dereci rushed into the street and began repeatedly punching Kheirabadi. Def.'s Ex. 6, at File No. SC02 at 0:14-0:22. Members of the TSD also threw punches and directed kicks at Kheirabadi and others. Def.'s Ex. 6, at File No. SC02 at 0:27-0:50.

Turkey's evidence for its misleading claim that the "first altercation broke out when Kheirabadi is seen in the video shouting and advancing towards a man in khaki uniform, breaking into a fist fight among them," MTD at 21, consists of a video which does not show Kheirabadi making any threatening movements before he is shoved and then punched by multiple members of the much-larger crowd of Erdogan Supporters and TSD agents. Def.'s Ex. 6, at File No. SC01 at 0:00-0:57.

The videos clearly show the Protesters reacting defensively to the assaults. As the Protesters retreat back to the sidewalk, a Protester steps into the street, screams, and flicks her water bottle in the direction of the CMR, releasing water onto the ground, but hitting no one. Def.'s Ex. 6, at File No. SCO2 at 1:10-1:19.

The criminal indictment filed by the United States against fifteen members of the TSD and four civilians (the "Indictment"), including Narin, confirms that the TSD and Erdogan Supporters initiated the first attack. Pls.' Ex. 8, *United States v. Narin* (D.C. Sup. Ct. July 17, 2017) ("Indictment"). According to the Indictment, the Erdogan Supporters "*bypassed* the MPD cordon and *moved toward* the collective group of anti-Erdogan protesters . . . ." *Id.* at ¶ 2 (emphasis added). After bypassing the cordon, members of the TSD and Erdogan Supporters "pushed . . . an anti-

11

Erdogan protester, to the ground" and "punched and kicked" other Protesters. *Id.* at ¶¶ 3, 5, 6.  In the Affidavits in Support of an Arrest Warrant for several TSD agents, the Department of Justice characterized the Protesters at Sheridan Circle as "conducting a peaceful First Amendment Assembly," Pls.' Ex. 12 at F005, F008.

Conversely, the Situation Report from the Agent-in-Charge who oversaw "the visit of the Republic of Turkey's Foreign Minister Mevlut Cavusoglu who visited Washington, DC along with Turkish President Recep Tayyip Erdogan on May 15-16, 2017," confirmed reports from USSS agents present at the beating that "the melee had been provoked by Turkish security officers who upon seeing the protesters had run directly into the crowd to physically engage them." Pls.' Ex. 12 at F013 at 2.

Local law enforcement concurred with the conclusion of the Department of Justice, Department of State, and the U.S. Secret Service. MPD Officer Tabitha Alberti's statement (attached to Turkey's Motion) repeatedly refers to the Protesters as "peaceful" while referring to the throng of Erdogan Supporters as "radicalized." Def.'s Ex. 9, ¶ 2. D.C. Chief of Police Peter Newsham echoed Officer Alberti's statement when he conducted a press conference and characterized these events as "a brutal attack on peaceful protesters." Harriet Sinclair, "*Turkish Embassy Bodyguards Beat Up Americans in Washington, Video Shows*," NEWSWEEK (May 18, 2017),   https://www.newsweek.com/police-involvement-brawl-outside-turkish-embassy-dc-was-pretty-dicey-chief-611166. D.C. Mayor Muriel Bowser agreed, stating that "[w]hat we saw yesterday – a violent attack on a peaceful demonstration – is an affront to DC values and our rights as Americans . . . ." Mark Hensch, "*DC police chief: 'We will not tolerate' attack on Turkish protesters*," THE HILL (May 17, 2017), https://thehill.com/homenews/news/333881-dc-police-chief-attack-on-protesters-at-turkish-embassy-brutal.

Even the United States House of Representatives unanimously passed a Resolution condemning "multiple armed Turkish security officials [who] beat, kicked, and choked unarmed demonstrators" and acknowledging the peaceful and constitutional character of the Protesters' actions. H. Res. 354, 115th Cong. (1st Sess.) (June 6, 2017). Pls.'s Ex. 18. The Resolution noted that the demonstrators did not instigate the violence, that Erdogan was never in danger, that two TSD agents were arrested for their physical assaults on U.S. agents but released only due an expression of diplomatic immunity, and that "Turkish officials blatantly suppressed the First Amendment rights of United States citizens . . . ." *Id.* at 2.

### C. U.S. Law Enforcement Efforts To Restore Order Despite the Aggression of Turkish Agents

After the initial assault concluded, MPD and USSS agents were able to temporarily restore order at Sheridan Circle. The MPD restored the cordon between the Protesters and the TSD and Erdogan Supporters, pushing them back to the sidewalk next to the CMR. Def.'s Ex. 6, at File No. SC03 0:10-0:13; 0:31-35. Undeterred by the initial assault, the Protesters courageously continued to demonstrate on the sidewalk opposite the CMR, but did not make any attempts to breach the MPD cordon. Def.'s Ex. 6, at File No. SC03 at 0:09-0:15; Pls. Ex. 3, Layton Decl. at ¶ 64; Pls.'s Ex. 5 at 1. Conversely, the TSD and Erdogan Supporters were spilling out into the street and required consistent attention from at least five American law enforcement officers who repeatedly ordered the TSD and Erdogan Supporters to get back on the sidewalk in front of the CMR. Def.'s Ex. 6, at File No. SC03 at 0:00-0:42; Pls.' Ex. 5 at 1; *see infra*, Section III.D.

Multiple videos show the MPD and USSS facing the crowd of Erdogan Supporters with their backs to the Protesters. Def.'s Ex. 6, at File No. SC03 at 0:00-0:42; *see also* Pls.' Ex. 2-5. It is a basic tenet of law enforcement that you do not turn your back on someone you believe presents an active threat. Pls. Ex. 3, Layton Decl. at ¶ 66. These officers, experienced in dealing with

protests in Washington, D.C. and present to observe the surrounding environment, were in the best possible position to determine who was and was not a threat to the safety of President Erdogan and all those present at Sheridan Circle. Pls. Ex. 3, Layton Decl. at ¶¶ 48, 55, 60, 63. While the MPD attempted to hold back the TSD and Erdogan Supporters, TSD agent Mustafa Sumercan angrily motioned at the Protesters to come over to the sidewalk in front of the CMR, Def.'s Ex. 6 at File No. SC09 at 2:53, and made a throat-slashing motion toward the Protesters. Pls.' Ex. 8 at ¶ 7; Compl. ¶¶ 34-35.

Prior to the second attack, MPD officers made the following statements to members of the TSD and their civilian co-conspirators:

- "Sir, don't cross this line. Just stay here." Def.'s Ex. 6, at File No. SC09 at 0:25-0:28.

- "You need to contain yourselves!" Def.'s Ex. 6, at File No. SC09 at 0:54-0:57; 1:00-1:03; 1:10-1:13.

- Referring to the Protesters: "Let them talk!" Def.'s Ex. 6, at File No. SC09 at 1:26-1:28. "They have a right to talk!" Def.'s Ex. 6, at File No. SC09 at1:33-137.

- "Stay back!" Def.'s Ex. 6, at File No. SC09 at 0:49-0:51; 1:43-1:45; 2:42-2:49.

- "Don't cross the white line!" Def.'s Ex. 6, at File No. SC09 at 2:51-2:53.

- "We need order right now." Def.'s Ex. 6, at File No. SC09 at 3:39-3:42.

- "I need you to back up!" Def.'s Ex. 6, at File No. SC09 at 3:47-3:50.

- "You are the head of security. You need to keep your guys back." Def.'s Ex. 6, at File No. SC09 at 6:55-7:00.

The MPD and Secret Service were focused on containing the TSD and Erdogan Supporters behind the police cordon. Def.'s Ex. 6, at File No. SC09 at 0:20-4:10. In one very clear demonstration of authority, a MPD officer shoved and moved into the personal space of a TSD agent in an attempt to maintain order. Def.'s Ex. 6, at File No. SC07 at 1:56-2:05. As the MPD acted to contain the TSD and Erdogan Supporters, it became clear to the lead MPD officer holding the line that the

14

TSD was ignoring orders, prompting her to order her officers: "I need you to activate your cameras." Def.'s Ex. 6, at File No. SC07 at 2:28-2:30.

The TSD and Erdogan Supporters blatantly ignored MPD's commands to stay on the sidewalk, and instead, lined up on the street saying, **"We are making a curtain for the President. We don't want him to see them. That is our frustration."** Def.'s Ex. 6, at File No. SC09 at 5:23-5:31. The MPD and USSS acted with discipline and restraint in their efforts to maintain order among the TSD agents and Erdogan Supporters. Pls. Ex. 3, Layton Decl. at ¶¶ 65-71. Meanwhile, the Protesters remained stationed on the sidewalk across the street. Def.'s Ex. 6, at File No. SC03 0:10-0:13; 0:31-35.

In contrast to the TSD agents' failure to obey law enforcement commands, the Protesters stood stationary on the opposite sidewalk.  Pls.'s Ex. 2A at 1:30-2:00 (authenticating Affidavit of Kasim Kurd at Pls.' Ex. 2B). At least seven additional MPD officers on motorcycles arrived on the scene and positioned themselves to prevent the TSD and Erdogan Supporters from crossing the street. *Id*. Unfortunately, even this heavy law enforcement presence was not enough to deter the angry mob of TSD agents and Erdogan Supporters from further attacks.

### D.     TSD Crosses the Street Into Sheridan Circle To Assault The Protesters

U.S. law enforcement had sealed off 23rd Street NW, which runs parallel to the entrance of the CMR, and lined up police vehicles where it intersects with Sheridan Circle to create a human and vehicular blockade between Erdogan's anticipated arrival point at the CMR and Sheridan Circle NW. The CMR is largely situated behind a concrete wall, with tall hedgerows overgrowing the wall, and trees that drape the building with foliage. Pls.' Ex. 9; Pls.' Ex. 2A at 0:00-2:55 (video taken by Protester Kurd showing from the Protesters' point of view exactly what they could see from their position in the interior of Sheridan Circle).   The environment is such that when President Erdogan's motorcade arrived at the CMR, the Protesters could not see President Erdogan sitting in his vehicle parked a few short steps from the front door of the CMR. Nor could the Protesters see the leader of the TSD who conveyed the order to attack the Protesters. *See* Def.'s



*Protesters' view towards the CMR. Pls.' Ex. 2 at 2:52.*

Ex. 6, at File No. SC10 at 0:00-0:18; Pls.' Ex. 10A (English translation at Pls.' Ex. 10B).

In an instant, a phalanx of TSD agents rushed together and unleashed a coordinated assault into Sheridan Circle, violently breaking through the police cordon and defying law enforcement commands and attempts to stop their attack on the Protesters. Def.'s Ex. 6, at File No. SC02 at 2:33-5:02; SC08 at 0:20-2:30. As the TSD crossed the MPD cordon to commence their assault, a member of the TSD can be heard repeatedly yelling in Turkish, "He is asking us to attack." Pls.'

16

Ex. 10A at 0:00-0:06 (English translation at Pls.' Ex. 10B); Compl. ¶ 55.  TSD agents Yusuf Ayar and Servet Erkan left the side of Erdogan to go barreling towards Sheridan Circle along with numerous other agents and civilians. Def.'s Ex. 6, at File No. SC02 at 5:20-5:25.

The TSD agents ran *away from* Erdogan after receiving the directive to attack. Def.'s Ex. 6, at File No. SC02 at 5:20-5:25. At least twenty members of the TSD and at least five civilian Erdogan Supporters simultaneously rushed across the street into Sheridan Circle where the Protesters stood and began their second assault. Def.'s Ex. 6, at File No. SC02 at 2:35-3:00; SC08 at 0:22-0:42. The attackers included two Turkish-American citizens, Sinan Narin and Eyup Yildirim, who subsequently pled guilty to criminal charges stemming from the assaults of May 16, 2017. Pls.' Ex. 11 at 8. Both Narin and Yildirim were sentenced to more than one year in jail for their criminal conduct. Pls.' Ex. at 11.[3] Tellingly, the TSD attacked Protesters with violent blows such as kicks to the head, punches, slaps, and strangulating headlocks. Def.'s Ex. 6, at File No. SC02 at 2:46-3:40; SC02 at 5:51-5:56; SC12 at 7:35-7:45. Kicks to the head via combat boots can easily kill a person and the TSD agents had military training. *E.g.*, Compl. ¶ 63. The TSD disregarded security protocols for Erdogan in favor of inflicting serious bodily injury to the Protesters. Pls. Ex. 3, Layton Decl. at ¶¶ 73-76; 83-94.

A single example of the violence demonstrates the senselessness of the assault and lack of discipline displayed by the TSD: the beating administered to Usoyan (who stands approximately 5'6" tall and weighs approximately 120 pounds, Compl. ¶ 61), was so severe that an MPD officer

---

[3] While they were incarcerated, Narin and Yildirim were visited by the Turkish Minister of Foreign Affairs Mevlut Cavusoglu, who showed support for, and posed for photos with, these men who have pled guilty to felony assault on U.S. citizens. Compl. ¶ 110. Narin and Yildirim are publicly heralded as heroes by the Turkish government and are celebrated for their attacks against the Protesters. Compl. ¶ 111.

was forced to use his baton to strike the TSD agent to stop him from kicking her, after she had

been knocked unconscious. Def.'s Ex. 6, at File No. SC02 2:53-2:58; Pls.' Ex. 5 at 6-7.

Unfortunately there were many other acts of violence, all captured on the video produced by

Turkey as exhibits to its Motion:

- The first individual to cross the street was a TSD agent in a black suit who charges directly at Protester Jalal Kheirabadi and began repeatedly punching him. The TSD agent is believed to be Gokhan Yildirim. Def.'s Ex. 6, at File No. SC02 at 2:35-2:47; SC08 at 0:26-0:30.

- Almost simultaneously, a TSD agent wearing a black suit and sunglasses (and identified as "Subject Q" in SC02) charges toward a group of protesters and throws a punch. Def.'s Ex. 6, at File No. SC02 at 2:37-2:47; SC08 at 0:28-0:33.

- TSD agent Harrettin Eren (identified as "Subject L" in SC02) knocks down an unidentified protester. Def.'s Ex. 6, at File No. SC02 at 2:45-2:47.

- TSD agent wearing a black suit executes a flying kick on a Protester Def.'s Ex. 6, at File No. SC02 at 2:45-2:48; SC08 at 0:29-0:31.

- TSD agents, Hamza Yurteri and Mehmet Sarman, and Erdogan Supporter Eyup Yildirim kick two female protesters, Elif Genc and Plaintiff Usoyan (identifiable by her maroon colored pants), who are lying vulnerably on the ground. Def.'s Ex. 6, at File No. SC02 at 2:45-3:22.

- TSD agent Servet Erkan kicks Protester Abbas Azizi. Def.'s Ex. 6, at File No. SC02 at 2:50-2:55.

- Erdogan Supporter Ahmet Dereci hits Murat Yasa, knocking him to the ground. Def.'s Ex. 6, at File No. SC02 at 2:56-3:00.

- TSD agents, Tugay Erkan, Ismail Ergunduz and Gokhan Yildirim, and Erdogan Supporters Eyup Yildirim and Ahmet Dereci kick Yasa while he is on the ground. Def.'s Ex. 6, at File No. SC02 at 2:59-3:18.

- Two male Erdogan Supporters wearing black suits ran toward Sheridan Circle to kick Protester Abass Azizi. Def.'s Ex. 6, at File No. SC02 at 3:03-3:05.

- TSD agent Servet Erkan shoves and punches Azizi. Def.'s Ex. 6, at File No. SC02 at 3:14-3:16.

- An unidentified civilian (identified as "Subject I" in SC02) kicks Protesters Usoyan and Yasa. Def.'s Ex. 6, at File No. SC02 at 3:18-3:21.

- Two TSD agents, Turgut Akar and an unidentified male, attack Protester Mehmet Tankan despite the fact that Tankan is flanked by two U.S. law enforcement officers. Def.'s Ex. 6, at File No. SC02 at 3:27-3:37.

- TSD agent Ismail Dalkiran places Protester Ceren Borazan in a chokehold and throws her to the ground Def.'s Ex. 6, at File No. SC02 at 3:40-3:43.

TSD agents continued to pursue the Protesters even after they had been pushed back significantly from their original protest location on the sidewalk, despite U.S. law enforcement officers' efforts to protect the Protesters. Def.'s Ex. 6, at File No. SC02 4:25-4:55. After the attacks, the TSD shifted their focus to collecting and tearing up the Protesters' signs, including a sign which depicts one of Erdogan's political rivals.  Def.'s Ex. 6, at File No. SC08 at 1:42-1:58; Pls.' Ex. 5 at 11-12.

### E.      The Assault on Lacy MacAuley

At 6:17 p.m., approximately two hours after the second assault, as Lacy MacAuley exercised her First Amendment rights by protesting against Erdogan's administration, she too was assaulted at a police perimeter, this one outside the Turkish Embassy. Def.'s Ex. 6, at File No. SC02 at 7:12-8:15. MacAuley, situated at least 300 feet from the Embassy, was standing on a public street and shouting, "Free the academics! Stop bombing the Kurds! If you value democracy, you will protest Erdogan! Fascist! No Erdogan! Democracy!" and holding a sign that said "Erdogan = Fascist." Def.'s Ex. 6, at File No. SC02 at 7:22-7:55. MacAuley, who stands approximately 5'4" tall and weighs approximately 100 pounds, Compl. ¶ 96, was the lone protester in her position across the street from the Turkish Embassy and was surrounded by four U.S. law enforcement officers. Def.'s Ex. 6, at File No. SC02 at 7:12-7:24. One of the law enforcement officers stated, "if she breaks the police tape, lock her up; only if she breaks the police tape." Def.'s Ex. 6, at File No. SC02 at 7:15-7:21.  MacAuley made no effort to break the police tape. Def.'s Ex. 6, at File No. SC02 at 7:22-7:55.

Despite MacAuley's peaceful demonstration, TSD agent Feride Kayasan and three other TSD agents abandoned Erdogan's motorcade, confronted MacAuley and assaulted her in an outrageous attempt to silence her protests. Def.'s Ex. 6, at File No. SC02 at 7:52-8:15. First, Kayasan yelled at MacAuley to stop protesting. *Id.* When MacAuley refused, Kayasan grabbed her wrist. Def.'s Ex. 6, at File No. SC02 at 7:52-7:58. A second TSD agent grabbed MacAuley's sign and walked away with it, causing MacAuley to shout, "Give me my property!" Def.'s Ex. 6, at File No. SC02 at 8:01-8:09; Pls.' Ex. 5 at 13. Kayasan then forcefully covered MacAuley's mouth with her hand, while two other TSD agents grabbed MacAuley's wrists and tried to prevent her from protesting. Pls.' Ex. 5 at 14; Def.'s Ex. 6, at File No. SC02 at 8:05-8:18.

An unidentified U.S. official described the assault on MacAuley in an email to DS Command Center at the U.S. Department of State:

> While on route to the Turkish Embassy (a few seconds prior to arrival), I observed a single female protestor [sic] screaming and chanting anti-Turkish sayings. The entire motorcade (both OS and USSS vehicles) stopped on Massachusetts Avenue for arrival. I observed 7 Turkish "Suit and tie" security personnel (one female and 6 males) dismount their passenger van in an all-out sprint running directly toward the single female protestor. Our OS motorcade was in the very back of a 25 car motorcade and we were stopped approximately 100 meters from the drop. It was at this time I looked over at the female Turkish security personnel and observed her grab the protestor and they began to fight. The other Turkish security personnel surrounded her and attempted to fight her, however, an MPD officer interceded and attempted to break it up.

Pls.' Ex. 12 at F012 at 3. Seven TSD agents exited a moving motorcade to assault a woman who stands approximately 5'4" tall and weighs approximately 100 pounds and to steal her sign. It is unclear what would have happened had the MPD not interceded. Left with little choice, Turkey's Motion actually acknowledges that the motivation for this assault was MacAuley's "anti-Turkey rhetoric." MTD at 28. Turkey cannot and does not describe any conduct by MacAuley that constituted a security threat that would justify its use of physical force against her.

**F.** **Additional Violence and Aggressive Tactics of the TSD During The Turkish Visit**

The Protesters were not the only victims of the Turkish delegation during its May 2017 Official Working Visit. From the moment the Turkish delegation arrived at Joint Base Andrews ("JBA") until the plane pulled up its wheels for their departure, the TSD engaged in a series of violent episodes beyond the attacks at Sheridan Circle. Shortly before Turkish Foreign Minister Cavusoglu landed at JBA, the U.S. Diplomatic Security Service Agent in Charge of Cavusoglu had to reprimand the TSD Leader because of a loud altercation that the Agent in Charge was concerned would escalate into an assault on the tarmac. Pls.' Ex. 12 at F013 at 1-2.

On the day of the attack, between 10:00 and 10:30 a.m., Minister Cavusoglu walked to Peet's Coffee from the St. Regis Hotel to have a coffee and conversation with the Turkish Energy Minister. Pls.' Ex. 12 at F013 at 2. During the walk, a member of the TSD assaulted a man that was videotaping Minister Cavusoglu. *Id.* The U.S. Agent in Charge of Cavusoglu explained to the aggressor and his colleague that "in the United States, it is inappropriate for police or other law enforcement officers to physically intervene with members of the public who videotape protective details or other law enforcement actions, unless there is some imminent danger, and that I would not expect a similar occurrence during the remainder of the visit." *Id.* at F013 at 2.

Later that day, after the attacks at Sheridan Circle, multiple members of the TSD assaulted United States law enforcement officers near the Turkish Embassy. *See* Affidavit in Support of An Arrest Warrant For Eyup Yildirim, attached as Pls.' Ex. 13. First, a diplomatic security service special agent was struck by a member of the TSD near the Turkish Embassy. Pls.' Ex. 12 at F014 at 2; Pls.' Ex. 13. The TSD agent was apparently agitated after being expelled from the Turkish motorcade for failing to follow Department of State protocol. Pls.' Ex. 12 at F014 at 2. Still agitated, the member of the TSD "became combative and failed to comply with federal law

21

enforcement officer commands." Pls.'s Ex. 13 at 16. A second member of the TSD became combative with U.S. law enforcement personnel, and the two combative officers had to be "restrained and detained for officer safety." *Id.* As a result of this combative behavior, "[s]everal U.S. law enforcement personnel suffered minor injuries." *Id.*

By the time that the Turkish delegation departed the United States, two Diplomatic Security Special Agents, six USSS officers, and one MPD officer had been injured.  Pls.' Ex. 12 at F010 at 1.  One of the Special Agents suffered a sprained wrist, lower back pain and a swollen lip.  Pls.' Ex. 12 at F013 at 4. MPD confiscated the weapons of two TSD agents and placed them in custody, but the TSD agents were subsequently released into the custody of the Turkish Ambassador, at his adamant request. Pls.' Ex. 12 F010 at 2.  Speaking to a Department of State Agent, Ambassador Serdar Kilic stated that he would "PNG" ("persona non grata"), or evacuate to Turkey, all "Turkish personnel involved" in the attacks, in lieu of further detention. Pls.' Ex. 12 at F012 at 5. Turkish officials then sped up the exit of the security guards, fearing their arrest. An eye-witness report by a DS agent responsible for returning the Turkish personnel on the tarmac noted that it was the "fastest" departure of foreign staff that "I've ever seen in my 16 years on this job." Pls.' Ex. 12 at F012 at 5.

### G.     The History of TSD's Use of Violence Abroad to Intimidate and Silence Protest and Political Dissent

The following examples from the TSD's history of chronic violence, demonstrate a pattern of willingness to deviate from security protocols and local laws in order to deter protest and protect Erdogan's international image:

- In October 2015, in Brussels, Belgium, two violent and physical altercations took place between Belgian and Turkish security. The first occurred during a rally of Erdogan supporters at Place Stéphanie, near Erdogan's hotel. The second followed when Erdogan gave a speech at Egmont Institute in Val Duchesse, where Belgian security services attempted to carry out their duties but were accosted by Turkish security who disregarded

the Belgian service's jurisdictional authority. The encounter became physical when a member of Erdogan's security detail assaulted a Belgian officer. The incidents were attributed by the Turkish security services to a "lack of respect". Pls. Ex. 4, Cook Decl. at ¶ 17; Vince Chadwick, "*Battle of the Erdogan Bodyguards*," POLITICO (Oct. 7, 2015), https://www.politico.eu/article/battle-of-erdogan-bodyguards-security-belgium-police/

- On February 4, 2016, at the National Higher Studies Institute in Quito, Ecuador, the TSD assaulted and ejected three protesters during a speech by Erdogan.[4] In this attack, three women were kicked and beaten after they were ejected from the venue and an Ecuadorean National Assembly member was injured, including suffering a broken nose, while trying to protect the female victims. Pls. Ex. 4, Cook  Decl. at ¶ 18; "*Ecuador complains to Turkish embassy about treatment of protesters at Quito event*," CUENCAHIGHLIFE (Feb. 8, 2016) https://cuencahighlife.com/ecuador-complains-turkish-embassy-treatment-protesters-quito-event/

- On March 31, 2016, the TSD assaulted and battered protesters and harassed journalists who were gathered outside of an event at the Brookings Institute in Washington, D.C. where Erdogan gave a speech during which he stated that he would continue prosecuting anyone who "insulted" him and defended his crackdown on journalists. Pls. Ex. 4, Cook Decl. at ¶ 19; Pls.'s Ex. 12 F010 at 2; Nahal Toosi, "*D.C. think tank gets a taste of Turkish conflict right outside its doors*," POLITICO (Mar. 31, 2016) https://www.politico.com/story/2016/03/erdogan-turkey-reacts-criticism-brookings-speech-221430.

- On July 26, 2018, activists were picketing Erdogan outside the Turkish Embassy in Pretoria, South Africa when Turkish security personnel emerged from the embassy and attacked the protesters, kicking some in the head. "*Turkey's South Africa embassy's personnel attacks protesters*," AHVAL https://ahvalnews.com/turkey-south-africa/turkeys-south-africa-embassys-personnel-attacks-protesters

The 2016 Brookings attack in Washington, D.C. foreshadowed the violence at Sheridan Circle, with one MPD officer on May 16 recalling, "we had the same problem . . . it was the security . . . that's what happened last time[.]" Def.'s Ex. 6, at File No. SC09 at 1:38:00-1:39:10. The State

---

[4] As here, a "senior Turkish official" excused the attack by saying "[t]he Ecuadorian officials should have acted more carefully. There was vulnerability because of the lack of sufficient measures by the Ecuadorian authorities. Our security officers have acted in a responsible manner. They intervened because they perceived a threat . . . ." Ermine Kart, "*Ecuador conveys 'unease' over use of force by Turkish president's guards*," HURRIYET DAILY NEWS (Feb. 7, 2016) http://www.hurriyetdailynews.com/ecuador-conveys-unease-over-use-of-force-by-turkish-presidents-guards-94852

Department has likewise documented Turkey's history of violence against protesters and journalists:

> Turkish facilities and diplomatic delegations are targeted by protesters throughout the United States, consistent with the high rating for protests and harassment by DS/TIA/ITA. Although emotions at these protests are typically high on both sides, most demonstrations take place without arrests or incidents to report. However, incidents have occurred and noted to have been instigated by Turkish security. Results have ranged from verbal to physical altercations with protestors [sic], journalists, and U.S. security personnel.

Pls.' Ex. 12 at F010 at 2.

### H.    The Protesters are Neither Terrorists, Nor are They "Anti-Turkey"

Turkey alleges that the Protesters were holding "signs and yellow flags that openly supported the PKK," which is designated by the U.S. as a Foreign Terrorist Organization ("FTO").[5] MTD at 14. The PKK flag is not yellow, however, and was not present at Sheridan Circle or, as far as Plaintiffs can tell from the video exhibits attached to the Motion, at Lafayette Square. The PKK flag is red, and is easily distinguishable from the YPG flag, which is yellow:

            

PKK Flag                          YPG Flag

http://pkk-online.com/en;          http://ypg-international.org/links/

The three video clips Turkey cites to in its Motion (LS07, LS08, LS09) are not from Sheridan Circle, and do not show the PKK flag anywhere. Instead, the videos show multiple flags

---

[5] While the Kurdistan Worker's Party ("PKK") is designated by the U.S. as a Foreign Terrorist Organization (FTO), "despite U.S. diplomatic and military support, including intelligence sharing, for Turkey in its fight with the PKK, the group has never staged an attack on U.S. soil and has never targeted Americans or American interests abroad." Cook Decl. at ¶ 40.

representing the YPG. (LS07, LS08, LS09). The only way for Turkey to claim there are PKK flags in Lafayette Square is to pretend that a YPG flag, is a PKK flag. This is the tactic that enables Turkey to claim in its Motion that "the Anti-Turkey Group's indicia of support for, or affiliation with, a known terrorist organization presented unique grounds for concern about the intentions of this group . . . ." MTD at 4. The Protesters in Sheridan Circle had no flags or signs indicating support for a terrorist organization.

Turkey states "the PKK's Syrian alter ego" is the YPG, and joins the two organizations together by naming them "PKK/YPG," *see, e.g.*, MTD at 18, but the PKK and the YPG are not interchangeable, and the YPG is not a U.S.-designated FTO. The YPG is a military fighting force that constitutes the primary member of the Syrian Democratic Forces. Pls. Ex. 4, Cook Decl. at ¶ 61. The YPG has been the United States' partner on the ground in the fight against ISIS for five years, and the United States has trained, armed, and equipped its members. Pls. Ex. 4, Cook Decl. at ¶ 63. According to Steven Cook, "[t]he YPG has been instrumental in helping the United States significantly undermine the ability of the Islamic State to wage war in the Middle East and beyond." Pls. Ex. 4, Cook Decl. at ¶ 62.  That the United States government considers the two groups to be separate entities could not be lost on Turkey, as Erdogan was in the United States in an attempt to persuade Trump to stop arming the YPG with heavy weapons. *See* Phil Stewart, "*U.S. to arm Syrian Kurds fighting Islamic State, despite Turkey's ire*," REUTERS (May 9, 2017) https://www.reuters.com/article/us-mideast-crisis-usa-kurds-idUSKBN18525V.

As Dr. Cook, an expert on Turkey and Middle Eastern affairs, observes, "[t]he Turkish government routinely uses the charge of terrorism or support for a terrorist organization, broadly defined to the point where it encompasses speech and thought, to jail opponents and silence dissent." Pls. Ex. 4, Cook Decl., ¶ 10. As of June 2018, "almost one-fifth (48,924) of the total

prison population (246,426) [in Turkey] had been charged with or convicted of terrorism offences, according to the Ministry of Justice." Human Rights Watch. "Turkey: Events of 2018" https://www.hrw.org/world-report/2019/country-chapters/turkey. Those prosecuted and convicted included journalists, civil servants, teachers, and politicians, as well as police officers and military personnel. *Id.*

Turkey also labels the Protesters as "Anti-Turkey" throughout its Motion.[6] In Turkey, the government can criminally prosecute anyone accused of "denigration of the Turkish nation" under Article 301 of the Turkish penal code ("Article 301"). Turkish Penal Code (Türk Ceza Kanunu/TCK), Law no: 5237 of 26 September 2004{ TA \l "Turkish Penal Code (Türk Ceza Kanunu/TCK), Law no: 5237 of 26 September 2004" \s "Turkish Penal Code (Türk Ceza Kanunu/TCK), Law no: 5237 of 26 September 2004" \c 1 }.[7] Most media in Turkey lacks any semblance of independence, and those media outlets that fail to promote Erdogan's party line risk imprisonment. Human Rights Watch, "*Turkey: Events of 2018*," https://www.hrw.org/world-report/2019/country-chapters/turkey. Moreover, in 2018 Turkey was the world leader in jailing journalists. *Id.* The Protesters' objections to specific policies of the Erdogan regime does not make them "anti-Turkey," but they risked Turkish prosecution for speaking out.

---

[6] Turkey uses the phrase "Anti-Turkey" at least eighty (80) times in its Motion, which does not include instances where the phrase is used in the exhibits thereto.

[7] "Article 301 of the penal code, which prescribes prison terms of six months to two years for 'denigration of the Turkish nation,' can be used to punish journalists who state that genocide was committed against the Armenians in 1915, discuss the division of Cyprus, or criticize the security forces." Freedom House, "*Freedom of the Press 2014: Turkey*," https://freedomhouse.org/report/freedom-press/2014/turkey.

I.    **The Expert Analysis of Dr. Ronald M. Layton Demonstrates That There Was No Actual Threat to Erdogan, a Fact That is Reflected by the TSD's Behavior**

Dr. Ronald M. Layton spent more than 26 years ascending the ranks in the United States Secret Service. Pls. Ex. 3, Layton Decl. at ¶ 5. During his 26-plus years, he held positions in Office of Protective Operations, and Office Strategic Intelligence and Information, among others.  *Id.* at ¶ 6.  Perhaps most relevant, Dr. Layton previously held the position of Deputy Assistant Director of the Office of Protective Operations, responsible for the protection of all visiting heads of state in the United States.  *Id.* at ¶ 5.  Dr. Layton analyzed the available footage showing the TSD's actions on May 16, 2017, and concluded that he not observe any "pre-attack indicators at Sheridan Circle,"  and that "the observable conduct of the TSD does not indicate in any manner that those agents believed that a handgun, IED or chemical-agent threat existed." *Id.* at ¶¶ 41-60.

In his expert declaration, Dr. Layton described the proper protocol for protecting a head of state, which includes: (a) establishing concentric circles of protection so that there is an outer, middle and inner perimeter around the protectee, and (b) following the "golden rule" that the least amount of agents addresses any threat while the greatest amount of agents stay with the protectee. Pls. Ex. 3, Layton Decl. at ¶¶ 30-31. Dr. Layton further explained that any force used must have a justifiable law enforcement objective, such as to investigate a threat or to detain or arrest an individual who presented such a threat. Pls. Ex. 3, Layton Decl. at ¶ 89. The TSD violated these procedures when they abandoned Erdogan to rush at the Protesters in order to indiscriminately deliver punches, kicks, slaps, and strangulating headlocks. Pls. Ex. 3, Layton Decl. at ¶¶ 87-94. Dr. Layton concluded, "the use of force deployed by the TSD served no legitimate security purpose, given the totality of circumstances on the ground at the time, especially since there was no attempt to legitimately neutralize any supposed threat", that such a use of force is illegal, and such conclusions are "not controversial." Pls. Ex. 3, Layton Decl. at ¶¶ 87-89.

As the Protesters voiced their opposition, the Erdogan Supporters began playing loud Turkish nationalist songs over a loudspeaker in an effort to drown out the Protesters. Def.'s Ex. 6, at File No. SC12 at 5:28-6:35. The TSD agents directed highly threatening gestures at the Protesters, such as a throat slashing motion, Pls.' Ex. 8 at ¶ 7, and angrily beckoned the Protesters to approach the TSD and the CMR, in an effort to provoke an altercation, Compl. ¶¶ 34-35.

In addition to the foregoing, members of the TSD were continually shouting at the Protesters, attempting to intimidate them with statements like the following:

- While beckoning the Protesters to approach: "Come on! Come on! Come on!" Def.'s Ex. 6, at File No. SC06 0:05-0:12 (English Translation at Pls.'s Ex. 14).

- "Tell him, I am going to fuck his mother. Do not come here. I am going to fuck your mom." Def.'s Ex. 6, at File No. SC09 0:39-0:49 (English Translation at Pls.' Ex. 14).

- "I am going to stick [inaudible] in your ass. You fucking son of a bitch. I am going to fuck your mother." Def.'s Ex. 6, at File No. SC09 2:42-2:52 (English Translation at Pls.' Ex. 14).

- "Come here" repeatedly. Def.'s Ex. 6, at File No. SC09 2:47-2:53 (English Translation at Pls.' Ex. 14).

- "Make those fuckers shut up! Shut them up!" Def.'s Ex. 6, at File No. SC09 6:55-6:58 (English Translation at Pls.' Ex. 14).

The civilian Erdogan Supporters joined in the efforts, with Eyup Yildirim yelling at a female Protester to "Shut the fuck up, bitch!" Def.'s Ex. 6, at File No. SC06 at 5:19-5:22. The TSD never sought to calm the civilian Erdogan Supporters but instead welcomed their assistance, despite their lack of training and the fact that they were complete strangers to the TSD. As further evidence that the TSD's attacks were politically motivated, after the second assault was complete, the TSD paused to stop and tear up the signs previously held by the now dazed and injured Protesters. Def.'s Ex. 6, at File No. SC08 at 1:40-2:00.

Less than 30 seconds before the second attack, Turkish Ambassador Serdar Kilic can be seen outside of the CMR, encroaching on the MPD cordon to engage with law enforcement and to register his disapproval of the protests. Def.'s Ex. 6, at File No. SC08 at 0:00-0:30. The TSD did not take any actions to prevent the Ambassador from standing a mere 50 feet from the Protesters.

A few minutes after the attack, the Ambassador exchanges the following with U.S. law enforcement:

> Ambassador Kilic: I asked you to remove them. It's your fault.
> Officer: They can protest.
> Ambassador Kilic: Here they cannot.

Def.'s Ex. 6, at File No. SC08 at 3:24-3:28.

Meanwhile, the TSD appeared to ignore the civilians on "their side" of Sheridan Circle, did not frisk them, did not scan their backpacks despite the presence thereof, did not interview them, and did not otherwise take any security measures with respect to them. Pls. Ex. 3, Layton Decl. at ¶¶ 51, 54. At times, the TSD appear to be taking orders from the civilian Erdogan Supporters. Def.'s Ex. 6 at SC05 at 0:18-0:25; SC12 at 4:05-4:10. One of these civilians, Eyup Yildirim—one of the civilian Erdogan Supporters who rushed into Sheridan Circle alongside the TSD—who is also represented by counsel for Turkey, previously represented to the D.C. Superior Court that he "does not know and was not associated with any of the Turkish security personnel gathered in Sheridan Circle on the afternoon of May 16, 2017. He had never seen them before, and he has not seen them since May 16, 2017." *See* Pls.' Ex. 15 (Yildirim Proffer of Facts). Co-conspirator Sinan Narin signed a Proffer of Facts with identical language. And yet, the TSD allowed these individuals to penetrate their perimeter. *Id.* (Narin Proffer of Facts).

Michael White speculates that the TSD *could have* feared that there were serious threats to Erdogan, including possible handguns, explosives and biochemical weapons, but Dr. Layton saw

no evidence that the TSD was concerned about such threats.  Pls. Ex. 3, Layton Decl. at ¶ 60. Dr.

Layton explains that standard protocol would provide a secondary arrival point for Erdogan in the

event that Erdogan was in danger. Pls. Ex. 3, Layton Decl. at ¶¶ 79-81. Indeed, Turkey admits in

its Motion that Erdogan's "security detail no doubt were aware of the violence that had just

occurred minutes prior." MTD at 24. Yet Erdogan's car was not stopped offsite or rerouted to a

secondary arrival point. As Dr. Layton notes:

> it is standard protocol for USSS controlled motorcades to maintain an alternate
> route of travel to and from USSS controlled sites. It is also standard practice for
> USSS controlled motorcades to use secondary arrival points in the event of an
> emergency or some event of significance that would endanger the protectee if the
> primary arrival were used.

Pls. Ex. 3, Layton Decl. at ¶ 79. Dr. Layton concludes that his arrival at the Residence is evidence

that the TSD did not believe "that there was an imminent threat to President Erdogan based on the

Sheridan Circle protest." Pls. Ex. 3, Layton Decl. at ¶ 80.

Maps and photos of the CMR show that there is a rear driveway that Erdogan could have been re-routed to, rather than sending him through the front entrance. *See* Pls.' Ex. 16. Moreover, White acknowledges that "if the security measures the presidential security detail deems necessary are not allowed, the trip, or certain portions of it, are cancelled, circumscribed, or rerouted." Def.'s Ex. 2,



*Source: Google Maps. See Pls' Ex. 16.*

30

Declaration of Michael White ("White Decl.") at ¶ 20.

Rather than re-routing President Erdogan or holding him in a secure location, Erdogan's vehicle rolled slowly into the driveway of the CMR, directly into the area where Turkey claims a terrorist threat was present. Def.'s Ex. 6, at File No. SC05 at 1:08-1:28. Then, the TSD opened the vehicle's doors, which would have increased the risk to Erdogan, if there had been an actual threat. Def.'s Ex. 6, at File No. SC02 5:05-5:20; SC05 1:28-1:40; Pls. Ex. 3, Layton Decl. ¶¶ 73, 96, 99. Erdogan sat in his vehicle with the doors open for over a minute, Def.'s Ex. 6, at File No. SC02 5:05-6:24; SC05 1:33-2:29, exited the vehicle on the side closest to Sheridan Circle, and then strolled around the back of the vehicle to the front entrance of the CMR, stopping to watch the assault for fifteen seconds as he entered, Def.'s Ex. 6, at File No. SC02 6:24-7:03. According to Dr. Layton, the steps taken by the TSD contradict the suggestion that the TSD actually believed President Erdogan was in danger. Pls. Ex. 3, Layton Decl. ¶ 80.

Michael White's conclusion that a handgun, explosives, and biochemical weapons threat was present in Sheridan Circle appears founded, in part, upon his erroneous acceptance of the 50 foot distance between Plaintiffs and Erdogan's arrival point. Michael White states, "[t]he Anti-Turkey Group was positioned on the sidewalk on the Sheridan Circle side of Massachusetts Avenue, which I understand to be within fifty feet of the sidewalk on the Residence side of Massachusetts Avenue." White Decl. at 12. Mr. White's usage of the words "I understand to be" reveals that he did not measure the distance. He then mistakenly conflates, as does Turkey in its Motion, the distance between Residence and Sheridan Circle with the distance between Circle and the arrival point: "The Anti-Turkey Group was within fifty feet of the arrival point and had a direct line of sight from Sheridan Circle." *Id.* at 17-19. However, the arrival point was more than twice the distance from Sheridan Circle. Pls.' Ex. 1.

Dr. Layton explained that this factor, in combination with others, severally minimizes the risk of handgun attack on the arrival point:

> For purposes of comparison, 130 feet is well beyond the distance that a Secret Service agent qualifies (on a sterile pistol range) with his or her issued handgun. The combination of the distance involved as well as the obscured line of sight to the target is such that an "aimed" shot would have been nearly impossible to execute, which severely minimizes the threat of a handgun at the site under review.

Pls. Ex. 3, Layton Decl. ¶ 46. This distance also negates the threat of an IED attack because "it would have been impossible for someone standing where the protesters were located on the border of Sheridan Circle to throw a backpack more than 130 feet (through natural and man-made barriers)." Dr. Layton also noted that there were other civilians with backpacks among the Erdogan Supporters who were not screened, and who were completely unknown to the TSD. Pls. Ex. 3, Layton Decl. ¶ 51-52.

Michael White's conclusion that the TSD perceived a threat to Erdogan relies on a number of other demonstrably false factual predicates. For instance, White claims that there are no visual barriers between Sheridan Circle and Erdogan's arrival point. White Decl. at ¶ 35. It is unclear how he made this determination, as White has not indicated that he visited Sheridan Circle prior to making his declaration. If he had visited the scene of the attack, as Dr. Layton did, he would have noticed that there are trees, hedges and other vegetation which obscure the view of the front of the CMR from Sheridan Circle. Def.'s Ex. 6 at SC01 at 0:00-0:15; Pls.' Ex. 1; Pls.' Ex. 2A at 0:00–2:55. Additionally, White incorrectly asserts that the first altercation was started by *Kurd* Plaintiff Jalal Kheirabadi despite the fact that Erdogan supporters Sinan Narin, an American citizen, and Alpkenan Dereci, a Canadian citizen, threw the first punches during the initial attack, a fact that Narin admits to. Def.'s Ex. 6 at SC01 at 0:48-0:54; SC02 at 0:14-0:22;

https://www.youtube.com/watch?v=pjC3KxX7MJA (English translation provided at Pls.'s Ex. 7);

*see supra* Section III.B.

Based on the conduct of the TSD, the Protesters, and U.S. Law Enforcement, Dr. Layton

concludes that:

- **[The] statements and actions of the TSD directly contradict that idea that the TSD's intent was to move the protesters further away from President Erdogan's arrival point for *security* reasons**. Pls. Ex. 3, Layton Decl. at ¶ 69

- **Turkish officials and agents, who asked MPD to remove the protesters, simultaneously acted as the primary causal factor for the melee and erosion of order**. Moreover, it is my conclusion that the aggressive actions taken by the TSD escalated tensions at the event site with no effort to de-escalate the situation. Pls. Ex. 3, Layton Decl. at ¶ 68.

- It was a **complete breakdown of professionalism and contrary to the goal of maintaining a secure environment for the TSD to hurl insults at and provoke the protesters**. Indeed, it was absolutely antithetical to proper practices and completely **inconsistent with the notion that the TSD believed the protesters were too close when TSD agents encourage protesters to come closer, inviting them to cross the street toward the CMR to fight**. This is further evidence of a blatant disregard for standard security measures and stands in contrast to any known professional law enforcement standard. Pls. Ex. 3, Layton Decl. at ¶ 70.

- **MPD and USSS acted with discipline and restraint in their efforts to maintain order as well as continually providing necessary and appropriate protection to President Erdogan** by establishing distance between the protesters and the arrival point; with the evidence being that no protester attempted to or actually breached the outer perimeter. Based on my review of the videos and my experience, significant efforts to de-escalate the situation at Sheridan Circle were demonstrated by the MPD and the Secret Service. Pls. Ex. 3, Layton Decl. at ¶ 70.

- **Significant police resources were needed to repel Turkish forces rather than protesters**; thereby diluting the overall strength of available personnel required to maintain a secure environment and separation between the two groups. Pls. Ex. 3, Layton Decl. at ¶ 67.

Finally, Turkey does not even attempt to provide a security justification for its assault on

Plaintiff MacAuley, a single protester that was surrounded by four law enforcement officers. Def.'s

Ex. 6 at SCO2 at 7:34-7:54. Turkey attempts to place MacAuley "outside the Embassy," MTD at 48, in a transparent attempt to piggyback on its arguments regarding the supposed "terrorist threat" near the CMR, although the events of Sheridan Circle occurred two hours before. MacAuley actually stood well over 300 feet from the Embassy. Pls.' Ex. 1. Nevertheless, TSD agents exited a moving motorcade to attack her and remove her sign. *See supra* Section III.E.

## IV.    ARGUMENT

### A.    Turkey's Burden Under the Legal Standard

Turkey has challenged some of the specific jurisdictional facts alleged within Plaintiffs' complaint, which requires the Court to go "beyond the pleadings" to address the particular disputes:

> When the defendant has thus challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.

*Phx. Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). When faced with such a challenge by a defendant, a plaintiff in a FSIA case must "present adequate supporting evidence", but this is only a "burden of production", "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008).

Where Turkey has not challenged the specific jurisdictional facts alleged within Plaintiffs' complaint, "then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phx. Consulting*, 216 F.3d at 40 (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 351, 361

(1993)). But Turkey must present "evidence" to challenge the allegations of a complaint. *Id.* at 41. The Court must fully credit both Plaintiffs' unchallenged factual allegations and their evidentiary material. *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197, (D.C. Cir.1992)). Moreover, the Court must "at this threshold stage, prior to any discovery," accord Plaintiffs "the benefit of all reasonable inferences." *Feldman*, 879 F.3d at 351 (internal citations omitted).

Should the Court find that Plaintiffs' complaint and evidence are insufficient to make out a case of subject matter jurisdiction, it "must" allow jurisdictional discovery.'" *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984). "The district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phx. Consulting*, 216 F.3d at 40-41 (quoting *Prakash*, 727 F.2d at 1179-80); *In re Papandreou*, 139 F.3d 247, 252 (D.C. Cir. 1998) ("Determining whether a suit falls under one of the exceptions of § 1605 often requires a court to look beyond the pleadings. See *Foremost-McKesson,* 905 F.2d at 449. Consequently, narrowly focused discovery may be permitted to allow plaintiffs to develop the facts necessary to support jurisdiction.").[8]

---

[8] Plaintiffs will file a motion for jurisdictional discovery which will argue for their right to obtain such discovery should the Court find their subject matter jurisdiction case wanting, as permitted by the binding caselaw of this Circuit. *See Phx. Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D. C. Cir. 2000); *Prakash v. American University*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984). Of note, by virtue of the fact that Turkey's counsel also defended Eyup Yildirim in the criminal proceedings against him for his role in the attacks, Turkey has reviewed dozens of hours of video disclosed to it as part of discovery in Yildirim's case and hand-picked from that larger set of video, a much smaller subset to use as exhibits to its Motion. Recently, the government provided those dozens of hours of video to Plaintiffs, but the government has currently barred Plaintiffs from citing to them in this brief. As a result, Plaintiffs have opposed Turkey's Motion solely using those videos that Turkey chose to attach to its Motion. Plaintiffs hope to supplement this Opposition with additional video once they receive permission from the United States Attorney's Office (request pending), and expect to request leave to file a sur-reply to do so.

**B.     The U.S. Law Cited by Turkey Upholds Plaintiffs' Right to Protest.**

1.     Defendant's Reliance on 18 U.S.C. §§ 112 and 878 is
       Misplaced Because Those Statutes Exempt First Amendment Protests

Turkey argues that the Protesters violated 18 U.S.C. §§ 112 and 878 and that therefore they deserved whatever violence the TSD chose to inflict upon them that day. MTD at 32-33. First, Turkey cannot cite any case to support the proposition that its officers were empowered to enforce 18 U.S.C. §§ 112 and 878. Second, even assuming *arguendo* that violating Sections 112 and 878 could justify Turkey's brutality, the Protesters broke no law. *See also* 39 C.F.R. § 7.96(g)(2)(i) (permits are not required to protest or demonstrate on federal land unless the demonstration involves more than 25 people); D.C. Code § 5331.02, *et seq.* (allowing individuals to assemble and protest on public streets, sidewalks or parks whether or not they have a permit or an approved assembly plan). Turkey's attempt to blame the Plaintiffs relies on a profound misunderstanding of 18 U.S.C. § 112, which explicitly protects Plaintiffs' protest in Sheridan Circle in section (d), which states: "[n]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States." 18 U.S.C. § 112(d).[9] Turkey fails to mention this codification of Plaintiffs' right to protest in its Motion.

In reviewing the legislative history of 18 U.S.C. § 112, the Fifth Circuit in *CISPES (Committee in Solidarity with People of El Salvador) v. Federal Bureau of Investigation*, 770 F.2d 468, detailed how the statute exempted First Amendment activities:

---

[9] 18 U.S.C. §§ 112 and 878 codifies the United States' obligations under the Convention on the Prevention and Punishments of Crimes Against Internationally Protected Persons. *See generally CISPES (Committee in Solidarity with People of El Salvador) v. Federal Bureau of Investigation*, 770 F.2d 468, 472 (5th Cir. 1985) (noting from the legislative history of the convention that it was "intended to protect foreign officials and diplomats from various terroristic acts, including murder, kidnapping and assault, and threats or attempts to commit such acts").

> First and foremost, the legislative history of the statute makes clear Congress'
> concern for, and desire to protect rights guaranteed by the First
> Amendment. Indeed, one of the changes made by the 1976 amendments was clearly designed to
> remove any question regarding the applicability of the statute to pickets and protests
> which did not otherwise violate the statute.

*CISPES*, 770 F.2d at 473; *see also Seals v. McBee*, 898 F.3d 587, 599 (5th Cir. 2018) (explaining

that 18 U.S.C. § 112 only applies to speech not within the protection of the First Amendment).

*CISPES*, a case cited by Turkey, involved a challenge to 18 U.S.C. § 112 by individuals

protesting the Honduran government's policies with respect to El Salvador. 770 F.2d at 470. The

CISPES members had gathered inside the Honduran consulate in Louisiana, questioned the

Honduran Consul, and then picketed outside the main entrance to the consulate until ordered to

leave by an FBI agent who cited 18 U.S.C. § 112. *Id.* at 470-71. CISPES members brought a

challenge to the constitutionality of the statute, arguing that it was overbroad in limiting First

Amendment protected activities. *Id.* at 471-72.

On appeal, the *CISPES* Court acknowledged the protection afforded to protests and

demonstrations as protected speech, finding that picketing and demonstrating:

> are, of course, protected forms of expression. . . . There is no doubt that as a general
> matter peaceful picketing and leafletting are expressive activities involving speech
> protected by the First Amendment. . . . We are unconvinced that the statute here
> was intended to, or will in the future, be read as prohibiting such
> protected expression.

770 F.2d at 473 (internal quotation marks and citation omitted).  Moreover, the *CISPES* Court

clarified that one "is *not in violation simply by merely congregating within 100 feet of the*

*consulate*. . . . [T]he statute does not prevent simple peaceable assembly for the purpose of lawful

discussion, which, of course, cannot be made a crime." 770 F.2d at 477 (emphasis added).

Accordingly, the *CISPES* Court upheld the statute, finding that it simply did not apply to First Amendment activities:

> Simply put, the statute does not on its face prohibit peaceful demonstrations, protests, and other communicative and expressive activities of a peaceful nature, which do not otherwise violate the statute, even when directed at foreign officials protected under the statute. . . . It merely proscribes actions of a threatening or intimidating nature directed at any protected official, and First Amendment rights are affected only to the extent that their exercise might serve to create such intimidation, etc.

770 F.2d at 474.

In Turkey's view, protesting within 100 feet of a foreign official or residence and making statements that such official may not wish to hear is harassment, coercion, or intimidation, MTD at 30, but the caselaw rejects this view. "Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982). In *Grayned v. City of Rockford*, another case cited by Turkey, the Supreme Court reiterated that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression . . . and that particular expressive activity could not be prohibited because of a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." 408 U.S. 104 (1972) (striking down the City's anti-picketing statute as unconstitutional).

While the Plaintiffs may have made statements that were unpleasant for Turkish officials to hear and that they were not used to hearing in Turkey, such speech is still protected. Federal courts have repeatedly held that insulting speech and speech that may trigger negative emotional responses from the hearer are within the protection of the First Amendment:

> As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment. . . . A dignity standard, like the outrageousness standard that we rejected in *Hustler*, is so

> inherently subjective that it would be inconsistent with our longstanding refusal to [punish speech] because the speech in question may have an adverse emotional impact on the audience. We are not persuaded that the differences between foreign officials and American citizens require us to deviate from these principles here.

*Boos v. Barry*, 485 U.S. 312, 322 (1988) (internal citation and quotation marks omitted, brackets in original) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)); *see also Hustler*, 485 U.S. at 51 ("The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.") (internal quotation marks omitted); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (acknowledging "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

After the assaults, the Turkish Ambassador expressed the view that the protest was unlawful and blamed the Protesters for the TSD's mayhem:

> Ambassador Kilic: I asked you to remove them. It's your fault.
> Officer: They can protest.
> Ambassador Kilic: Here they cannot.

Def.'s Ex. 6 at SC08 at 3:24-3:28. The Turkish Ambassador's view of U.S. law is incorrect, as shown above. The Ambassador also stated, "just tell them to move away . . . and they keep on insulting." Def.'s Ex. 6 at SC08 at 5:35-5:50). The Ambassador's words and Turkey's Motion make it clear that the problem was that Erdogan: "could see and *hear* the PKK supporters in Sheridan Circle in close proximity", MTD at 24 (emphasis added), and the Protesters were, "yelling aspersions about President Erdogan. . . ."MTD at 3.

2.      The Protesters Were Engaged in Peaceful Demonstration Covered by the
        First Amendment and Were Not in Violation of 18 U.S.C §§ 112 and 878

Turkey paints a warped picture of a frenzied, fanatical protest by terrorist-affiliates who

initiated all acts of violence and lurked within striking distance of President Erdogan." MTD at 2-

3. The facts do not cooperate with Turkey's story.

Not only does Turkey ignore 18 U.S.C. § 112(d), but the arguments in its Motion and the

conclusions of its security expert Michael White both hinge on an incorrect measurement—of

critical importance—between the Plaintiffs and Erdogan's arrival point at the CMR. Turkey

conflates the boundary of the CMR with Erdogan's arrival point and opportunistically uses this

mistaken measurement to describe the distance between the Protesters and Erdogan. Turkey's brief

states repeatedly that Plaintiffs pushed themselves within 50 feet of Erdogan, such that they were

"within hand-gun or improvised explosive device ('IED') proximity of President Erdogan." MTD

at 2, 42, 49 n.37. This distance is a central fact upon which most of Turkey's argumenta hang, but

it is wrong. Erdogan's arrival point was roughly 130 feet from Sheridan Circle. Pls.' Ex. 1. Most

of Turkey's conclusions suffer from this critical defect.

The mistaken measurements pollute Mr. White's declaration as well. Mr. White apparently

did not measure any distances, and he mistakenly conflates the distance between the CMR and

Sheridan Circle with the distance between Circle and the arrival point. *See supra* Section III.J;

White Decl. at 18-19. Of course, this discussion of distances is irrelevant because the Protesters

were engaged in peaceful First Amendment-protected demonstration, Def.'s Ex. 6 at SC01 at 0:00-

0:49, and the 100 foot limit of 18 U.S.C. § 112 shall not be "construed or applied so as to abridge

the exercise of rights guaranteed under the first amendment to the Constitution of the United

States." 18 U.S.C. § 112 (d). Nevertheless, Turkey and Mr. White's inaccurate measurement

further undermines their argument.

During the first assault, it was Erdogan Supporter Sinan Narin who threw the first punch, directed at Protester Jalal Kheirabadi who was subsequently beaten and kicked by TSD agents. *See supra* Section III.B. Only after this instigation, do the Protesters react defensively, with Kurd throwing his megaphone at one of Kheirabadi's assailants. Def.'s Ex. 6, at File No. SC02 at 0:17. During this first attack, Kurd also threw a water bottle at Narin,[10] who was still actively participating in the assault even as MPD tried to push him back across the street. Def.'s Ex. 6, at File No. SCO2 at 0:56-1:03. As the Protesters retreat back to the sidewalk, a visibly upset Protester, Ceren Borazan, screams and flicks her water bottle in the direction of the CMR, releasing water onto the street, but hitting no one. Def.'s Ex. 6 at SCO2 at 1:10-1:19. Thus, while Turkey complains about the Protesters throwing the megaphone, water bottles, and spraying water—which they label as a "potential biochemical hazard[,]" MTD at 22—these actions were all taken during and in the few seconds following the first attack by Narin. It also bears mentioning that this conduct was carried out by Protesters who are not Plaintiffs in this case. In any event, these actions should not be interpreted as harassment which violates 18 U.S.C. § 112.

Moreover, the video evidence shows that the MPD and other police on the scene considered the TSD and not the Protesters to be the problem. Contemporaneous statements made by MPD officers also confirm that the Protesters were engaged in peaceful protest. For example, MPD Officer Alberti's repeatedly refers to the Protesters as "peaceful" in her statement and MPD Officer Victor DePeralta also refers to the Protesters as "peacefully protesting when they were attacked . . ." Def.'s Mot., Ex. 9, ¶ 2; Ex. 11, ¶ 1.

---

[10] Turkey speculates, at multiple points, in its Motion to Dismiss that the water bottle may have been "frozen." *E.g.*, MTD at 22. Turkey has no evidence for such speculation and it is difficult to understand how a water bottle held by a Protester, who had been walking around for hours on even a relatively cool day in May in Washington, D.C., could be frozen after 4 p.m. in the afternoon.

Public statements and internal reports made by U.S Department of Justice and Department of State Officials, as well as local law enforcement, all based on eyewitness accounts of law enforcement officers, confirm that the conduct of the Protesters was well within the parameters of protected First Amendment activities. *See supra* Section III.B. D.C. Mayor Muriel Bowser agreed, stating that "[w]hat we saw yesterday – a violent attack on a peaceful demonstration – is an affront to DC values and our rights as Americans[.]" Mark Hensch, "*DC police chief: 'We will not tolerate' attack on Turkish protesters*," THE HILL (May 17, 2017), https://thehill.com/homenews/news/333881-dc-police-chief-attack-on-protesters-at-turkish-embassy-brutal. The U.S. House of Representatives even passed a unanimous resolution condemning the activities of the TSD and affirming the Protesters' First Amendment activities. *See supra* Section III.B (citing Pls.' Ex. 18, H. Res. 354, 115th Cong. (1st Sess.) (June 6, 2017)).

Nor did Plaintiff MacAuley engage in anything other than peaceful protest, which Turkey does not even attempt to deny. MTD at 28; Def.'s Ex. 6 at SCO2 at 7:34-7:54; *see supra* Section III.E. MacAuley was attacked at the corner of California Avenue and Massachusetts Avenue, over 300 feet from the Embassy, well outside the 100 foot perimeter provided for in 18 U.S.C. § 112. *See* Pls.' Ex. 1.

The TSD's actions contradict Turkey's post-hoc rationalizations. As Dr. Layton relates in his expert declaration, if the TSD perceived that the Protesters represented a security threat to President Erdogan, the Turkish Ambassador, or any of the staff and other foreign officials within the CMR, they would have behaved entirely differently. Pls. Ex. 3, Layton Decl. at ¶ 95-100; *supra* at Section III.I. Given that there was no security threat present, and that the Protesters were lawfully exercising their First Amendment rights, 18 U.S.C. §§ 112 and 878 do not apply.

42

**C.** **Turkey Is Liable Under 28 U.S.C. § 1605(a)(5) for the Violent Torts Committed by the TSD on U.S. Soil**

Turkey's tortious conduct included several serious violations of U.S. criminal law, which precludes the application of foreign sovereign immunity in this case. Under 28 U.S.C. § 1605(a)(5), a foreign sovereign has liability for personal injuries caused by the tortious acts or omissions of its officials or employees. The discretionary function exception at 28 U.S.C. § 1605(a)(5)(A) allows a foreign sovereign to reassert its immunity if the claim against it is "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused . . . ." While there is sufficient caselaw decided under the Foreign Sovereign Immunities Act ("FSIA") to guide the Court in this case, in deciding what acts qualify as discretionary under the FSIA the Court may draw "from decisions construing the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680 (1982)." *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921-22 (D.C. Cir. 1987).

In Turkey's analysis, it both misinterprets the decisions regarding the discretionary function exception under the FSIA at 28 U.S.C. § 1605(a)(5)(A), and ignores mandatory precedent regarding its application in the Foreign Tort Claims Act ("FTCA") context.

1.    The TSD Engaged in Tortious Conduct in the United States

At the outset, a case for subject matter jurisdiction under 28 U.S.C. § 1605(a)(5) requires allegations of tortious conduct. Turkey's agents and employees —whom Turkey asserts were all acting under the command of their superiors in the course of their duties as predicate for its defense, MTD at 24-25—committed assault when they "pushed past a police cordon and attacked one or more Plaintiffs, causing all Plaintiffs to be in reasonable apprehension of harmful bodily contact." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 48 (D.D.C. 2019). The TSD also committed battery, "'an intentional act that causes harmful or offensive bodily contact," against Plaintiffs

43

when they rained punches and kicks on Plaintiffs while Plaintiffs were standing, and then after

they fell to the ground, and also when they enveloped Lacy MacAuley, ripped her sign from her

hands, and covered her mouth. *Id.* (declining to dismiss aiding and abetting claims against the

Erdogan supporters who stormed after plaintiffs and aided the battery conducted by the

TSD) (quoting *Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012)).

These torts are also serious crimes, as a grand jury indicted fifteen TSD agents and charged

them with conspiracy, assault with a dangerous weapon, aggravated assault, assault with

significant bodily injury, and simple assault, each of which was classified as a hate crime because

the acts demonstrated prejudice against the perceived ethnicity and political affiliation of the

victims. Ex. 8 at 12-20.

> 2.     The Discretionary Function Exception Does Not Immunize
>        Turkey's Tortious Conduct Because the TSD Committed Serious Crimes

Turkey argues that 28 U.S.C. § 1605(a)(5) does not confer jurisdiction on this Court

because its agents' conduct satisfies the discretionary function exception to 28 U.S.C. § 1605(a)(5).

MTD at 37-53. Turkey wildly overstates the scope of the discretionary function exception under

the FSIA: "the protective shield of sovereign immunity is, by its terms, far-reaching and

unassailable for any claim in tort involving a discretionary function." MTD at 38.. The single D.C.

Circuit opinion to review the scope of 28 U.S.C. § 1605(a)(5)(A) recognized "the proposition that

a criminal act cannot be discretionary" provided the criminal act is an act "*malum in se*" or "wrong

in itself." *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 922 n.4 (D.C. Cir.

1987) (citing *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980)). The discretionary

function exception cannot be applied when serious crimes are committed.

The discretionary function exception, 28 U.S.C. § 1605(a)(5)(A), does not include, as held

in *Letelier v. Republic of Chile*, "discretion to commit, or to have one's officers or agents commit"

acts leading to the assassination of U.S. citizens in Washington, D.C. 488 F. Supp. 665, 673 (D.D.C. 1980). This holding has been expanded to include all criminal acts that are sufficiently *malum in se*. *MacArthur*, at 922 n.4.

Turkey's assertion that "*Letelier* is no longer good law", MTD at 49, is unsupported by the relevant caselaw, including that cited by Turkey. For example, Turkey acknowledges that in *Miango v. Democratic Republic of Congo*, this Court found the discretionary function exception did not apply when "members of the [DRC] President's entourage allegedly proceeded to beat the protesters and steal items from the car of one of the plaintiffs." MTD at 51. Specifically, this Court *sua sponte* evaluated and rejected the "discretionary function" defense because the conduct at issue was illegal:

> [T]he Court must consider whether either of the exceptions to liability for tortious acts found in section 1605(a)(5) applies in this instance. *See Letelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C. 1980) . . . [T]he discretionary function exception, *id.* § 1605(a)(5)(A), does not apply because "*there is no discretion to commit, or to have one's officers or agents commit, an illegal act.*" *Letelier*, 488 F.Supp. at 673 (concluding that it had jurisdiction over plaintiff's tort claims under section 1605(a)(5) against the Republic of Chile for its alleged involvement in a political assassination conducted by persons who acted at the direction of the Chilean government), citing *Cruikshank v. United States*, 431 F.Supp. 1355, 1359 (D. Haw. 1977).

*Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117, 126 n.3 (D.D.C. 2018) (emphasis added). Turkey claims that the reasoning of *Miango* does not apply to this case because (1) "the DRC did not make an appearance to assert its immunity" and (2) because the Court conducted its analysis briefly, and "in a footnote." MTD at 51. However, the *Miango* reasoning is applicable here. First, this Court properly determined that it "must consider" the discretionary function question to properly determine its subject matter jurisdiction, *see Miango*, 288 F. Supp. 3d at 126, irrespective of the DRC's default. Second, the placement of the ruling in a footnote does not detract from its persuasive force.

Furthermore, Turkey incorrectly asserts that in *MacArthur* "the D.C. Circuit rejected *Letelier*'s seeming blanket rule that a foreign government lacks the discretion to commit illegal acts." *See id*. To the contrary, the D.C. Circuit recognized *Letelier*'s proposition that criminal acts cannot be discretionary, but distinguished its holding because there was no evidence that the defendant in *MacArthur* had committed the alleged crime (a municipal zoning violation):

> We need not be detained by the Association's contention that Peru's acts are criminal and thus cannot be discretionary, *see* Appellant's Brief at 12–13. While case law buttresses the proposition that a criminal act cannot be discretionary, *see, e.g.*, *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980), it has by no means been established that Peru has violated any criminal law. The District of Columbia never cited Peru for any criminal violation or, indeed, for any violation of the underlying zoning ordinance.

*MacArthur*, 809 F.2d at 922 n.4. Additionally, the D.C. Circuit drew a distinction between violent crimes considered *malum in se*, such as the assassination attempts at issue in *Letelier*, and merely *malum prohibitum*, such as the alleged zoning violations at issue in *MacArthur*. *Id*. This distinction is of no moment in this case.

The crimes with which fifteen members of the TSD were charged, and to which their private co-conspirators pled guilty, such as aggravated assault, are unquestionably *malum in se*. *Orosco v. Holder*, 396 F. App'x 50, 54 (5th Cir. 2010) (noting that aggravated assaults are considered *malum in se* because they are "morally reprehensible and intrinsically wrong."). Four members of the TSD remain under indictment for aggravated assault and assault with a dangerous weapon, both of which were charged as bias-related (hate) crimes, and have outstanding bench warrants against them.[11]

---

[11] *See* D.C. Superior Court Cases: 2017 CF3 014892 United States vs. SARMAN, MEHMET; 2017 CF3 014842 United States vs. ERKAN, SERVET; 2017 CF3 014907 United States vs. DALKIRAN, ISMAIL; 2017 CF3 014908 United States vs. KARABAY, AHMET.  These four individuals have outstanding bench warrants issued against them. *See also* Pls.' Ex. 17.

Moreover, Dr. Layton concluded that the conduct at issue, including the repeated kicking of prone victims, had no basis in security operations, constituted assault, and would have resulted in criminal liability if perpetrated by USSS. Pls. Ex. 3, Layton Decl. at ¶¶ 84-89, 92-93; *see also United States v. Schatzle*, 901 F.2d 252, 253 (2d Cir. 1990) (affirming criminal conviction of USSS agent who, while protecting U.S. presidential candidate Albert Gore, punched and kicked a bystander in the course of an arrest). Dr. Layton addresses every point raised by Michael White and demonstrates that there was no threat to Erdogan. *See supra* Section III.I. Furthermore, even accepting all of Turkey's unfounded assertions about a potential threat, the force deployed by the TSD—such as the kicking of unconscious women while they lay on the ground—constituted serious violations of U.S. law, *see e.g.*, *Schatzle*, 901 F.2d at 253, and therefore do not qualify as discretionary acts.

Every FSIA discretionary function exception case cited by Turkey supports the proposition that serious crimes, such as the assassination in *Letelier* or the beating of protesters in *Miango*, are not "discretionary functions" within the meaning of 28 U.S.C. § 1605(a)(5)(A). MTD at 49-51. In *Risk v. Halvorsen*, the court ruled "the nature of the act" at issue differed greatly from that in *Letelier*, and that not "every conceivably illegal act is outside the scope of the discretionary function exception", 936 F.2d 393, 397 (9th Cir. 1991) (citing *MacArthur*, 809 F.2d at 922 n.4), which merely distinguished *Letelier* but validated its central holding. *See also Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (also citing *Letelier* as good law). The "nature of the act" complained of in *Risk* was a mother's act of removing her two children from California to Norway in violation of a temporary child custody order, which can hardly be considered a violent crime. *Risk*, 936 F.2d at 394.

The Court, in a recent FSIA opinion on the issue, found that "Congress did not mean to shield 'discretionary' acts by foreign states when those acts involve serious violations of U.S. criminal law" and that that "reading of the exception is consistent with the D.C. Circuit's sole opinion [*MacArthur*] touching upon this question. . . ." *Doe v. Fed. Democratic Republic of Eth.*, 189 F. Supp. 3d 6, 27 (D.D.C. 2016), *aff'd on other grounds*, 851 F.3d 7 (D.C. Cir. 2017).[12] "The Restatement [also] provides a similar standard, suggesting that the exception should not apply to 'serious criminal act[s].' Restatement (Third) of the Foreign Relations Law of the United States § 454 n.3." *Id.* at 28.

The foregoing caselaw directly contradicts Turkey's assertion that *Letelier* "is no longer good law," MTD at 49, and that "it is the scope of sovereign discretionary authority that matters, not the nature or unlawfulness of the underlying acts." MTD at 51-52. Whether otherwise tortious conduct is shielded by the discretionary exception depends on the "the nature of the conduct, rather than the status of the actor . . . ." *MacArthur Area Citizens Ass'n*, 809 F.2d at 922 (quoting *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)). The cases uniformly hold that the foreign sovereign does not have the discretion to commit serious crimes. The straightforward principle is that a foreign sovereign cannot escape liability for serious crimes, just as the United States cannot escape liability for violations of a pertinent "federal statute, regulation, or policy" under the FTCA. *See e.g.*, *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

---

[12] In another case cited by Turkey, *Mohammadi v. Islamic Republic of Iran*, the court explicitly made no findings about the scope of the discretionary function exception because the plaintiffs "abandoned the FSIA's non-commercial tort exception. . . ." 947 F. Supp. 2d 48, 81 n.4 (D.D.C. 2013). Thus, any discussion of 28 U.S.C. § 1605(a)(5)(A) would constitute *dicta* in this decision because there was no basis to argue the issue before the court.

**D.      The FTCA Contains a Corollary Principle to *Letelier*, But Even More Drastically Limits the Application of the Discretionary Function Exception**

It is unsurprising that Turkey would bury the dispositive FSIA decisions discussed above under a lengthy digression through an analogy to FTCA decisions. MTD at 39-48. Faced with unflattering video and unfavorable precedent, Turkey argues that the FSIA decisions should be completely ignored and that "the Court should rely exclusively on its application of the two-part discretionary acts test in this case of first impression." MTD at 49.  The Court cannot ignore *Letelier* and its progeny; the courts that have looked to the FTCA for "additional guidance", 809 F.2d at 921, and for the "general principles established under the same exception in the Federal Tort Claims Act," *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989), have unsurprisingly also referred to other FSIA decisions, such as *Letelier*. *E.g.*, *MacArthur*, 809 F.2d at 922 n.4. What is surprising is Turkey's argument for the wholesale adoption of the FTCA, because the FTCA caselaw is even less favorable to Turkey's cause.

As with the FSIA, the discretionary function exception under the FTCA bars a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The two-part test asks (1) whether the conduct involved an element of judgment and (2) whether that judgment is of the kind that the discretionary function exception was designed to shield. *See e.g.*, *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). But Turkey overlooks the FTCA's corollary principle to the *Letelier* rule; that the discretionary exception in a FTCA action does not apply if the defendant violated a law or constitutional right. *See, e.g.*, *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016). Thus, Turkey's summary of the law under the discretionary function exception under both the FSIA and FTCA, "it is the scope of sovereign discretionary authority that matters, not the nature or

unlawfulness of the underlying acts," MTD at 51-52, reads the law exactly backwards. *See, e.g.*, *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984) ("the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts. . . are of the nature and quality that Congress intended to shield from tort liability.").

Under *Loumiet v. United States*, the FTCA's discretionary function exception does not apply because the actions of the TSD violated the Plaintiffs' rights and liberties guaranteed under the First and Fourth Amendment rights. 828 F.3d 935, 943 (D.C. Cir. 2016). In *Loumiet*, the D.C. Circuit held that the discretionary function exception does not shield conduct in violation of constitutional rights. 828 F.3d 935, 943 (D.C. Cir. 2016) ("At least seven circuits, including the First, Second, Third, Fourth, Fifth, Eighth, and Ninth, have either held or stated in dictum that the discretionary-function exception does not shield government officials from FTCA liability when they exceed the scope of their constitutional authority."). The case seemed open-and-shut on its face, as it analyzed a federal agency's decision "whether to prosecute," normally a "'quintessentially discretionary' function that involves judgment and requires balancing policy goals and finite agency resources . . . ." 828 F.3d at 942. But the claimant had properly alleged a violation of his constitutional rights, including the First Amendment. *Id.* The panel ruled that the discretionary function exception does not shield conduct which also violates "a constitutional prescription." *Id.* at 943.

That Turkey's conduct—assaulting Plaintiffs in order to silence protected speech—suppressed Plaintiffs' constitutional rights is beyond question. "[P]ublic streets and sidewalks" are "traditional public fora" that from "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Boos v. Barry*, 485

U.S. 312, 322 (1988) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). In *Boos v. Barry*, the

Supreme Court found that public protest is "classically political speech." *Id.* at 318. "[P]olice may

not interfere with orderly, nonviolent protests merely because they disagree with the content of the

speech or because they simply fear possible disorder." *Papineau v. Parmley*, 465 F.3d 46, 56 (2d

Cir. 2006) (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965)). As the Supreme Court explained

in striking down the content-based restriction portion of a D.C. law in *Boos v. Barry*, "it is well

established that no agreement with a foreign nation can confer power on the Congress, or on any

other branch of Government, which is free from the restraints of the Constitution." 485 U.S. at 324.

Dr. Layton concluded that there was simply no security interest furthered by the TSD's

attack. Pls. Ex. 3, Layton Decl. at ¶ 84. Instead, the purpose of the assault was to silence protected

speech which the TSD perceived as a slight and insult to their President. Plaintiffs' expert, Steve

Cook noted that the TSD "zealously safeguard him [Erdogan] from all expressions of dissent" and

concluded "Erdogan's security team reacted as they would in Turkey; any speech insulting or

offensive to him, especially from Kurds, will be crushed." Pls. Ex. 4, Cook Decl. at ¶¶ 8, 65. That

the main goal of the TSD was to protect Erdogan from dissent is demonstrated by is demonstrated

by the TSD's care in ripping up protest signs, rather than searching for handguns, biochemical

weapons, or IEDs.

> Official reprisal for protected speech "offends the Constitution [because] it
> threatens to inhibit exercise of the protected right," *Crawford-El* v. *Britton,* 523
> U.S. 574, 588, n. 10, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998), and the law is
> settled that as a general matter the First Amendment prohibits government officials
> from subjecting an individual to retaliatory actions, including criminal
> prosecutions, for speaking out, *id.,* at 592, 118 S. Ct. 1584, 140 L. Ed. 2d 759; *see
> also Perry* v. *Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570
> (1972) (noting that the government may not punish a person or deprive him of a
> benefit on the basis of his "constitutionally protected speech").

*Hartman v. Moore*, 547 U.S. 250, 256 (2006). An arrest during the exercise of First Amendment rights is a "violation of First Amendment rights … directly attributable to the arresting officers." *Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977); *see also Quaker Action Grp. v. Morton*, 516 F.2d 717, 724 (D.C. Cir. 1975) (stating that "[t]he general concepts of First Amendment freedoms are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause of the Constitution which assures citizens of their right to assemble peaceably at the seat of government and present grievances.").

In the context of a strict FTCA analysis, the TSD's vicious attack also violated the Plaintiffs' Fourth Amendment rights against unreasonable seizure. In *Johnson v. District of Columbia*, the D.C. Circuit affirmed that a police officer, who had a legitimate fear a suspect may have been armed, nonetheless violated the suspect's Fourth Amendment rights when he kicked the suspect while arresting him.  528 F.3d 969, 974-75 (D.C. Cir. 2008). In *Williams v. District of Columbia*, police officers had outnumbered a suspect they believed to have committed simple assault, and had him prone on the ground. 268 F. Supp. 3d 178, 190-91 (D.D.C. 2017). The court found that the subsequent strikes to the suspect's head violated of the Fourth Amendment, even though the suspect had initially resisted arrest. *Id.* at 191-92.

In this case, the TSD had no legitimate reason to suspect the Protesters were armed, but nonetheless punched and kicked them while they stood and then after they dropped to the ground, and never searched them for weapons. The TSD had several minutes to assess the situation and then inflicted the maximal "intrusion on the individual's Fourth Amendment interests" by savagely kicking and punching them, without making an investigatory stop or arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]the state may not perpetrate violence for its own sake. Force without reason is unreasonable." *Johnson*, 528 F.3d at 977 (finding that the police officer's

"kick to the groin of a prone man, which caused great personal harm to Johnson without any corresponding public benefit, violated the Fourth Amendment.").

Dr. Layton echoed this sentiment, stating that "an officer may not legally apply a striking technique (kicking or punching) to a protester that is completely dissociated with any official law enforcement or protective function (*e.g.*, lawful detention)." Pls. Ex. 3, Layton Decl. at ¶ 87. Moreover, as Dr. Layton details in his Declaration, the TSD also deployed more force than necessary to control the situation:

> I observed several TSD agents apply kicking techniques to the head and midsection of people who had been knocked down and were on the ground in positions of extreme vulnerability and who were offering no threat or level of resistance. Most of the protesters kicked were already on the ground in positions of vulnerability, and posed no threat to law enforcement and offered no resistance to the TSD.

Pls. Ex. 3, Layton Decl. at ¶ 86.

Finally, *Loumiet* also restated that the discretionary exception cannot be applied where a federal statute, regulation, or policy is violated. As noted in *Loumiet*, the Supreme Court has long held that the violation of an applicable "federal statute, regulation, or policy" which "specifically prescribes a course of action for an employee to follow" prevents the application of the discretionary-function exception. 828 F.3d at 944 (quoting *Berkovitz*, 486 U.S. at 536); *see also Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009) (stating that "[i]t is elementary that the discretionary function exception does not immunize the government from liability for actions proscribed by federal statute or regulation."); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) (holding that "federal officials do not possess discretion to violate constitutional rights or federal statutes.") (citing *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)). Moreover, in *Red Lake Band of Chippewa Indians v. United States*, the D.C. Circuit

found that "[a] government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers." 800 F.2d 1187, 1196 (D.C. Cir. 1986).

While the TSD are not officers of the United States and cannot be charged with Constitutional violations, Turkey cannot expect to be immunized under the FTCA caselaw for such violations. Furthermore, this important limitation on the discretionary function exception bolsters the FSIA-specific *Letelier* exception, as discussed above in Section IV.D. If the FSIA draws from the "general principles established under the same exception in the Federal Tort Claims Act", as the discretionary function exception under the FTCA will not be extended in the event of constitutional or statutory violations, then the *Letelier* decision makes perfect sense.

### E.   Even if the FTCA's Discretionary Function Exception Applied, the TSD's Conduct Fails the Two-Step *Macharia* Test as Adopted by the D.C. Circuit in a FSIA Case

Even if the Court ignores the *Letelier* line of FSIA cases and the corollary proposition under the FTCA as announced by *Loumiet*, which wholesale prevents the application of the discretionary function exception, the decisions cited by Turkey demonstrate that "the government actions in question" are not "discretionary in nature and grounded in an appropriate policy." *Macharia v. United States*, 238 F. Supp. 2d 13, 23 (D.D.C. 2002). Thus, even if the discretionary function exception test is applied, the TSD's conduct fails the test.

As explained in *Macharia*, there are two steps to deciding the discretionary function exception test under the FTCA, and if the defendant satisfies the test, then immunity attaches. *Id.* The TSD, however, did not exercise discretion as it is defined in the relevant caselaw, discussed *infra* at IV.D.1.a, and its outrageous conduct is not "'of the nature and quality that Congress[13]

---

[13] In view of Resolution unanimously passed by the United States House of Representatives which condemned the "multiple armed Turkish security officials [who] beat, kicked, and choked unarmed demonstrators" and acknowledged the peaceful and constitutional character of the Protesters'

intended to shield from tort liability.'" *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) (quoting

*Varig,* 467 U.S. at 813).

           1.      TSD Ignored the Statutory Directive Prohibiting their Assault on
                        the Protesters, and the Majority of the TSD Exercised No Discretion

The TSD failed to satisfy the first prong of the two-part test for the discretionary function

exception because they violated a federal statute that specifically prescribed a course of action,

and their decision to attack was not the "product of judgment or choice." *See Berkovitz*, 486 U.S.

at 536. Turkey claims that the TSD had to exercise discretion as they performed their security

operations and analyzed whether any threats were present against Erdogan:

> Since the Turkish security officers' acts involved elements of choice and judgment,
> they satisfy the first prong. . . . the Turkish security officers had to undertake the
> necessary risk assessment calculations to carry out their mission to protect their
> head of state.

MTD at 41-42. But this formulation overlooks the first question, as stated by *Berkovitz*:

> In examining the nature of the challenged conduct, a court must first consider
> whether the action is a matter of choice for the acting employee. This inquiry is
> mandated by the language of the exception; conduct cannot be discretionary unless
> it involves an element of judgment or choice. *See Dalehite* v. *United States*, 346
> U.S. 15, 34, 97 L. Ed. 1427, 73 S. Ct. 956 (1953) (stating that the exception protects
> "the discretion of the executive or the administrator to act according to one's
> judgment of the best course"). Thus, the discretionary function exception will not
> apply *when a federal statute, regulation, or policy specifically prescribes a course
> of action for an employee to follow*. In this event, the employee has no rightful
> option but to adhere to the directive.

*Id.* (emphasis added). In this case, U.S. law forbids the TSD from interfering with "the exercise of

rights guaranteed under the first amendment to the Constitution of the United States." 18 U.S.C.

§ 112(d). There was no threat to Erdogan, but the TSD would not tolerate a protest within earshot

---

actions, there is no mystery in this case "whether the challenged discretionary acts of a government
employee 'are of the nature and quality that Congress intended to shield from tort liability.'" *See*
H. Res. 354, 115th Cong. (1st Sess.) (June 6, 2017).

of Erdogan. MTD at 3 (noting that the Protesters were "yelling aspersions" at Erdogan), MTD at

24 (noting Erdogan could "he could see and hear" the protest when he arrived). Without a breach

of the peace, law enforcement had no right to interfere with the Protesters' rights to assemble

and protest.

Even if the Court finds that the TSD did not violate the prescription of 18 U.S.C. § 112(d),

the video evidence does not portray "necessary risk assessment calculations" or the TSD carefully

exercising their "choice and judgment" when they decided to begin the beatings, as Turkey argues.

MTD at 41-42. The facts and evidence demonstrate that the majority of the TSD roared toward

Sheridan Circle at the same time, Def.'s Ex. 6 at File No. SC02 at 2:35-3:00; SC08 at 0:22-0:42,

once the order to attack issued. It is clear from the video of the incident that someone ordered the

TSD front-line agents "to attack", which left them with no choice or discretion. Pls.' Ex. 10A

(English translation at Pla.'s Ex. 10B); *see e.g.*, *Berkovitz*, 486 U.S. at 536. As discussed above,

this decision cannot be shielded by the discretionary function exception because U.S. law forbids

the TSD from interfering with "the exercise of rights guaranteed under the first amendment to the

Constitution of the United States." 18 U.S.C. § 112(d). While the discretionary exception may

shield the actions of subordinates, it will only do so if they exercised discretion:

> Some clear principles emerge from *Varig*. The discretionary function exception
> shields the government from liability for those decisions which involve a measure
> of policy judgment, and immunizes as well the execution of such decisions in
> specific instances by subordinates, even those at the operational level, *if they must
> exercise such judgment too*.

*MacArthur*, 809 F.2d at 922 (quoting *Red Lake Band of Chippewa Indians*, 800 at 1196)

(emphasis added).

The TSD's concerted and mindless attack was not the product of any discretion or choice.

While "[d]ecisions regarding the timing of arrests are the kind of discretionary government

decisions" normally immunized from lawsuit, *e.g.*, *Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008), in this case, there were no decisions made after the order to attack issued and Turkey has submitted no evidence of any choice or discretion exercised by the TSD to challenge the allegations of the complaint. The closest Turkey comes to describing the discretion exercised is in a statement by Michael White, who describes "the decision point for the Turkish Security Detail", which occurred when "the head of state is on site." White Decl. at at 17.  Turkey's Motion agrees that this was the "decision point":

> Based on Mr. White's experience and training, it is his conclusion that President Erdogan was in an extremely vulnerable safety position when he arrived and was forced to temporarily remain in his vehicle. (*Id.* ¶¶ 51-52.) Mr. White opines that President Erdogan's security detail made a reasonable decision, given the circumstances, the available intelligence, and lack of assistance from local law enforcement, not to permit him to exit the vehicle until the Anti-Turkey Group was under control and the threat neutralized. (*Id.* ¶¶ 56-57.)

MTD at 28.

The problem with this position is that Turkey's Motion relies completely on Michael White in making this argument, and Michael White did not talk to any TSD agents, Turkish officials, or any other witnesses that day—he did nothing more than watch video tape which revealed in no way the thinking or discussion among the TSD, or their nature or quality of their decision making. Where Turkey has not challenged, with evidence, the specific jurisdictional facts alleged within Plaintiffs' complaint, "then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phx. Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Relying on the video, and ignoring the speculation offered by Michael White, whose report is otherwise undermined by critical factual errors, we see most of the TSD attack at the same time, and exercise no discretion whatever.

If Turkey cannot offer any contrary evidence, then the Court must fully credit Plaintiffs'

allegations. *See, e.g.*, *MacArthur Area Citizens Ass'n*, 809 F.2d at 922 (analyzing the allegations

of the complaint to determine the applicability of the discretionary exception in a FSIA case).

Plaintiffs allege in their Complaint that the TSD "attacked the anti-Erdoğan protesters because of

the protesters' opposition to President Erdoğan, their support of the HDP and their support of

ethnic Kurds." Compl. ¶ 49. Indeed, Turkey's Motion supports this allegation, and reveals the

actual motivations of the TSD agents that day:

> The likelihood is great that among the crowd of Turkish Americans gathered in
> Lafayette Park and later at the Residence were individuals who had experienced
> PKK terror that claimed the lives of, or that injured, loved ones or close friends.
> The same would be true for the Turkish security officers accompanying President
> Erdogan and his delegation.

MTD at 16; MTD at 3 (noting that the Protesters were "yelling aspersions" at Erdogan). Here

Turkey admits that, despite the fact that no PKK flags were displayed in Sheridan Circle, the

"Kurdishness" of the Protesters was a major factor that day.

### 2.    These Are Not the Type of Actions Congress Sought to Protect

The TSD's assault on unarmed Protesters exercising their Constitutional rights does not

constitute a decision "grounded in social, economic, and political policy." *MacArthur Area*

*Citizens Ass'n*, 809 F.2d at 922 (quoting *S.A. Empresa De Viacao Aerea Rio Grandense (Varig*

*Airlines)*, 467 U.S. at 814). While the TSD's actions clearly fail the first prong of the *Macharia*

test, it is abundantly clear that Turkey also fails the second prong.

The second step of the FTCA test advocated by Turkey requires that "legislative and

administrative" decision making be "grounded in social, economic, and political policy" and the

"the challenged acts of a Government employee – whatever his or her rank – are of the nature and

quality that Congress intended to shield from tort liability." *S. A. Empresa De Viacao Aerea Rio*

*Grandense (Varig Airlines)*, 467 U.S. at 813. Thus, even if the TSD's conduct involved deliberative choice, "only conduct that is 'susceptible to policy judgment and involve[s] an exercise of political, social or economic judgment' is exempt." 238 F. Supp. 2d 13, 23 (quoting *Cope v. Scott*, 45 F.3d 445 (D.C. Cir. 1995)).

The panel in *MacArthur* analyzed the Supreme Court decision in *Varig*, which "held that the claim fell within the discretionary function exception because the aircraft certification program implemented a safety policy established pursuant to a legislative grant of discretion to the Secretary of Transportation." *Id.* Discretion was lawfully exercised to further the safety policy, which immunized the decision. Based upon an analysis of the allegations in the complaint, the *MacArthur* panel concluded the exception applied in the case before it because: "establishing a chancery in the District of Columbia to conduct foreign relations is a discretionary public policy decision and that this decision undergirds the specific acts which the Association bewails. . . [these] arrangements are properly viewed as decisions made in the execution or implementation of a discretionary policy or activity . . . ." *Id.* The decision to establish a chancery and its security arrangements was "grounded in social, economic, and political policy", as the decision:

> (1) is grounded in an economic judgment regarding which property represents the best value; or (2) embodies a political decision regarding the image that the Peruvian Government seeks to project through the offices it occupies; or (3) reflects security considerations that one might presume to be of interest in the present day; or (4) represents some combination of the foregoing considerations.

*Id.* Such a decision could not be more far removed than an unjustified mob assault by the TSD.

From all appearances, the TSD's wild rampage did not include any moments of "legislative and administrative" decision making "grounded in social, economic, and political policy." *Varig*, 467 U.S. at 813. As Plaintiffs' expert Steven Cook concludes from his expertise in Turkish politics, the TSD are frequently involved in acts of political violence, especially in the presence of Erdogan

himself, designed to send a message of intimidation to domestic opponents. Pls. Ex. 4, Cook Decl. ¶¶ 14-20. Once the TSD began their charge into the small group of protesters, there were no judgments or decisions "grounded in social, economic, and political policy." 809 F.2d at 922.

Michael White's declaration provides only speculative interpretations as to these issues, as he admits that he did not speak to any Turkish officials or employees, or review any Turkish security protocols or policies. White Decl. at ¶¶ 4-5. Instead, White concludes without any basis that the TSD "was trained in how to protect the secure zone around their protectee and neutralize perceived threats with the minimal degree of force necessary." White Decl. at ¶ 58.  White also makes a number of assumptions based on what he believes the TSD "would have been" thinking or trained on. White Decl. at ¶¶ 28, 31, 45- 47, and 51.

Consequently, this Court has no way of telling whether any judgement was exercised or whether it was exercised in pursuit of the "advancement of a governmental purpose and pursuant to the specific grant of authority." *Varig*, at 820.

Under *Letelier* and *Loumiet*, the discretionary exception cannot even be applied due to the violent crimes committed by the TSD, which suppressed Plaintiffs Constitutional rights as well as injured them. Should the Court apply the two step test, then the TSD's conduct fails both steps, as its agents did not exercise deliberative choice and judgment, nor were the actions "of the nature and quality that Congress intended to shield from tort liability."

**F.    Turkey Is Liable Under 28 U.S.C. § 1605B**

1.    The Sheridan Circle Beating Was a
        Violent Criminal Act Under D.C. and Federal Law

Turkish agents need not be convicted in criminal proceedings or even charged in order for their actions to be considered acts of international terrorism under 28 U.S.C. § 1605B (incorporating by reference 18 U.S.C. § 2331). Instead, their actions must have involved "violent

60

acts or acts dangerous to human life" that satisfy the elements of a crime under U.S. or state law.

18 U.S.C. § 2331(1)(A). Turkey does not contest generally that its beating of the Protesters at

Sheridan Circle was "violent,"[14] but rather asserts that the beatings were not a crime under U.S.

federal or D.C. local law. MTD at 59. This assertion is facially absurd, especially given that fifteen

members of the TSD were indicted.

---

[14] However, Turkey does allege that Plaintiff Lacey MacAuley "did not experience a "violent act," and that "undisputed video evidence"—to which it does not cite—shows that Turkish agents' contact with Plaintiff MacAuley "never exceeded slight touching." MTD at 59. To the contrary, eyewitness reports of State Department Diplomatic Protection agents state that the "entire motorcade" stopped on Massachusetts Avenue so that seven Turkish security agents could "dismount their passenger van in an all-out sprint running directly toward the single female protestor." Pls.' Ex. 12 at F012 at 3. The "female Turkish security personnel" "grabb[ed] [Plaintiff MacAuley]" and "began to fight." *Id.* The six male security personnel "surrounded [Plaintiff MacAuley] and attempted to fight her, however an MPD officer interceded and attempted to break it up." *Id.* The observing DS agents "deployed and took up defensive positions around the limousine and held [their] ground as the fighting continued, the female protestor eventually ran away and escaped being assaulted." *Id.* Numerous Turkish security personnel were charged with assault against Plaintiff MacAuley. The term "violent" means "[o]f, relating to, or characterized by strong physical force" "[r]esulting from extreme or intense force," or "vehemently or passionately threatening." VIOLENT, Black's Law Dictionary (11th ed. 2019). Turkey's treatment of Plaintiff MacAuley meets this definition (as well as the tangentially related "violent felony" definition offered by Turkey from the Armed Career Criminal Act). Def's Ex. 6, at File No. SC02 at 7:12-8:15; MTD at 58-59. As a result of this assault, Plaintiff MacAuley has suffered from loss of sleep, increased sadness, and increased anxiety. Compl., ¶ 98.

Turkey also claims that" Doe II does not allege Turkey or its agents committed a violent act against him." MTD at 58-59. Turkey concedes, however, that Doe I alleges Turkey conspired with his attackers. *Id.* Moreover, as this Court found in *Kurd* regarding the same attack, allegations of "contribut[ing] to the "free-for-all" atmosphere" are sufficient to sustain a claim for aiding and abetting battery as they demonstrate that Defendants intentionally helped to create a dangerous and injurious atmosphere which assisted other Defendants in committing battery on Plaintiffs." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 50 (D.D.C. 2019). As with the Defendants in *Kurd*, TSD agents contributed to the chaos that made the battery possible by "yelling at law enforcement, warning them of potential violence, as well as by yelling at Plaintiffs," and that they "each played a role in breaking through the law enforcement line to attack Plaintiffs and in creating an environment in which all Plaintiffs were vulnerable to injury." *Compare id. with supra* Section III.D ("In an instant, the TSD unleashed a coordinated assault into Sheridan Circle, violently breaking through the police cordon.").

The U.S. Attorney's Office for the District of Columbia issued indictments and arrest warrants for fifteen members of the TSD, four of which remain currently active against TSD agents Ismail Dalkiran, Servet Erkan, Ahmet Karabay, and Mehmet Sarman, for their role in the Sheridan Circle beatings. Pls.' Ex. 8 at 1-2. According to the Indictment, Dalkiran, Erkan, Karabay and Sarman joined in a conspiracy to "to assault with a dangerous weapon" the Sheridan Circle protesters "in violation of 22 D.C. Code Sections 402, 404." *Id.* at 2. These conspirators, all members of the TSD, "were bound together by their aversion towards a group of persons who oppose Mr. Erdoğan, support pro-Kurdish political parties in Turkey and Syria, and are of ethnic Kurdish background from Iran, Iraq, Syria, and Turkey (collectively, the 'anti-Erdoğan protesters')." *Id.* at 4-5. The Erdogan security team "used threats and physical violence—intensely kicking at protesters—to dispel the anti-Erdoğan protesters, attack the anti-Erdoğan protesters, and blatantly ignore American law enforcement commands to cease the violence." *Id.*; *see supra* Section III.B-C. They "attacked the anti-Erdoğan protesters because of their opposition to Mr. Erdoğan, their support of the HDP, their support of ethnic Kurds, and their [the TSD's] belief that the protesters were ethnically Kurdish." Pls.' Ex. 8 at 1-2. In addition to conspiracy, Dalkiran, Erkan, Karabay and Sarman were variously charged with "bias-related hate crimes," "assault," "aggravated assault," "assault with a dangerous weapon," "assault with a Dangerous Weapon of a Senior Citizen," and "assault with Significant Bodily Injury." *Id.* at 12-20.

Dalkiran, Erkan, Karabay and Sarman are unlikely to ever face prosecution for these crimes because Turkey evacuated them from the United States and offered them safe haven from prosecution. *See supra* Section III.F. Two of their private co-conspirators, Sinan Narin and Eyup Yildirim, pled guilty to assault with significant bodily injury (a felony) stemming from the same indictment. Pls.' Ex. 11 (Sinan Narin's Signed Plea Agreement (Dec. 20, 2017)); Pls.' Ex. 11

(Eyup Yildirim's Signed Plea Agreement (Dec. 21, 2017)). Canadian co-conspirators have also been indicted, but have not been brought to justice. Compl. ¶ 31, 107.

Again, 18 U.S.C. § 2331(1)(A) merely requires that the perpetrators' "activities" satisfy the elements of a crime under U.S. or state law. 18 U.S.C. § 2331(1)(A) (defining the first prong of "international terrorism" as "involve[ing] violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"). As evidenced by the U.S. Attorney for the District of Columbia's ("U.S. Attorney") initial decision to file criminal charges against fifteen of the TSD members, Turkey's treatment of Plaintiffs satisfies the elements of several crimes in the District of Columbia. For example, the D.C. Code provision governing assault criminalizes threatening others in a "menacing manner," § 22-404(a)(1), with heightened penalties for causing "significant bodily injury," § 22-404(a)(1), and use of a "dangerous weapon," § 22–402. Not only were members of the TSD charged with these crimes and warrants issued for their arrest, but they can also be observed violating these laws in the video exhibits submitted to the Court by Turkey. *See supra* Section III.B-E (discussing those videos from Turkey's Motion depicting members of the TSD committed the aforementioned crimes).

The U.S. Attorney's factual understanding of the attack is supported by State Department reports. For example, a report generated for Bill A. Miller, Principal Deputy Assistant Secretary of State and Director of the Diplomatic Security Service ("DS"), by State Department officials confirmed that "Turkish security personnel used undue force against protestors/demonstrators and U.S. law enforcement personnel," "physically assault[ed] protestors," and "assault[ed] law enforcement personnel" including "DS and USSS [Secret Service] agents." Pls.' Ex. 12 at F010 at 1. Three U.S. agencies, local law enforcement, the Mayor if D.C., and the House of Representative

all independently confirmed that Turkish security personnel initiated violence against a group conducting a "peaceful First Amendment assembly" in violation of U.S. and D.C. law, *see supra* Section III.B. These independent conclusions are corroborated by the video evidence. *See supra* Section B-E. There is no question that Plaintiffs have satisfied the first element of the controlling definition of "international terrorism" by proving that Turkey committed "violent acts . . . that are a violation of the criminal laws of the United States or of any State . . . ." 18 U.S.C. § 2331(1)(A).

> 2.  The Sheridan Circle Beatings are Part of a Pattern of Political Violence To Intimidate Opponents Of The Erdogan Regime In the U.S. And Abroad

The second prong of the definition of international terrorism under 18 U.S.C. § 2331 requires that the offending activities "appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B).

The question of whether the beatings "appear to be intended to intimidate or coerce a civilian population" turns on objective manifestations of intent, including but not limited to the TSD's conduct. *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 49 (D.D.C. 2010) (citing *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008)). Turkey misunderstands the term "objective intent" as used by this Court. In *Wultz,* the plaintiff alleged that the Bank of China ("BOC") was liable for carrying out transfers to a known terrorist organization. 755 F. Supp. 2d at 18.

In referring to the "objective intent" standard, Judge Lamberth disregarded the BOC's assertion that its "subjective" intent was merely to provide banking services. *Wultz*, 755 F. Supp. 2d at 48–49. Rather, the objective standard of § 2331's "appear to be intended" language was satisfied where BOC could reasonably have foreseen that its conduct would result in one of

64

motivations of terrorism enumerated by § 2331(1)(B) (*e.g.*, intimidating a civilian population, or

influencing the policy of a government):

> At first glance, it does seem remarkable that BOC—an internationally respected
> financial institution with branches in this country—would actually intend to
> facilitate the terroristic murder of American civilians by the [Palestinian Islamic
> Jihad]. Unfortunately for BOC, actual subjective intent is not what the ATA is
> concerned with. Instead, the law requires only that a defendant's acts "appear to be
> intended" to achieve one of the three enumerated items. § 2331(1)(B) (emphasis
> added) . . . . Plaintiffs allege that the objective intent standard is satisfied "by the
> fact that subsequent to April 2005[,] BOC knowingly continued to carry out the PIJ
> Transfers after being expressly warned of the consequences of its actions and asked
> to desist." . . . . Plaintiffs thus adequately allege the objective appearance of intent
> by BOC.

*Wultz*, 755 F. Supp. 2d at 48–49 (citing *Boim*, 549 F.3d at 694) (internal citations omitted).

In ruling that conduct which would foreseeably result in the intimidation of a civilian

population demonstrates objective intent to achieve that goal within the meaning of 18 U.S.C.

§ 2331(1)(B) this Court explicitly adopts the Seventh Circuit's reasoning:

> A knowing donor to Hamas—that is, a donor who knew the aims and activities
> of the organization—would know . . . that donations to Hamas, by augmenting
> Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire
> to kill more people in Israel. And given such foreseeable consequences, such
> donations would "appear to be intended ... to intimidate or coerce a civilian
> population" or to "affect the conduct of a government by ... assassination," as
> required by section 2331(1) in order to distinguish terrorist acts from other violent
> crimes, though it is not a state-of-mind requirement; it is a matter of external
> appearance rather than subjective intent, which is internal to the intender.

*Boim*, 549 F.3d at 693–94 ("*Boim III*"); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207

n.6 (2d Cir. 2014) (stating that "[t]he requirement to "appear to be intended . . ." does not depend

on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent

intentions of actions); *see also Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 676 (S.D. Tex. 2014)

("Donations appear to be intended to intimidate or coerce a civilian population . . .  when a donor

knows the terroristic aims and activities of its recipient and when it is foreseeable that the donations

will advance such terroristic aims.") (internal citation omitted). As discussed in greater detail below, Turkey not only would have reasonably foreseen that its conduct would "intimidate or coerce a civilian population," but its objectively manifested behavior evidenced a desire to achieve that result.

Additionally, *Wultz* and the rest of *Boim III*'s progeny stand for the proposition that this Court need not defer to the pretext ("security") proffered by Turkey in justification of its political violence and terroristic conduct; the fact that defendants in the *Boim III* line of cases were nominally "providing automated, electronic banking services," among other services, did not prevent those courts from referring the question of the defendants' objective intent to the finder of fact. *See, e.g.*, *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d at 45–46.

Plaintiffs have provided substantial evidence that Turkey's stated purpose in beating Plaintiffs, that is, providing security for President Erdogan, is a flimsy pretext and that its agents were motivated by a desire to intimidate and deter protesters in Turkey and abroad. While Turkey asserts that the team was "objectively focused solely on clearing a safe zone for its head of state and senior ministers," MTD at 73, all objective evidence, such as the videos submitted by Turkey and U.S. Diplomatic Security Service reports, indicates that Turkey was not motivated by security concerns. *See supra* Sections III.B-F. Moreover, aside from video of the Sheridan Circle beating, Turkey has produced no direct evidence in support of its factual assertion. No Turkish agent has offered any statement about a perceived assassination threat. No Turkish agent has stated that he or she saw a backpack or water bottle and drew the conclusion that these items raised the threat level present.

Second, as Plaintiffs' security expert, Dr. Layton, explains, the TSD did not behave as if they believed a threat to Erdogan existed. Pls. Ex. 3, Layton Decl. at ¶¶ 73-76, 78, 80, 84, 91, 94,

96-100. If the TSD genuinely believed that a handgun or IED was present, it would not have manifested the following behaviors:

- Allowed Erdogan's motorcade to arrive at the location of the alleged threat. Pls. Ex. 3, Layton Decl. at ¶¶ 77-81;

- Abandoned Erdogan by running across the street to brawl. Pls. Ex. 3, Layton Decl. at ¶ 74.

- Punched and kicked the supposed threats instead of using professional means of restraint. Pls. Ex. 3, Layton Decl. at ¶ 75.

- Shouted sexual epithets, such as, "Tell him, I am going to fuck his mother.  Do not come here.  I am going to fuck your mom.  Do not come here", and "I am going to stick [INDISCERNIBLE] in your ass.  You fucking son of a bitch.  I am going to fuck your mother." Def.'s Ex. 6, at File No. SC09 0:39-0:49, SC09 2:42-2:52 (English Translations at Pls.' Ex. 14); Pls. Ex. 3, Layton Decl. at ¶ 69.

- Allowed Erdogan to stand outside his car and listen to the beating (there was no clear line of sight) from approximately 130 feet away. Pls. Ex. 3, Layton Decl. at ¶¶ 97, 99.

- Urged the protesters verbally and through gestures to come closer. Pls. Ex. 3, Layton Decl. at ¶ 69.

- Taken the time to tear up protester's signs. Pls. Ex. 3, Layton Decl. at ¶ 91.

These objective manifestations, visible in the videographic evidence submitted by Turkey, reveal an intent other than security.

For these reasons, Dr. Layton, former Deputy Assistant Director of the Office of Protective Operations (supervisor of the Dignitary Protective Division which is responsible for the protection of all visiting heads of state) with 26 years of experience in the Secret Service concludes that the **"statements and actions of the TSD directly contradict that idea that the TSD's intent was to move the protesters further away from President Erdogan's arrival point for *security* reasons."** Pls. Ex. 3, Layton Decl. at ¶ 69-71 (emphasis added); *see supra* Section III.J.

There is no evidence in this case that the Protesters behaved in any manner that would justify Turkey's attack. To the contrary, all available evidence indicates that there was no threat to

Erdogan or any other Turkish protectees: "Secret Service agents are trained to distinguish between civil protests or acts of civil disturbance, and an actual attack on protectees" and "[t]he Secret Service is well versed in the principle that civil protest by individuals who exercise their First Amendment rights to assembly and freedom of speech must be respected."  Pls. Ex. 3, Layton Decl. at ¶ 38. Dr. Layton concluded that not only did he not observe any of the typical "pre-attack indicators at Sheridan Circle," he specifically reviewed the available videographic evidence for the alleged threats asserted by Turkey (IED, handgun, biochemical), concluding that "the observable conduct of the TSD does not indicate in any manner that those agents believed that a handgun, IED or chemical-agent threat existed." Pls. Ex. 3, Layton Decl. at ¶ 41-60.

According to the Declaration of Plaintiffs' expert, Dr. Steven Cook, the ENI Enrico Mattei Senior Fellow for Middle East and Africa Studies at the Council on Foreign Relations, the beatings demonstrated to audiences in Turkey and abroad that neither the honor of Turkey nor the honor of President Erdogan, the "Great Master" and "Tall Man," will suffer insult:

> The incident on Sheridan Circle on May 16, 2017 happened because President Erdogan's security detail aggressively shields their leader from even peaceful criticism and, in the process, protects the honor of the Turkish nation. The melee also shifted the narrative of Erdogan's visit with President Trump from his failure to convince the new President stop arming the YPG to the failure of American law enforcement to protect the visiting Turkish leader. The violence of the Turkish security team is part of a pattern in which they have employed violence against protesters, journalists, and average citizens at home and abroad.

Pls. Ex. 4, Cook Decl. at ¶¶ 2, 11, 16. Both Dr. Cook and the State Department separately agree that this beating represents the most recent in a pattern of message-sending violence "instigated" by the TSD against protesters and journalists, with such pattern including the attack against journalists and protesters at the Brookings Institution in D.C.:

> Ahead of a speech Erdogan was to give at the Brookings Institution, his security team clashed with pro-Kurdish protesters and other critics of the Turkish leader  . . . . [A]n eyewitness named Yochi Dreazan, who at the time was an editor at Foreign Policy magazine, Tweeted:

68

"Never seen anything like this: a female protester just tackled. DC cops are in the street trying to keep Turkish guards from hurting folks"

Another journalist at Foreign Policy Tweeted: "In front of Brookings for Turkish Pres. Erdogan speech, one of his security assaulted Brookings employee. It's crazy"

In addition, President Erdogan's bodyguards tried to prevent journalists who they deemed critical of the president from attending the event. One journalist, a diminutive woman named Amberin Zaman—an American citizen of Bangladeshi and Turkish descent who has worked for the Economist, Washington Post, the Los Angeles Times, a variety of Turkish newspapers, and as a visiting fellow at the Woodrow Wilson Center for International Scholars in Washington, DC—was surrounded by Erdogan's security team, blocking her from entering Brookings, and called a "PKK whore."

Pls. Ex. 4, Cook Decl. at ¶¶ 17-22; *see also* Pls.' Ex. 12 at F010 ("Social media captured Turkish security personnel being held back from assaulting protesters by the cops, Brookings employees, and [Secret Service agents].")

The Brookings incident caused the then-President of the National Press Club, Thomas Burr, to release a statement, which read, in part:

Turkey's leader and his security team are guests in the United States. They have no right to lay their hands on reporters or protesters or anyone else for that matter, when the people they were apparently roughing up seemed to be merely doing their jobs or exercising the rights they have in this country. We have increasingly seen disrespect for basic human rights and press freedom in Turkey . . . . Erdogan doesn't get to export such abuse."

Pls. Ex. 4, Cook Decl. at ¶ 21. Just as it attempts to do in this matter, the Turkish government blamed the violence at the Brookings Institute on the alleged incompetence of the MPD and the U.S. State Department's Bureau of Diplomatic Security. *Id.*

As with the Sheridan Circle and Brookings Institute attacks, Turkey frequently dehumanizes and justifies violence against its victims by labeling them as "terrorists" or "terrorist sympathizers." Pls. Ex. 4, Cook Decl. at ¶ 40, 41, 52, 53, 56, 57, 66; MTD at 2-4, 14-18. Turkey's Motion parrots this propaganda, arguing, without any evidence, that "it was likely that there were individuals in the Anti-Turkey Group that had received training on the use of weapons and

explosives from PKK/YPG terrorists and were part of PKK/YPG units." MTD at 18. Turkey does not have any support for this wild and ill-advised accusation and cannot allege that any of Plaintiffs were so trained or affiliated. *Id*. Turkey does attempt to damn Plaintiffs by a loose chain of association between a *Kurd* plaintiff and persons who were not in Sheridan Circle, Lucas Chapman and Robert Amos, MTD at 17, which is not worth a further response. This entire argument is regrettable and unfortunate.

Plaintiffs are unaware of any report by any U.S. official that mentions the remotest threat of a terrorist attack or alleges that any Protesters were terrorists or terrorist affiliates. *Accord* Pls.' Ex. 12; Def.'s Exs. 9, 11. Moreover, even if every Plaintiff were a hardened terrorist, the TSD did not act as if their principal were under threat of a terrorist attack, Pls. Ex. 3, Layton Decl. at ¶¶ 99-100, but rather acted consistently within their pattern of intimidating anti-Erdogan dissidents in Turkey and abroad. Pls.' Ex. 12 at F010 at 12; Pls. Ex. 4, Cook Decl. at ¶ 15. Thus, Turkey's "objective intent," *i.e.*, its intent as manifested in observable conduct, was to "intimidate or coerce a civilian population" or "to influence the policy of a government by intimidation or coercion." *See Wultz*, 755 F. Supp. 2d at 49. Plaintiffs have therefore satisfied the second prong of the controlling definition of "international terrorism." 18 U.S.C. § 2331(1)(B).

3. The Events of the Sheridan Circle Beating and
 Effects Thereafter "Transcended National Boundaries."

The third and final prong defining international terrorism under the FSIA, requires that the activities at issue "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1)(C).

Turkey argues that because the Sheridan Circle beating occurred on U.S. soil, it cannot meet the definition of "international terrorism." MTD at 62. This is facially contradicted by the text of the controlling definition. There are outstanding arrest warrants in the United States for four TSD agents who were evacuated from the United States by Turkey after the Sheridan Circle beating, Pls.' Ex. 17, and who continue to operate in and receive shelter from Turkey. *See supra* Section III.F. At the very least, the acts complained of in this case "transcend national boundaries in terms of . . . the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1)(C).

Turkey also claims that "the political question doctrine forbids the court from making findings about Turkey's national policies and international goals." MTD at 64. Not only does this argument fundamentally misunderstand the authority granted to this Court by the political branches through the FSIA, it is also inapposite when it comes to Plaintiffs' evidence that Turkey is harboring the perpetrators of this attack outside the United States. The Court need not analyze Turkish policy to understand that it is harboring fugitives from U.S. law. This "asylum" in and of itself satisfies the third prong. *See* 18 U.S.C. § 2331(1)(C).

Accordingly, to satisfy the third prong of 18 U.S.C. § 2331(1), the Court need not find that Turkey's violence against Plaintiffs "appear[s]" motivated by a desire to intimidate protesters in Turkey and abroad. It is nonetheless undeniably true that Turkey appeared to be, and was, so motivated. Pls. Ex. 4, Cook Decl. at ¶ 8. This satisfies an alternative condition for the "international" prong of "international terrorism." 18 U.S.C. § 2331(1). Turkey asks that this Court blind itself to the aims of Turkey's political violence in Sheridan Circle. MTD at 65 (pointing out the irrelevant, uncontroversial proposition that "[t]he Constitution distributes the powers of the federal government over external affairs between the Executive and the Legislative Branches.")

In so arguing, Turkey ignores the fact that the President and Congress, in passing the FSIA

and its subsequent amendments, specifically authorized this Court to stand in judgment over the

policies of foreign governments where said policies trigger one of the Act's enumerated exceptions

to sovereign immunity:

> The Sudan defendants insist that this case requires the resolution of issues that are
> "committed by the text of the Constitution to a coordinate branch of government"
> and "beyond areas of judicial expertise," but nothing could be farther from the truth.
> . . . The decision whether suit should be allowed against the Republic of Sudan is
> certainly one that touches on the relationship between the United States and other
> nations, a concern that is primarily committed to the discretion of Congress and the
> President. Through the waiver of sovereign immunity in section 1605(a)(7),
> however, and the designation of Sudan as a state sponsor of terror under the EAA,
> these coordinate branches have exercised this discretion to revoke the sovereign
> immunity of Sudan and expose it to suits such as this one.

*Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 28 (D.D.C. 2005); *see also Simon v. Republic of*

*Iraq*, 529 F.3d 1187, 1197 (D.C. Cir. 2008), *rev'd in part on other grounds sub nom.*, *Republic of*

*Iraq v. Beaty*, 556 U.S. 848, (2009) ("[I]f the political branches decide tort suits against a foreign

sovereign are contrary to the foreign policy of the Nation, then they may by law remove them from

our jurisdiction . . . . The Congress has given the courts of the United States the jurisdiction to

decide the legal issues and factual questions raised by the plaintiffs' allegations, which sound in

tort; accordingly the courts have the duty to proceed to the extent the actions are justiciable.")

This Court has already disposed of the same argument from Syria under the same *Baker v.*

*Carr*[15] framework proposed by Turkey, MTD at 65 (citing 369 U.S. 186 (1962)), noting a long

line of FSIA cases in which the D.C. Circuit explicitly disposed of the political question objections

of foreign sovereigns:

---

[15] In *Baker v. Carr*, the Supreme Court held that a complaint alleging a Tennessee statute effected
an unconstitutional deprivation of the plaintiffs' equal protection of the law under the Fourteenth
Amendment presented a justiciable cause of action and did not present a nonjusticiable political
question. 369 U.S. at 197-98, 209. In *Baker*, the Supreme Court described the factors typical of a
case in which a political question prevents adjudication. *Id.* at 217.

The D.C. Circuit previously rejected the claim that suits under 28 U.S.C. § 1605(a)(7), the predecessor to § 1605A, present a nonjusticiable political question. *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1197 (D.C. Cir. 2008), *rev'd in part on other grounds sub nom*, *Republic of Iraq v. Beaty*, 556 U.S. 848, 129 S.Ct. 2183, 173 L.Ed.2d 1193 (2009). "**[I]f the political branches decide tort suits against a foreign sovereign are contrary to the foreign policy of the Nation, then they may by law remove them from [the court's] jurisdiction.**"

*Gates v. Syrian Arab Republic*, 646 F. Supp. 2d 79, 87 (D.D.C. 2009), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011) (emphasis added). Clearly, if Turkey is upset that the President and Congress empowered this Court to analyze its motives, its only recourse is to prevail upon those branches to amend 28 U.S.C. § 1605B.

Turkey's Sheridan Circle attack thus satisfies all three prongs of the controlling definition of international terrorism found at 18 U.S.C. § 2331. First, Turkey's acts were a "violent act" in "violation of the criminal laws of the United States or of any State," and gave rise to criminal indictments and arrest warrants. *See* 18 U.S.C. § 2331(1)(A). Second, Turkey's proffered motivation for the beatings, the prevention of a terrorist attack, is an obvious pretext and Plaintiffs have provided compelling evidence that the beatings were part of a pattern of politically-motivated violence that "appear to be intended to intimidate or coerce a civilian population . . . .". *See* 18 U.S.C. § 2331(1)(B). Third, Turkey offered safe haven to the perpetrators outside of the United States, and intended to intimidate anti-Erdogan activists in Turkey and abroad, conduct which "transcend[ed] national boundaries" both "in terms of . . .  the persons they appear intended to intimidate or coerce" and/or the "locale in which [the] perpetrators operate or seek asylum." *See* 18 U.S.C. § 2331(1)(C). Further, except for the "definition of international terrorism," with one exception as to one Plaintiff,[16] Turkey does not challenge that Plaintiffs have otherwise satisfied

---

[16] Turkey argues that Doe I "lacks standing" to sue under the ATA because he is not a national of the United States. Turkey misunderstands the significance of Doe I's nationality because it fails to distinguish between the immunity provision and the federal cause of action in 28 U.S.C. § 1605B. The immunity provision of 28 U.S.C. § 1605B has no nationality requirement; it merely states that

the elements of a Section 1605B claim. MTD at Section C. Accordingly, because the events of May 16, 2017 meet the definition of international terrorism, this Court has subject matter jurisdiction over, and Turkey is not immune from, Plaintiffs' claims.

### G.     The "International Comity" Defense Has Not Existed Since the Passage of the FSIA in 1976

Turkey urges this Court to dismiss Plaintiffs' claims under "the doctrine of international comity," which has never been a ground for decision in a FSIA case. Specifically, Turkey requests that this Court ignore the text of the FSIA because allowing judicial proceedings against it to

---

"[a] foreign state shall not be immune from the jurisdiction of the courts of the United States" where the suit against the foreign state is (1) for money damages (2) for "physical injury to person or property or death," caused by (3) "an act of international terrorism," (4) in the United States, that was (5) a tortious act. 28 U.S.C. § 1605B(b). Turkey does not contest elements (1), (2), (4), and (5). The only live question regarding jurisdiction under § 1605B(b), which Plaintiffs comprehensively address above, is Turkey's argument that its violence against Plaintiffs did not meet the statutory definition of international terrorism. Accordingly, Turkey is not *immune* from Doe I's claims, regardless of his nationality.

Even if Doe I does not qualify for the federal cause of action found at § 1605B(c), where, as here, "an FSIA exception abrogates immunity, plaintiffs may bring state law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) ("In this way, 'the FSIA ... operates as a "pass-through" to state law principles.'") (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir.1996)); *Owens v. Republic of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017), *cert. granted on other question of law sub nom. Opati v. Republic of Sudan*, 139 S. Ct. 2771 (2019) ("[I]n most cases . . . the plaintiff need not rely upon state tort law. This does not, however, imply that the Congress intended to foreclose access to state law by those who need it, as do foreign [plaintiffs]. U.S. nationals will continue to sue under [the federal cause of action in 1605A] and benefit from its consistent application. But the pass-through approach remains viable to effectuate the intent of the Congress to secure recoveries for other plaintiffs harmed by a terrorist attack."). Doe I does "not have to identify the specific source of [state] law in his complaint," but rather must "do so at an appropriate time in the litigation." *Oveissi*, 573 F.3d at 841. In the Complaint, Doe I pleads assault (Count I), battery (Count II), negligent infliction of emotional distress (Count III), and intentional infliction of emotional distress (Count IV), all of which are torts in the District of Columbia, *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 45-56 (D.D.C. 2019); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) (en banc), civil conspiracy to commit those torts (Count V), also actionable in the District of Columbia, as well as a claim for bias-related crime under D.C. Code § 22-3704 (Count VI).

74

continue would "vex" and "imperil amicable relations" between Turkey and the United States. MTD at 73-74 (citations omitted). As the Supreme Court has explained, in passing the FSIA more than 40 years ago the political branches forced the Judiciary to retire the evaluation of international comity in the now-defunct multi-factor common law immunity analysis; if a foreign government is concerned that the FSIA will harm relations between it and the United States, its "apprehensions are better directed to that branch of government with authority to amend the [FSIA]." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 (2014) (allowing discovery against foreign sovereign Argentina to continue under the FSIA, regardless of purported "international comity" concerns.)

In *NML Capital*, the Supreme Court reviewed the evolution of the sovereign immunity regime in the United States, concluding that the FSIA *comprehensively* replaced all previously available common law immunity defenses:

> To understand the effect of the Act, one must know something about the regime it replaced . . . Not surprisingly, the governing standards were neither clear nor uniformly applied.
>
> **Congress abated the bedlam in 1976, replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the Foreign Sovereign Immunities Act's "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state."** *Ibid.* The key word there—which goes a long way toward deciding this case—is comprehensive . . . . The Act comprehensively regulat[es] the amenability of foreign nations to suit in the United States. This means that [a]fter the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity . . . . Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall.

573 U.S. at 142 (quotations and citations omitted) (emphasis added). Indeed, since the passage of the FSIA, this Court and others have entered scores of judgments against foreign sovereigns with

whom the U.S. has a diverse array of political relationships and in none of those cases are foreign sovereigns afforded any unique defenses not enumerated in the FSIA.

In support of its international comity argument, Turkey presents (1) a thinly veiled threat to hamper the security of U.S. presidents visiting Turkey; (2) two decisions in non-FSIA cases (with this Court declining to dismiss an action under international comity in one and the other predating the FSIA by half a century); and (3) an overridden veto statement. MTD at 73-74. As to the first, if Turkey complains that Secret Service agents and MPD officers present at Sheridan Circle hampered President Erdogan's security by refusing Turkey's instruction to beat unarmed, lawful protesters, and even impeded Turkey in that mission, those complaints are best directed at the branches of U.S. government capable of directing the Secret Service. Likewise, Turkey's thinly veiled threats to reciprocally deny the requests of the Secret Service operating in Turkey are best directed to those branches. Moreover, if Turkey, consistent with its unlawful, violent responses to the perceived indignities suffered by President Erdogan through the protected speech of peaceful protesters, wishes to complain that this lawful action under the FSIA itself represents an indignity, such complaint is best directed to the branches of U.S. government capable of amending the FSIA, which comprehensively governs the questions of immunity in these proceedings. *NML Capital*, 573 U.S. at 142-146.

In the first case presented by Turkey in support of its international comity argument, this Court *permitted* a civil forfeiture case brought by DOJ—under The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), **not the FSIA**—against an airplane owned by the son of Equatorial Guinea's President, who DOJ alleged "purchased the jet with funds derived from extortion, misappropriation, theft, and embezzlement." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 4 (D.D.C. 2013). As this Court noted:

> [I]t would be erroneous "to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Thus, few cases view international comity as a doctrine of preemption that would require courts to decline jurisdiction merely because foreign affairs are at play. *United States v. Portrait of Wally, A Painting By Egon Schiele*, 2002 WL 553532, at *10 (S.D.N.Y. 2002).

*One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d at 10.

The second case cited by Turkey involves the disputed ownership of "two large consignments of hides" purchased from Mexican General Francisco Villa on January 3, 1914. *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 299 (1918). The ancient rule expressed in *Oetjen*, decided nearly 60 years before the passage of the FSIA and barring claims for money damages against any foreign sovereign, was clearly overturned by the FSIA. *See NML Capital*, 573 U.S. at 146; 28 U.S.C. §§ 1605(a)(1), (a)(5); 28 U.S.C. § 1605B.

Finally, the President's overridden veto of JASTA, the statute which created 28 U.S.C. § 1605B, of necessity cannot prevent this Court from applying that valid law if it finds that Plaintiffs have met its requirements. U.S. CONST. ART. I § 7. Turkey's reference to President Obama's JASTA Veto Message is therefore similarly unavailing.

### H.    Plaintiffs Do Not Argue that 42 U.S.C. § 1985 Provides an Independent Basis for Jurisdiction.

Turkey filed a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, not for failure to state a claim under 12(b)(6). MTD at 4. A motion made under Rule 12(b)(1) can only result in an order which dismisses a ground of subject matter jurisdiction. Plaintiffs have not made a Section 1985 claim, and thus, Turkey's purported defense that "a foreign government is not a 'person' within the meaning of Section 1985" should not be considered by the Court at this time. Provided that this Court finds that jurisdiction over the

subject matter of this case is proper under 28 U.S.C. §§ 1605(a)(5) and 1605B, Plaintiffs reserve

their right to amend the Complaint to add a claim under 42 U.S.C. § 1985. Fed. R. Civ. P. 15(a).

## V.    CONCLUSION

For the reasons stated above, the Court should deny the Defendant's Motion.  If the Court

is unable to deny the Defendant's Motion, the Court should hold Defendant's Motion in abeyance

and while Plaintiffs engage in jurisdictional discovery.


DATED:                                          Respectfully Submitted,

September 9, 2019                       /s/ Steven R. Perles              .
                                                     Steven R. Perles (No. 326975)
                                                     Edward MacAllister (No. 494558)
                                                     Joshua K. Perles (No. 1031069)
                                                     Emily Amick (No. 242018)
                                                     PERLES LAW FIRM, PC
                                                     1050 Connecticut Ave. NW, Suite 500
                                                     Washington, DC 20036
                                                     Telephone: 202-955-9055


                                                     /s/ Stephen J. Whelan
                                                     Douglas M. Bregman (No. 218354)
                                                     Andreas N. Akaras (No. 461481)
                                                     Stephen J. Whelan (No. 1010351)
                                                     Bregman, Berbert, Schwartz & Gilday, LLC
                                                     7315 Wisconsin Avenue, Suite 800 West
                                                     Bethesda, MD 20814
                                                     Telephone: (301) 656-2707