**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LUSIK USOYAN, *et al.*,<br>          Plaintiffs<br><br>     v.<br><br>REPUBLIC OF TURKEY, *et al.*,<br>          Defendants. | Civil Action No. 18-1141 (CKK) |

**MEMORANDUM OPINION**
(February 6, 2020)

Two separate but factually similar cases[1] deal with events that took place at a May 16, 2017 protest over Turkish President Recep Erdogan's visit to the District of Columbia. Plaintiffs were protesting President Erdogan's policies when they allege that they were attacked by Turkish security forces and civilian supporters of President Erdogan in two altercations outside the Turkish Ambassador's Residence and one altercation near the Turkish Embassy. These attacks form the basis of Plaintiffs' various claims against multiple Defendants who include the Republic of Turkey ("Turkey"), individual members of the Turkish security forces, and civilian Defendants. As is relevant to this Memorandum Opinion, Defendant Turkey has moved to dismiss all claims in both cases, arguing that this Court lacks subject matter jurisdiction over claims against Defendant Turkey due to Defendant Turkey's sovereign immunity. Because Defendant Turkey's Motions to Dismiss present nearly identical factual and legal issues, the Court will resolve both Motions in one Memorandum Opinion.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court DENIES WITHOUT PREJUDICE Defendant Turkey's Motion to Dismiss. The

---

[1] The other, related case is *Kurd v. The Republic of Turkey*, No. 18-cv-1117-CKK.
[2] The Court's consideration has focused on the following documents in addition to the attached exhibits:

Court concludes that Defendant Turkey has failed to establish that it is entitled to sovereign immunity as to the claims stemming from the violent physical attacks on May 16, 2017, which includes three discrete altercations, the second of which is most heavily relied upon by the Court. Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs' supported allegations fit within the tortious acts exception to sovereign immunity. And, Defendant Turkey has failed to carry its burden of persuasion to show that its acts fall within the discretionary function rule. For these reasons, the Court finds that Defendant Turkey has not proven its entitlement to sovereign immunity at this time on this record.

## I. BACKGROUND

The Court's approach to resolving the issue of sovereign immunity in these cases has been informed by the parties' briefing. Throughout its briefing, Defendant Turkey argued that it has blanket sovereign immunity for any and all of the acts which transpired on May 16, 2017. Defendant Turkey does not address immunity for specific claims. And, Defendant Turkey does not distinguish between immunity for the first and second altercations occurring outside the Turkish Ambassador's Residence, which will be further discussed below. Plaintiffs in both cases

---

- Kurd, Def. Republic of Turkey's Mot. to Dismiss, ECF No. [90] ("Kurd, Def. Mot.");
- Kurd Pls.' Res. to Def. Republic of Turkey's Mot. to Dismiss, ECF No. [105] ("Kurd Pls.' Res.");
- Kurd, Def. Republic of Turkey's Reply in Support of its Mot. to Dismiss, ECF No. [112] ("Kurd, Def. Reply");
- Usoyan, Def. Republic of Turkey's Substitute Mot. to Dismiss, ECF No. [56] ("Usoyan, Def. Mot.");
- Usoyan Pls.' Mem. of Points and Authorities in Opp'n to Def. Republic of Turkey's Mot. to Dismiss, ECF No. [70] ("Usoyan Pls.' Opp'n"); and
- Usoyan, Def. Republic of Turkey's Reply in Support of its Mot. to Dismiss, ECF No. [79] ("Usoyan, Def. Reply").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

take a similar approach, arguing that Defendant Turkey is not immune for the injuries they incurred on May 16, 2017, without differentiating their arguments for separate claims or altercations. Considering the parties' arguments and approach, the Court has focused on the second altercation outside the Ambassador's Residence, using the first altercation as background to inform Defendant Turkey's actions during the second altercation. Sovereign immunity as to any specific claims, particularly any claims arising solely out of the first altercation, would require additional development of the record and additional argument from the parties.

The Court notes that in setting out the factual background, the Court has been aided by the abundance of video evidence filed as exhibits by both parties. While some of the videos are repeated, the Court was able to view the events at issue from multiple camera angles through the ample video evidence submitted by the parties. This video evidence supplemented the parties' factual descriptions of the altercations which occurred outside the Turkish Ambassador's Residence and, later, near the Turkish Embassy. The Court has viewed all the video evidence submitted. As much of the video evidence is repeated by the parties in each case, the Court has cited to the video exhibits submitted by Defendant Turkey in *Usoyan v. The Republic of Turkey*, No. 18-cv-1141-CKK.

On May 16, 2017, President Erdogan visited the White House in Washington, D.C. to meet with United States President Donald Trump. Usoyan Compl., ECF No. 1, ¶ 19; Kurd Am. Compl., ECF No. 63, ¶ 51. Certain individuals, including Plaintiffs in both cases, assembled outside the White House adjacent to Lafayette Square. Usoyan Compl., ECF No. 1, ¶ 19; Kurd Am. Compl., ECF No. 63, ¶ 53. These individuals were gathered to protest President Erdogan and his policies, especially as those policies relate to the Kurdish minority in Turkey. Usoyan Compl., ECF No. 1, ¶ 20; Kurd Am. Compl., ECF No. 63, ¶ 55. The protesters had a valid permit

to protest, and the protest outside the White House was peaceful. Usoyan Compl., ECF No. 1, ¶¶ 21, 22; Kurd Am. Compl., ECF No. 63, ¶ 53, 55.

Following his meeting with President Trump, President Erdogan visited the Turkish Ambassador's Residence located near Sheridan Circle in Washington, D.C. Kurd Am. Compl., ECF No. 63, ¶ 57. Ascertaining that the Ambassador's Residence would likely be President Erdogan's next location, some of the protesters, including Plaintiffs from both cases, decided to travel to the Ambassador's Residence. Usoyan Compl., ECF No. 1, ¶ 23; Kurd Am. Compl., ECF No. 63, ¶ 58. The protesters outside the Ambassador's Residence totaled approximately twenty individuals. Usoyan Compl., ECF No. 1, ¶ 24; Kurd Am. Compl., ECF No. 63, ¶ 61. The protesters were carrying signs, chanting, and had a bullhorn. Usoyan Compl., ECF No. 1, ¶ 24; Kurd Am. Compl., ECF No. 63, ¶ 63.

The protesters initially gathered on the Sheridan Circle sidewalk across the street from the Ambassador's Residence. Kurd Am. Compl., ECF No. 63, ¶ 62. By the time the protesters had arrived, many other individuals were already gathered on the sidewalk directly in front of the Ambassador's Residence, facing the protesters. *Id.* at ¶ 59. These individuals were gathered to support President Erdogan and included civilians as well as Turkish security forces. *Id.* The pro-Erdogan group greatly outnumbered the protesters and were standing in between the protesters and the entrance to the Ambassador's Residence. Usoyan Compl., ECF No. 1, ¶ 32; Kurd Am. Compl., ECF No. 63, ¶ 61. Both the protesters and the pro-Erdogan groups engaged in yelling, taunts, and threats. Usoyan, Def. Mot., Ex. 6, SC01, 0:35-0:45.

There is a dispute between the parties as to whether or not the protesters' presence on the sidewalk violated 18 U.S.C. § 112, which prohibits individuals from gathering within 100 feet of diplomatic, consular, or residential premises used by foreign governments or foreign officials if

those individuals are gathered to or to attempt to intimidate, coerce, threaten, or harass the foreign officials. 18 U.S.C. § 112(b). For purposes of this Memorandum Opinion, the Court will assume, but not decide, that the protesters were, at times, in violation of 18 U.S.C. § 112. There is video evidence that the protesters did not remain on the Sheridan Circle sidewalk prior to the first altercation which resulted in violent physical attacks by both the protesters and pro-Erdogan groups.

In an effort to maintain peaceful interactions, United States law enforcement, including Metropolitan Police Department ("MPD") officers, were gathered between the protesters and pro-Erdogan groups. Despite the presence of law enforcement, at approximately 4:05 p.m., members of both groups engaged in a violent physical altercation. Usoyan Compl., ECF No. 1, ¶ 33. During this first altercation, both groups were no longer standing on their respective sidewalks and had, instead, gathered in the street which had previously been separating them. Usoyan, Def. Mot., Ex. 6, SC01, 0:20-45. The parties dispute whether this initial altercation was started by the protesters or by the pro-Erdogan group. However, the Court need not resolve this dispute as it is not material to the Court's resolution of the issue of sovereign immunity. What is relevant, and is evident from video evidence, is that both sides engaged in physical violence and that there were injuries on both sides. Usoyan, Def. Mot., Ex. 6, SC01, 0:45-1:02; SC02, 0:14-1:30.

This first altercation lasted less than a minute. Following the first altercation, United States law enforcement officers, including MPD officers, separated the groups. Kurd Am. Compl., ECF No. 63, ¶ 69. The protesters went back to the Sheridan Circle sidewalk across from the Ambassador's Residence. And, the pro-Erdogan group returned to the sidewalk directly in front of the Ambassador's Residence. Both sides were instructed to stay on their respective

sidewalks. Usoyan, Def. Mot., Ex. 6, SC03, 0:00-0:37; SC04, 0:00-0:05. United States law enforcement officers, including MPD officers, lined up between the two groups, primarily facing the pro-Erdogan group. Usoyan, Def. Mot., Ex. 6, SC05, 0:00-0:37; SC06, 0:00-0:32. The pro-Erdogan group, including the Turkish security forces, repeatedly asked the United States law enforcement officers, including MPD officers, to force the protesters to leave in anticipation of President Erdogan's arrival. Usoyan, Def. Mot., Ex. 6, SC09, 0:50-2:15; 2:40-3:10. During this time, the shouting continued on both sides. Additionally, the protesters continued holding up their signs and yelling through their bullhorn. While two of the protesters took one brief step down from the curb, they both quickly stepped back up. Usoyan, Def. Mot., Ex. 6, SC07, 2:27-2:42. Otherwise, the protesters remained in a crude line on the Sheridan Circle sidewalk across from the Ambassador's Residence. *Id.*

Sometime between 4:10 p.m. and 4:13 p.m., President Erdogan arrived at the entrance to the Ambassador's Residence in a black car. Usoyan Compl., ECF No. 1, ¶ 50. President Erdogan remained sitting in his car for a limited period of time. Plaintiffs allege that President Erdogan then ordered his security forces and his civilian supporters to launch a second attack on the protesters. Usoyan Compl., ECF No. 1, ¶ 53; Kurd Am. Compl., ECF No. 63, ¶ 80. Defendant Turkey denies this allegation. However, the Court need not resolve this dispute at this time as it is not material to the Court's resolution of the issue of sovereign immunity.

At approximately 4:13 p.m., about eight minutes after the first altercation, while President Erdogan remained sitting in his car at the entrance to the Ambassador's Residence, the pro-Erdogan group, including Turkish security forces, launched an attack on the protesters. As the video evidence shows, at the time the pro-Erdogan group attacked the protesters, all of the protesters were standing on the Sheridan Circle sidewalk. Usoyan, Def. Mot., Ex. 6, SC02, 2:36-

2:40; SC08, 0:08-0:12; SC07, 2:27-3:45. In order to launch the attack, the pro-Erdogan group, including Turkish security forces, rushed forward and broke through the United States law enforcement line which had been separating the two groups. Usoyan, Def. Mot., Ex. 6, SC02, 2:36-2:50; SC09, 7:15-7:25. The video evidence shows that none of the protesters rushed forward to meet the attackers. *Id.* Some of the protesters immediately fell to the ground. Once on the ground, Erdogan civilian supporters and Turkish security forces continued to strike and kick the protesters who were lying prone on the ground. Usoyan, Def. Mot., Ex. 6, SC02, 2:45-5:03; SC08, 0:25-2:26; SC09, 7:29-7:40; SC10, 0:30-0:57. Other protesters attempted to run away from the attackers and away from the Turkish Ambassador's Residence. *Id.* Erdogan civilian supporters and Turkish security forces chased the protesters and violently physically attacked many of them. *Id.* It is uncontroverted that each of the Plaintiffs in both suits, except Plaintiff Lacy MacAuley who will be further discussed below, alleged injuries flowing from this altercation.

Sometime during the pendency of this second altercation, President Erdogan left his car and walked into the Ambassador's Residence. Usoyan, Def. Mot., Ex. 6, SC10, 0:00-1:52. The attack lasted a couple of minutes. Eventually, United States law enforcement officers, including MPD officers, were able to stop the attack. After the attack, Turkish security forces and other Erdogan supporters ripped up the protesters' signs. Usoyan, Def. Mot., Ex. 6, SC08, 1:41-1:45; 1:50-2:00. It is uncontroverted that the Turkish security forces did not detain, question, search, or otherwise investigate any of the protesters before, during, or immediately after the attack.

One of the Plaintiffs in the *Usoyan* case, Ms. MacAuley, was not present during the altercations at Sheridan Circle. Instead, at approximately 6:15 p.m. that same day, Plaintiff MacAuley created anti-Erdogan signs and began walking from her home to the Turkish

Embassy, which was President Erdogan's next scheduled stop. Usoyan Compl., ECF No. 1, ¶¶ 88-89. Prior to reaching the Embassy, Plaintiff MacAuley reached a police perimeter, guarded by at least four United States law enforcement officers, including MPD officers. Plaintiff MacAuley stopped at the police perimeter and stood with her sign and began yelling. Usoyan, Def. Mot., Ex. 6, SC02, 7:15-7:50. While Plaintiff MacAuley, as a lone protester standing 5'3'' tall and weighing approximately 105 pounds, was standing behind the police perimeter, President Erdogan's motorcade drove by on its way to the Embassy. Usoyan Compl., ECF No. 1, ¶¶ 90, 96. At approximately 6:17 p.m., it is uncontroverted that a group of Turkish security forces emerged from a van that was part of President Erdogan's motorcade and at least four Turkish security forces surrounded Plaintiff MacAuley. Usoyan Compl., ECF No. 1, ¶ 90; Usoyan, Def. Mot., Ex. 6, SC02, 7:52-8:25. One of the Turkish security forces placed her hand over Plaintiff MacAuley's mouth, another aggressively grabbed her wrist, and another snatched her sign, crumpled it, and threw it to the ground. Usoyan, Def. Mot., Ex. 6, SC02, 7:52-8:25. Ultimately, United States law enforcement officers, including MPD officers, intervened to end the altercation.

## II.    LEGAL STANDARD

Turkey has filed its Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Pursuant to Rule 12(b)(1), a party may move for dismissal based on "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). When a foreign sovereign defendant moves for dismissal under Rule 12(b)(1) on the grounds of sovereign immunity, initially, the plaintiff bears the burden of overcoming the presumption of sovereign immunity "by producing evidence that an [FSIA] exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). After the plaintiff has met

this initial burden of production, the foreign sovereign defendant bears the "ultimate burden of persuasion" to show that the alleged exception to sovereign immunity does not apply. *Id.*

In resolving a motion to dismiss pursuant to Rule 12(b)(1), the court can, and often must, go beyond the allegations in the complaint. "Where a motion to dismiss a complaint 'present[s] a dispute over the factual basis of the court's subject matter jurisdiction … the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). Instead of merely relying on the truth of the facts alleged in the complaint, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* (quoting *Phoenix Consulting*, 216 F.3d at 40).

### III.    LEGAL FRAMEWORK

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also* 28 U.S.C. §§ 1604-1605. The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Nelson*, 507 U.S. at 355 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions ... [a]t the threshold of every action in a district court against a foreign state ... the court must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983). "In other words, U.S. courts have no power to hear a case brought against a foreign sovereign

*unless* one of the exceptions applies." *Diag Human S.E. v. Czech Republic-Ministry of Health*, 64 F. Supp. 3d 22, 30 (D.D.C. 2014), *rev'd on other grounds* 824 F.3d 131 (D.C. Cir. 2016).

As is relevant for purposes of this Memorandum Opinion, Plaintiffs in both cases claim that the Court has subject matter jurisdiction over Defendant Turkey pursuant to the FSIA's tortious acts exception. Under the tortious acts exception, "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5). Legislative history indicates that the tortious acts exception to sovereign immunity "is directed primarily at the problem of traffic accidents." *El-Hadad v. United Arab Emirates*, 216 F.3d 29, 35 (D.C. Cir. 2000) (quoting H.R. REP. NO. 94-1487, at 20-21, U.S. Code Cong. & Admin. News 1976, at 6619). "[A]lthough cast in general terms, the 'tortious act' exception was designed primarily to remove immunity for cases arising from traffic accidents[,] … [and] the exception should be narrowly construed so as not to encompass the farthest reaches of common law." *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987).

There are two qualifiers to the FSIA's tortious acts exception to sovereign immunity. As is relevant here, the exception shall not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). When considering the discretionary function rule, it is "the nature of the conduct, rather than the status of the actor, that governs

whether the discretionary function exception applies in a given case." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 813 (1984).

As the Court previously noted in the Legal Standard section, on a motion to dismiss, the plaintiff bears the burden of overcoming the presumption of sovereign immunity "by producing evidence that an [FSIA] exception applies." *Helicopter Textron*, 734 F.3d at 1183. Once the burden of production is met, the defendant foreign sovereign bears the burden of persuasion to show that the claimed exception to sovereign immunity does not apply. *Id.* Additionally, when the defendant foreign sovereign invokes the discretionary function rule to the tortious acts exception, "[t]he burden of proof is on the defendant to demonstrate by a preponderance of the evidence that the discretionary exception applies." *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 35 (D.D.C. 2002) (citing *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995)).

## IV.     ANALYSIS

The Court bases its conclusion that it has jurisdiction over Defendant Turkey on the FSIA's tortious acts exception. Under the tortious acts exception, "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5).

Defendant Turkey does not appear to dispute that the tortious acts exception applies in these cases. And, the Court finds that the tortious acts exception is applicable on its face. Plaintiffs in both cases seek money damages against a foreign state, the Republic of Turkey, for personal injuries. The events leading to the claimed personal injuries all occurred in the United

States. Furthermore, the personal injuries were allegedly caused, in part, by the tortious acts of officials or employees, specifically the presidential security forces, of Defendant Turkey. Finally, those presidential security forces of Defendant Turkey were acting within the scope of their employment. "Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master." *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (quoting Restatement (Second) of Agency § 228 (1958)). The events at issue, including the use of force, occurred while the Turkish security forces were engaged in their employment of providing security for President Erdogan. And, as security forces, the use of some degree of force is not unexpected. Accordingly, the Court concludes that the tortious acts exception to sovereign immunity applies to Defendant Turkey in these cases.

### A. Discretionary Function Rule

Rather than disputing the applicability of the tortious acts exception, Defendant Turkey relies on the discretionary function rule to argue that its sovereign immunity is preserved. Pursuant to the discretionary function rule, the tortious acts exception shall not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). As an initial matter, despite Plaintiffs' arguments to the contrary, the Court concludes that Defendant Turkey is not categorically barred from relying on the discretionary function rule to maintain immunity. However, using the two-part discretionary function test developed in *Berkovitz by Berkovitz v. United States*, 486 U.S. 531 (1988), the Court concludes

that Defendant Turkey cannot rely on the discretionary function rule to maintain its immunity because Defendant Turkey's exercise of discretion relating to the violent physical attack on the protesters was not grounded in social, economic, or political policy and was not of a nature and quality that Congress intended to shield from liability.

### 1. Categorical bar on discretionary function rule

Plaintiffs argue that the discretionary function rule categorically does not apply to Defendant Turkey because their Complaints include allegations of serious crimes. In arguing that Defendant Turkey is barred from relying on the discretionary function rule, Plaintiffs cite primarily to *Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980). In *Letelier*, survivors of an assassinated Chilean dissident leader sued the Republic of Chile under the FSIA, alleging that Chile had directed the assassination. Using the tortious acts exception, the district court determined that the Chile was not immune from suit. The court further concluded that the discretionary function rule was inapplicable because participation in an assassination was not a discretionary act. *Letelier*, 488 F. Supp. at 673. In determining that participation in an assassination was not a discretionary act, the court explained that "there is no discretion to commit, or to have one's officers or agents commit, an illegal act." *Id.* Specifically, the court found that a foreign country "has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law." *Id.* Plaintiffs interpret *Letelier* to mean that the discretionary function rule does not apply where the foreign country has committed a serious criminal act.

The Court is unpersuaded by Plaintiffs' reliance on *Letelier*. As an initial matter, *Letelier* is a 40-year old district court case which is not binding on this Court. Moreover, *Letelier* is

factually distinguishable from these cases. *Letelier* involved an assassination found to be "clearly contrary to the precepts of humanity as recognized in both national and international law." *Id*. While the Court in no way intends to minimize the violent physical acts alleged by Plaintiffs, those acts do not rise to the level of an assassination. And, Plaintiffs have produced no evidence that Defendant Turkey's actions are contrary to the precepts of humanity.

Perhaps recognizing that *Letelier* provides inadequate support, Plaintiffs further rely on statements from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") in *MacArthur Area Citizens Association v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987). In *MacArthur*, the D.C. Circuit determined that the discretionary function rule served to make Peru immune from claims that it had used as its chancery a building which was zoned for residential occupancy. 809 F.2d at 922. In making this determination, the court addressed the plaintiffs' arguments that "Peru's acts are criminal and thus cannot be discretionary." *Id.* at 922 n.4. Rejecting this argument, the court noted that the plaintiffs had failed to establish that Peru violated any criminal law and that, even if Peru had violated a criminal law based on zoning requirements, such a violation would likely not be sufficient to "automatically prevent designation of Peru's acts as discretionary." *Id.* Citing approvingly of *Letelier*, the court explained that "case law buttresses the proposition that a criminal act cannot be discretionary." *Id.* However, the court noted that the criminal acts in *Letelier* which were found to be categorically non-discretionary were "of a rather different character and order." *Id.*

Like *Letelier*, *MacArthur* lends support to the proposition that some serious criminal violations are categorically non-discretionary. However, neither case provides a set of standards for determining when a criminal act is of a character and order sufficient to bar invocation of the discretionary function rule. *MacArthur* did not definitively answer the question of "whether a

clear violation of *jus cogens*[, meaning norms of international law,] would bar a finding that a defendant acted within the scope of his authority." *Belhas v. Ya'alon*, 515 F.3d 1279, 1293 (D.C. Cir. 2008) (Williams, J., concurring). Even if *MacArthur* had definitively answered that question, *MacArthur* did not establish a standard for determining whether or not a criminal act constitutes a violation of jus cogens, thus barring the application of the discretionary function rule. *See Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 81 n.4 (D.D.C. 2013) (acknowledging that there are "unresolved questions regarding the scope of a sovereign foreign state's ability to engage in discretionary tortious conduct for political purposes in the United States"); *Doe v. Federal Democratic Republic of Ethiopia*, 189 F. Supp. 3d 6, 27-28 (D.D.C. 2016) (explaining that the discretionary function rule does not apply to "serious violations of U.S. criminal law," but drawing no conclusion as to whether or not the foreign sovereign's actions constituted a serious criminal act); *Risk v. Halvorsen*, 936 F.2d 393, 397 (9th Cir. 1991) ("it cannot be said that every conceivably illegal act is outside the scope of the discretionary function exception"). And, it does not appear to the Court that the actions of Defendant Turkey alleged in these cases are of the same nature or order as the assassination which was previously been found to be non-discretionary in *Letelier*. 488 F. Supp. at 673; *see also Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (finding that Defendant China's alleged acts involving murder were non-discretionary).

Looking beyond FSIA cases, as further support for a categorical bar on Defendant Turkey's use of the discretionary function rule, Plaintiffs also rely on cases involving the Federal Tort Claims Act ("FTCA"). Specifically, Plaintiffs rely on a line of cases concluding that the discretionary function rule does not apply when plaintiffs allege conduct which violates a constitutional prescription. *See e.g.*, *Loumiet v. United States*, 828 F.3d 935, 942-46 (D.C. Cir.

2016) (holding that "the FTCA's discretionary-function exception [does not] shield[] the Untied States from common-law tort liability … when the otherwise discretionary conduct the plaintiff challenges exceeds constitutional limits on the government's authority to act"). Because Plaintiffs allege that Defendant Turkey's acts infringed on their First Amendment right to free speech and their Fourth Amendment right against unreasonable seizure, Plaintiffs argue that Defendant Turkey cannot rely on the discretionary function rule.

"[G]uidance on what acts should be deemed discretionary for FSIA purposes can be drawn from decisions construing the Federal Tort Claims Act." *MacArthur*, 809 F.2d at 921. However, in these cases, the Court finds Plaintiffs' reliance on the cited line of FTCA cases unpersuasive. Plaintiffs rely on FTCA cases holding that there is no discretion for United States officials to commit unconstitutional acts. This proposition is reasonable when applied to United States officials because the Constitution places limits on the power of the United States government. See *Loumiet*, 828 F.3d at 944. A constitutional prescription "circumscribes the government's authority even on decisions that otherwise would fall within its lawful discretion." *Id.* However, foreign sovereigns are not bound by the United States Constitution. *See Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 993 (9th Cir. 2013) (explaining that Japan is not bound by the United States Constitution); *United States v. Gecas*, 120 F.3d 1419, 1430 (11th Cir. 1997) (en banc) (providing limits of United States Constitution on foreign sovereigns); *Flynn v. Shultz*, 748 F.2d 1186, 1197 (7th Cir. 1984) ("Obviously, the Mexican government is not bound by the requirements of our Constitution."). And, Plaintiffs have cited no case in which a foreign government has been found liable for violating the constitutional rights of an individual. For this reason, the Court concludes that FTCA cases finding violations of constitutional prescriptions by

United States officials to be non-discretionary are not persuasive to the Court's analysis of Defendant Turkey's sovereign immunity under the FSIA.

In summary, it does not appear to the Court that the conduct alleged by Plaintiffs rises to the level of that in *Letelier*, which involved an act, assassination, "that is clearly contrary to the precepts of humanity as recognized in both national and international law." 488 F. Supp. at 673. Additionally, it does not appear to the Court that allegations that Defendant Turkey infringed on Plaintiffs' constitutional rights would be relevant to the sovereign immunity analysis under the FSIA. However, the Court need not determine whether or not the acts alleged by Plaintiffs rise to the level of being categorically non-discretionary. Instead, the Court will assume for purposes of this Memorandum Opinion that they are not categorically non-discretionary. And, the Court will engage in the *Berkovitz* discretionary function test which Defendant Turkey agrees applies to the actions in these cases. Kurd, Def. Mot., ECF No. 90, 38; Usoyan, Def. Mot., ECF No. 56, 39.

### 2. *Berkovitz* **test for discretionary functions**

In order to determine whether or not the discretionary function rule applies, the United States Supreme Court developed a two-part test. *Berkovitz*, 486 U.S. at 536. Under this two-part test, immunity is preserved over a discretionary act where (1) there is no statute, regulation, or policy specifically prescribing the official's conduct and the action is a product of judgment or choice, and where (2) the exercise of discretion is grounded in social, economic, or political policy and is of a nature and quality that Congress intended to shield from liability. *Id.* at 536-37. Reviewing both parts of the test, the Court finds that Defendant Turkey has failed to meet its burden of persuasion to show that its exercise of discretion was grounded in social, economic, or political policy and was of a nature and quality that Congress intended to shield from liability.

### a. Prescription by federal statute, regulation, or policy

First, the discretionary function rule will not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. The Court finds that there was no federal statute, regulation, or policy specifically prescribing Defendant Turkey's actions during the events at issue in these cases.

Plaintiffs rely on 18 U.S.C. § 112(d) to argue that Defendant Turkey's choice of actions was prohibited by federal law. But, Section 112(d) neither mandates nor forbids specific actions by a foreign sovereign. Instead, Section 112 is designed to protect foreign officials. As was previously explained, Section 112(b) makes it a crime to or to attempt to intimidate, coerce, threaten, or harass a foreign official or foreign guest. § 112(b)(1)-(2). It is also a crime to congregate within 100 feet of diplomatic, consular, or residential premises with the intent to violate Section 112(b). § 112(b)(3). The portion of the statute relied on by Plaintiffs states that "[n]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States." § 112(d). While this portion of the statute ensures that potential violators of the statute will not be sanctioned for exercising their First Amendment rights, it does not mandate specific conduct by foreign sovereigns. As such, Plaintiffs' reliance on this provision is misplaced. And, Plaintiffs do not cite another statute, regulation, or policy specially prescribing Defendant Turkey's conduct.

Plaintiffs further argue that the conduct of the Turkish security forces was not the product of judgment or choice. Plaintiffs argue that "someone" ordered the Turkish security forces to attack the protesters standing on the Sheridan Circle sidewalk. In their Complaints, Plaintiffs allege that it was President Erdogan who ordered the Turkish security forces to attack. Usoyan Compl., ECF No. 1, ¶ 53; Kurd Am. Compl., ECF No. 63, ¶ 80. Plaintiffs further argue that the

Turkish agents engaged in the attack in a coordinated manner that did not leave room for choice or discretion.

Even if the Court were to assume the truth of Plaintiffs' allegation that the Turkish security forces were ordered to attack, such an order would not prevent the individual agents from exercising choice and discretion in their method of attack. "The discretionary function exception shields the government from liability for those decisions which involve a measure of policy judgment, and immunizes as well the execution of such decisions in specific instances by subordinates, even those at the operational level, if they must exercise such judgment too." *MacArthur*, 809 F.2d at 922( quoting *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986)). Plaintiffs' allegation that the Turkish security forces did not exercise discretion because they attacked at the same time in a coordinated fashion is speculative. Moreover, Defendant Turkey has introduced evidence that security forces make split-second decisions and are "trained on how to identify perceived threats on the ground as they unfold in real time, and how to respond in time to mitigate the perceived risk." Kurd, Def. Reply, Ex. 13, ECF No. 112-1, ¶¶ 10-11. Furthermore, video evidence supports the contention that, even if the security forces were ordered to attack and attacked in a coordinated manner, each agent made his or her own individual choice as to whom to attack and in what manner to attack. Usoyan, Def. Mot., Ex. 6, SC02, 2:45-5:03; SC08, 0:25-2:26; SC09, 7:29-7:40; SC10, 0:30-0:57.

Accordingly, the Court concludes that there was no federal statute, regulation, or policy specifically prescribing Defendant Turkey's actions during the events at issue in these cases.

### b. Grounding in social, economic, or political policy

The Court now moves to the second part of the *Berkovitz* test. The Court considers whether the foreign sovereign's exercise of discretion is "grounded in social, economic, or

political policy" and is "of the kind that the discretionary function exception was designed to shield." 486 U.S. at 536-37. The Court finds that Defendant Turkey's exercise of discretion in these cases was not grounded in social, economic, or political policy and was not "of the nature and quality that Congress intended to shield from tort liability." *S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. at 813.

As was previously explained, the tortious acts exception is "directed primarily at the problem of traffic accidents." *El-Hadad*, 216 F.3d at 35 (quoting H.R. REP. NO. 94-1487, at 20-21, U.S. Code Cong. & Admin. News 1976, at 6619). While the tortious acts exception is drafted in general terms, courts have cautioned that the "discretionary function exception should not be applied too broadly immunizing almost all governmental activity." *Hawes v. United States*, 322 F. Supp. 2d 638, 645 (E.D. Va. 2004*); see also Cestonaro v. United States*, 211 F.3d 749, 755 (3d Cir. 2000) (explaining that the discretionary function rule should not be a "toothless standard that the government can satisfy merely by associating a decision with a regulatory concern"). The Court concludes that Defendant Turkey, who bears the burden of persuasion on this issue, has presented no evidence that Congress intended to provide immunity for acts such as those alleged by Plaintiffs in these cases.

In attempting to show that its acts were grounded in social, economic, or political policy and were of a nature and quality that Congress intended to shield from liability, Defendant Turkey cites to a myriad of cases applying the discretionary function rule. However, these cases are not persuasive to the Court. Almost all of the cases relied on by Defendant Turkey involve claims of governmental negligence or claims that the United States or a foreign government created a danger and negligently failed to warn or protect individuals from that danger. *See e.g., Allen v. United States*, 816 F.2d 1417, 1421-24 (10th Cir. 1987) (applying the discretionary

function rule to a lawsuit alleging a failure to monitor and a failure to warn concerning the implementation of open-air atomic bomb tests); *Macharia v. United States*, 334 F.3d 61, 65-68 (D.C. Cir. 2003) (applying the discretionary function rule to a lawsuit alleging negligence related to the security of a United States embassy); *Sledge v. United States*, 883 F. Supp. 2d 71, 82-88 (D.D.C. 2012) (applying the discretionary function rule to a lawsuit alleging that the United States failed to prevent or stop an attack on an inmate); *Singh v. South Asian Society of George Washington University*, 572 F. Supp. 2d 11, 13-14 (D.D.C. 2008) (applying the discretionary function rule to a lawsuit alleging negligent selection, retention and supervision of security providers on public lands); *Haygan v. United States*, 627 F. Supp. 749, 750-51 (D.D.C. 1986) (applying the discretionary function rule to a lawsuit alleging negligence after plaintiff's car was taken from a government-owned parking lot by a third party); *Dalehite v. United States*, 346 U.S. 15, 33-43 (1953) (applying the discretionary function rule to a lawsuit alleging negligence in United States' plan for producing and distributing fertilizer); *Monarch Insurance Company of Ohio v. District of Columbia*, 353 F. Supp. 1249, 1256-61 (D.D.C. 1973) (applying the discretionary function rule to a lawsuit alleging negligence in carrying out a riot prevention plan); *Shuler v. United States*, 531 F.3d 930, 933-36 (D.C. Cir. 2008) (applying the discretionary function rule to a lawsuit alleging negligence in failing to protect and conceal the identity of an informant). In contrast to actions for negligence and the like, here, Plaintiffs' claims involve intentional conduct by Defendant Turkey which directly caused the complained-of injuries. Moreover, Defendant Turkey's alleged actions were sudden and spur-of-the-moment as opposed to the longer-developed policies and plans which were challenged in the cited cases.

Defendant Turkey further attempts to rely on another case, *Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70 (D.D.C. 2011). In that case, the plaintiff sued the United States

pursuant to the FTCA alleging, among other common law claims, false arrest and imprisonment. The court found that the plaintiff's claims of detention and false arrest were barred by the discretionary function rule. *Olaniyi*, 763 F. Supp. 2d at 88. In making this determination, the court relied on precedent holding that "[d]ecisions regarding the timing of arrests are the kind of discretionary government decisions, rife with considerations of public policy, that Congress did not want the judiciary 'second guessing.'" *Id.* at 89 (quoting *Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008)). Here, it is uncontroverted that Defendant Turkey did not detain, question, search, or otherwise investigate the protesters before, during, or immediately following the events in question. Moreover, Plaintiffs' claims are not based on false arrest or detention. Instead, they are based on Defendant Turkey's alleged violent physical attacks. As such, the court's reasoning in *Olaniyi* is not relevant to this Court's resolution of the issue of Defendant Turkey's sovereign immunity.

The Court further notes that Defendant Turkey failed to cite any case in which allegations of a violent physical attack, involving battery and assault, were found to fall under the discretionary function rule and be entitled to immunity. While the parties do not cite and the Court could not find any case directly analogous to that currently before the Court, there are cases which support the Court's conclusion that Defendant Turkey's use of its discretion in violently physically attacking Plaintiffs was not grounded in social, economic, or political policy and was not of a nature and quality that Congress intended to shield from liability.

First, the Court considers *Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117 (D.D.C. 2018). In *Miango*, the plaintiffs alleged that they were participating in protests across the street from the hotel where the President of the Democratic Republic of the Congo was staying when they were beaten by the Congo's security forces. 288 F. Supp. 3d at 120, *vacated*

*in part on other grounds* in No. 15-1265, 2019 WL 2191806 (D.D.C. 2019). The court found that it had jurisdiction over the plaintiff's claims based on the tortious acts exception to the FSIA. *Id.* at 124-26. The court further found that the discretionary function rule did not apply. *Id.* at 126 n.3.

Defendant Turkey argues that the Court should not be persuaded by the decision in *Miango* because the case was decided by default judgment and because the discussion of the discretionary function rule occurs only in a footnote citing *Letelier*. But, even on a motion for default judgment, the court must still assure itself of its jurisdiction under the FSIA. *Verlinden B.V.*, 461 U.S. at 498 n. 20 ("Under the [FSIA], subject-matter jurisdiction turns on the existence of an exception to foreign sovereign immunity. Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a district court still must determine that immunity is unavailable under the Act." (internal citation omitted)). The *Miango* court's discussion of the discretionary function rule is admittedly short. But, the *Miango* court's ultimate decision that the Congo did not have sovereign immunity for its violent physical attack on protesters remains relevant to the Court's decision due to the factual similarities between *Miango* and the cases currently before the Court.

The Court is further persuaded by another FSIA case finding that allegations involving sudden, violent, physical acts are not grounded in social, economic, or political policy and are not of a nature and quality that Congress intended to shield from liability. In *Rendall-Speranza v. Nassim*, 942 F. Supp. 621 (D.D.C. 1996), the plaintiff sued a director of the International Finance Corporation ("IFC") for assault and battery. Employees of the IFC "enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." *Rendall-Speranza*, 942 F. Supp. at 626, r*ev'd on other grounds by* 107 F.3d 913 (D.C. Cir. 1997) (quoting

22 U.S.C. § 288a(b)). As such, the court addressed the defendant's sovereign immunity pursuant to the FSIA. The court explained that, in attacking the plaintiff, the defendant "was acting in his official duties by taking steps to protect the employee's offices from trespass and to protect the employee's files from tampering or theft." *Id.* However, the court decided that the defendant's alleged acts, grabbing the plaintiff's wrists, twisting her arm behind her back, and kicking her shin, were not discretionary because "it was not a decision grounded in social, economic, or political policy." *Id.* at 627. Accordingly, the court found that allegations involving a violent physical attack did not involve the type of discretion that Congress intended to immunize. *See also Kalasho v. Republic of Iraq*, No. 06-11030, 2007 WL 2683553, *7 (E.D. Mich. Sept. 7, 2007) (explaining that "[d]iscretionary functions are limited to legitimate diplomatic functions" and do not include allegations such as assault and battery).

The Court further notes persuasive language in other cases implying that the violent physical acts alleged here are not protected by the discretionary function rule. In *Morgan v. International Bank for Reconstruction and Development*, 752 F. Supp. 492 (D.D.C. 1990), the court found that the defendant World Bank was immune from the plaintiff's allegation of false imprisonment based on the discretionary function rule. The court based its decision on evidence that the defendant had engaged in "a continuous process of investigation into missing money which involved the participation of higher level World Bank security and Ethics Department officials." *Morgan*, 752 F. Supp. at 495. However, the court implied that if the complaint had alleged "a mere scuffle with guards," the decision may have been different. *Id.* Similarly, in *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994), the court explained that the Defendant Saudi Arabia "would not be immune if the consular officers committed serious physical abuse." 860 F. Supp. at 384. The court ultimately concluded that the plaintiffs had failed

to present evidence of serious physical abuse. The court explained that the plaintiffs failed to produce "hospital records, pictures, scars, or testimony from others about the extent of harm." *Id.* Conversely, in these cases, the Court has been presented with video evidence of Defendant Turkey's actions and its effect on some Plaintiffs as well as uncontroverted allegations of serious injuries.

The Court also considers related decisions in the context of the FTCA. The Court acknowledges that the FTCA treats allegations of intentional torts, such as assault and battery, against United States officials differently than does the FSIA. Under the FTCA, claims of assault and battery by law enforcement officers are explicitly exempted from the United States' sovereign immunity defense. 28 USC § 2680(h). Courts have struggled with how to read this explicit exemption for some intentional torts in congruence with the discretionary function rule which maintains immunity for discretionary acts. *Nguyen v. United States*, 556 F.3d 1244, 1257-58 (11th Cir. 2009) (explaining circuit split as to whether or not the United States can maintain discretionary immunity for intentional torts by law enforcement). However, the Court notes that in FTCA cases, courts have determined that Congress intended to allow claims for battery and assault against United States law enforcement officials even when the allegations relate to those law enforcement officials performing security functions. *See Garcia v. United States*, 826 F.2d 806, 809 (9th Cir. 1987) (finding the discretionary function rule inapplicable in FTCA case for assault and shooting by United States law enforcement); *Beran v. United States*, 759 F. Supp. 886, 892 (D.D.C. 1991) (finding allegations of assault and battery against United States law enforcement non-discretionary, based in part on § 2680(h)).

Based on its review of caselaw concerning the discretionary function rule, the Court concludes that Defendant Turkey's alleged actions, particularly those involving a violent

physical attack during the second altercation outside the Ambassador's Residence, were not grounded in social, economic, or political policy and were not of a nature and quality that Congress intended to shield from liability.

Prior to the second altercation, the approximately 20 protesters, including Plaintiffs, were standing and remaining on the Sheridan Circle sidewalk which had been designated for protesting by United states law enforcement. Usoyan, Def. Mot., Ex. 6, SC02, 2:36-2:40; SC08, 0:08-0:12; SC07, 2:27-3:45. As previously stated, for purposes of this Memorandum Opinion, the Court assumes without deciding that the protesters were, at times, within 100 feet of the Turkish Ambassador's Residence and engaging in conduct which violated 18 U.S.C. § 112.[3] However, in the time preceding the second altercation, the protesters remained standing on the designated sidewalk. Turkish security forces and other pro-Erdogan individuals then crossed a police line to attack the protesters. The protesters did not rush to meet the attack. Instead, the protesters either fell to the ground, where Turkish security forces continued to kick and hit them, or ran away, where Turkish security forces continued to chase and otherwise attack them. Usoyan, Def. Mot., Ex. 6, SC02, 2:45-5:03; SC08, 0:25-2:26; SC09, 7:29-7:40; SC10, 0:30-0:57. The Turkish security forces violently physically attacked the protesters.

Defendant Turkey argues that President Erdogan was within range of a possible handgun, improvised explosive device, or chemical weapon attack. Even if the Court assumes this to be true, at the time of the second attack, the protesters were merely standing on the Sheridan Circle sidewalk. Defendant Turkey points to no indication that an attack by the protesters was imminent. Moreover, it is uncontroverted that the Turkish security forces did not detain,

_____

[3] The Court notes that whether or not the protesters were within 100 feet of the Turkish Ambassador's Residence and whether or not the protesters were engaging in conduct violative of 18 U.S.C. § 112 and outside the protection the First Amendment continues to be disputed.

question, search, or otherwise investigate the protesters before, during, or immediately following the altercation as would be expected if they thought the protesters were armed with serious weapons. Instead, the Turkish security forces chased and violently physically attacked the protesters, many of whom had fallen to the ground and no longer posed a threat. *Id*. Defendant Turkey's decision to engage in this violent physical attack was not grounded in social, economic, or political policy and was not of a nature and quality that Congress intended to shield from liability.

The Turkish security forces also violently physically attacked Plaintiff MacAuley, who was not present at the protest outside the Turkish Ambassador's Residence. Plaintiff MacAuley was a lone protester holding a sign and chanting near the Turkish Embassy. She was standing behind a police line, surrounded by at least three United States law enforcement officers, including MPD officers. Def. Mot., Ex. 6, SC02, 7:52-8:25. After President Erdogan's motorcade had already passed, multiple Turkish security forces ran towards Plaintiff MacAuley and surrounded her. The Turkish security forces physically attacked Plaintiff MacAuley by forcibly covering her mouth, grabbing her wrist and arm, and snatching and crumbling her sign. *Id*. Defendant Turkey's decision to violently physically attack a lone protester, standing 5'3'', weighing approximately 105 pounds, and surrounded by United States and MPD law enforcement officers, after President Erdogan's motorcade had already passed was not grounded in social, economic, or political policy and was not of a nature and quality that Congress intended to shield from liability.

In reaching the conclusion that Defendant Turkey's acts do not fall within the discretionary function rule, the Court makes a very narrow, fact-specific decision. The Court acknowledges that providing security for a president is extremely challenging and often requires

split-second decision making. These challenges are especially fraught when providing security for a leader such as President Erdogan who has been the victim of multiple assassination threats and attempts.[4]

The Court further recognizes that those charged with the security of a president in a foreign country are often required to use their discretion to successfully perform their duties. The United States Secret Service requires this same degree of discretion when protecting the United States President during visits to foreign countries.

In exercising their discretion to make these life or death decisions, presidential security forces may sometimes make the wrong decision. The discretionary function rule protects this possibility of error by retaining immunity for foreign nations even when "the discretion be abused." 28 U.S.C. 1605(a)(5)(A). Had the facts of these cases differed slightly, the Court's decision as to Defendant Turkey's sovereign immunity may have differed as well. The Turkish security forces had the discretion to protect their president. They even had the discretion to err, to some degree, in their determination as to the nature of force required to protect President Erdogan. However, the Turkish security forces did not have the discretion to violently physically attack the protesters, with the degree and nature of force which was used, when the protesters were standing, protesting on a public sidewalk. And, Turkish security forces did not have the discretion to continue violently physically attacking the protesters after the protesters had fallen to the ground or otherwise attempted to flee.

---

[4] Defendant Turkey has provided evidence that Plaintiff Kheirabadi had a flag supporting the YPG, or the People's Protection Unit, while protesting outside the White House prior to the altercations at issue. *See* Usoyan, Def. Mot., ECF No. 56, Ex. 8. The parties dispute whether or not the YPG, which the United States does not recognize as a terrorist organization, is an alter ego of the PKK, the Kurdistan Workers' Party, which is a designated foreign terrorist organization. The Court need not resolve this dispute because the dispute is not material to the Court's resolution of the issue of sovereign immunity.

For these reasons, the Court concludes that the discretionary function rule does not apply to Defendant Turkey. Without the protection of the discretionary function rule, Defendant Turkey is subject to the tortious acts exception to sovereign immunity under the FSIA.

## B. Political Question Doctrine

Defendant Turkey further argues that the Court's consideration of whether or not its sovereign immunity is abrogated by the tortious acts exception is barred by the political question doctrine. The Court disagrees.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (internal quotation marks omitted). The political question doctrine works as a narrow exception to this general rule. The Court confronts a nonjusticiable political question where any one of the following six factors is present: "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962). "Unless one of [the *Baker* factors] is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id*. Here, the Court finds that no *Baker* factor is inextricable from the Court's application of the tortious acts exception or of the discretionary function rule.

First, Defendant Turkey argues that *Baker* factors 1 and 6 are implicated because "[s]peaking on behalf of the federal government regarding a foreign state's perceived national policies is a function constitutionally committed to the Executive Branch." Kurd, Def. Mot., ECF No. 90, 52; *see also* Usoyan, Def. Reply, ECF No. 79, 56-57. Defendant Turkey is correct that Plaintiffs' Complaints contain allegations relating to Turkey's perceived national policies. However, these allegations are not inseparable from the issue of sovereign immunity currently before the Court. In determining that the tortious acts exception applies and that Defendant Turkey did not have discretion to commit the acts alleged, the Court makes no determination or assumption as to Turkey's national policies. The Court further makes no judgment as to the morality or rightfulness of Turkey's national policies, including Turkey's policies towards Kurdish people. As such, the Court is not infringing on the executive branch's role in directing foreign relations or risking inconsistency with the executive branch's public statements regarding relations between the United States and Turkey.

Moreover, the Court notes that both of the other branches of government have already spoken out concerning the acts which are at issue in these cases. Some United States Senators have openly expressed condemnation of Defendant Turkey's attack on the protesters. *See* May 18, 2027 Letter from Dianne Feinstein, United States Senator, and John McCain, United States Senator, to Recep Erdogan, President of Turkey, https://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=1019B0F4-1AB5-469E-9032-E33155E58EA0 (last visited February 5, 2020) ("[t]he violent response of your security detail to peaceful protestors is wholly unacceptable"). Additionally, the United States House of Representatives unanimously passed a Resolution stating that "the Turkish security forces acted in an unprofessional and brutal manner" and requesting "the waiver of immunity of any Turkish security detail official engaged

in assault" and that Turkish security forces "should be charged and prosecuted under United States law." *Condemning the violence against peaceful protesters outside the Turkish Ambassador's residence on May 16, 2017, and calling for the perpetrators to be brought to justice and measures to be taken to prevent similar incidents in the future*, H. Res. 354, 115th Congress (2017). And, immediately following the altercations, the United States Department of State issued a statement communicating concern to the Turkish government regarding the actions at issue and stating that violence was not an appropriate response to free speech. Tracy Wilkinson, *State Department protests Turkish guards' beating of demonstrators in Washington*, Los Angeles Times (May 17, 2017), https://www.latimes.com/ nation/la-fg-turkey-us-protests-20170517-story.html. Moreover, there are four pending criminal indictments against Turkish security forces in the Superior Court of the District of Columbia. *See* Kurd Res., Ex. 9, ECF No. 105-9 (indictments). The risk of embarrassment from multifarious pronouncements is accordingly lower.

Second, Defendant Turkey argues that *Baker* factor 2 is implicated because "[t]here are no judicially discoverable and manageable standards for resolving Plaintiffs' allegations that Turkey has a long history of discrimination against and oppression of the Kurdish people." Kurd, Def. Mot., ECF No. 90, 54 (internal quotation marks omitted); *see also* Usoyan, Def. Reply, ECF No. 79, 57-58. The Court need not resolve the issue as to whether or not there are judicially manageable standards for analyzing Plaintiffs' allegations of discrimination and oppression against Kurdish people. Any allegations of Turkey's history of discrimination and oppression against Kurdish people are separable from the issue of sovereign immunity currently before the Court. Again, in concluding that the tortious acts exception applies and that Defendant Tukey did

not have discretion to commit the violent physical acts alleged, the Court has no need to make any determination as to Turkey's alleged history of discrimination and oppression.

Also relying on the second *Baker* factor, Defendant Turkey further contends that this Court is "not equipped to judge a presidential security team in the discharge of sensitive executive functions." Kurd, Def. Mot., ECF No. 90, 57; *see also* Usoyan, Def. Reply, ECF No. 79, 57-58. In rendering its decision, the Court is not making a value judgment as to whether or not the Turkish security forces discharged their functions well or poorly. Instead, the Court is only concluding the alleged acts, including allegations of battery and assault, were not grounded in social, economic, or political policy and were not of a nature and quality that Congress intended to shield from liability. Moreover, courts regularly hear and adjudicate claims against the United States Secret Service, which provides presidential security, as well as against a variety of other law enforcement officials performing security functions. *See e.g. generally United States v. Schatzle*, 901 F.2d 252 (2d Cir. 1990) (affirming conviction of a special agent of the United States Secret Service, for using excessive force on an individual near a presidential candidate's motorcade); *Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996) (in part, affirming denial of qualified immunity for law enforcement officer assisting with security for Russian President Boris Yeltsin's visit to the United States who was accused of beating the plaintiff who was near Yeltsin's motorcade).

Third, Defendant Turkey argues that *Baker* factors 4 and 5 are implicated because "[t]he Court cannot decide issues of Turkey's national policies without running afoul of [the] prudential principle" that the judiciary should not conflict with the other two branches of government on issues of foreign relations. Kurd, Def. Mot., ECF No. 90, 58; *see also* Usoyan, Def. Reply, ECF No. 79, 57-58. For the reasons that have already been given, in resolving the issue of sovereign

immunity, the Court need not make any determinations as to Turkey's national policies or as to Turkey's relationship with the United States. Any allegations in Plaintiffs' Complaints concerning the morality or the wisdom of Turkey's national policies are extricable from the issue of sovereign immunity. The Court's decision is narrow and limited to the determination that Defendant Turkey's alleged actions, particularly those involving a violent physical attack on protesters during the second altercation outside the Turkish Ambassador's Residence, were not grounded in social, economic, or political policy and were not of a nature and quality that Congress intended to shield from liability.

Accordingly, the Court concludes that none of the *Baker* factors are inextricable from the issues at bar in this Memorandum Opinion. As such, the political question doctrine is not implicated.

### C. Comity

Finally, Defendant Turkey argues that the doctrine of international comity favors dismissal in these cases. Comity "is a doctrine of deference based on respect for the decisions of foreign sovereigns." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.D.C. 2013); *see also Hilton v. Guyot*, 159 U.S. 113, 164 (1895) (explaining that comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation"). Comity is based on "a 'golden rule among nations—that each must give the respect of the laws, policies and interests of others that it would have others give to its own in the same or similar circumstances.'" *One Gulfstream*, 941 F. Supp. 2d at 8 (quoting *Mich. Community Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002)). Comity serves to protect amicable relations between countries and to ensure peace between nations. *Oetjen v. Central Leather Co*., 246 U.S. 297, 303-04 (1918). However, "[t]he case law of this circuit

makes it clear that 'comity' is rarely employed to justify the dismissal of viable claims that are otherwise properly before the court." *Northwest Forest Resource Council v. Dombeck*, 107 F.3d 897, 901 (D.C. Cir. 1997).

As an initial matter, it appears to the Court that the doctrine of comity is not applicable in these cases. Comity defines the "extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." *Hilton*, 159 U.S. at 163. Here, the Court is applying United States law to actions which occurred in the United States. Defendant Turkey has cited no case in which comity principles justified dismissal in circumstances such as these.

However, even if the doctrine of comity was available, the Court does not find it to be ground for dismissal in these circumstances. First, in this Memorandum Opinion, the Court addresses only sovereign immunity, not the merits of the claims against Defendant Turkey. Congress passed the FSIA for the express purpose of allowing the judicial branch to make determinations on the sovereign immunity of foreign governments. *Verlinden B.V.*, 461 U.S. at 488 (explaining that Congress passed the FSIA and charged the courts with determining sovereign immunity "in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process" (internal quotation marks omitted)). The Court is reluctant to find that comity principles prevent it from exercising its duties directly set forth by Congress. Second, both the legislative and executive branches have previously issued statements expressing concern regarding the actions of Defendant Turkey during the events at issue here. *See* Supra Sec. IV.B. Insofar as Defendant Turkey argues that a decision denying sovereign immunity could chill otherwise amicable relations with Turkey, it

seems that the statements from both the legislative and executive branches would already have led to this threatened harm. Third, courts most often dismiss cases on principles of comity where there is an existing judgment or a pending proceeding which could provide an alternative remedy. *See e.g., Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (explaining that comity requires that "the decisions of foreign tribunals should be given effect in domestic courts"); *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011) ("Comity is a doctrine of deference based on respect for the judicial decisions of foreign sovereigns."); *Dombeck*, 107 F.3d at 901 (explaining that "we have sometimes held that comity may warrant dismissal of an action where there is a case pending in another jurisdiction involving the same parties, issues, and subject matter"). And, here, there is no other judgment or pending proceeding which could provide Plaintiffs an alternative remedy.

Again, in declining to dismiss these cases on principles of comity, the Court in no way intends to understate the importance of granting discretion to presidential security forces operating in foreign countries. In order to conduct diplomacy, world leaders must often travel abroad. While in foreign countries, these leaders need to know that their security forces have discretion to take the steps necessary to ensure security. Recognizing this need, the United States grants discretion to security forces when foreign leaders are in our country, and the United States expects this same grant of discretion when our leaders travel abroad. While discretion is necessary to protect those engaging in international diplomacy, such discretion is not unbounded. And, here, Plaintiffs have alleged acts by Defendant Turkey which were not grounded in social, economic, or political policy and were not of a nature and quality that Congress intended to shield from liability.

## V.    CONCLUSION

For the reasons explained above, the Court concludes that Defendant Turkey has not met its burden of persuasion to show that it is immune from suit in these cases. Plaintiffs' allegations fall within the tortious acts exception to immunity under the FSIA. Defendant Turkey has failed to show that its exercise of discretion was grounded in social, economic, or political policy and was of a nature and quality that Congress intended to shield from liability. Accordingly, the Court DENIES WITHOUT PREJUDICE Defendant Turkey's Motions to Dismiss on the ground of sovereign immunity.

Because the Court has concluded that the FSIA's tortious acts exception provides the Court with jurisdiction, the Court need not, and will not, examine whether or not jurisdiction would be appropriate under the Justice Against Sponsors of Terrorism Act ("JASTA") exception or under a theory of waiver.

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge