## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LUSIK USOYAN, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>REPUBLIC OF TURKEY,<br><br>  Defendant. | Case No. 18-cv-1141-CKK-MJS |

## REPORT AND RECOMMENDATION

On May 16, 2017, a group of Turkish security officials attacked a small crowd of protesters outside the Turkish Ambassador's residence in Washington, D.C. Those events spawned two separate lawsuits seeking to hold the Republic of Turkey accountable for the conduct of its agents under the Foreign Sovereign Immunities Act ("FSIA"). After losing its bid for dismissal on sovereign immunity grounds in both cases, Turkey decided it would no longer participate in the lawsuits and defaulted. Now, the five plaintiffs in this case—Lusik Usoyan, John Doe I, John Doe II, Lacy MacAuley, and Mehmet Yuksel—ask the Court to enter default judgment against Turkey as to liability on their various claims.[1] The motion is referred to the undersigned for a report and recommendation. Concluding that Plaintiffs have established liability for most—but not all—of the claims they pursue, the undersigned **RECOMMENDS** that Plaintiffs' motion for default judgment (ECF No. 127) be **GRANTED IN PART** and **DENIED IN PART**.

---

[1] The other case is *Kurd v. Republic of Turkey*, No. 18-cv-1117-CKK-ZMF/MJS, through which another group of plaintiffs pursue similar claims against Turkey and a group of private individuals who allegedly participated in the attacks. The *Kurd* plaintiffs likewise seek default judgment against Turkey—but not the private individuals, who are actively defending against the claims—and the Court is issuing its report and recommendation on that motion today, too. Because both cases arise from the same core set of facts, rely on similar (and sometimes overlapping) evidence, and pursue many of the same legal claims, the Court's rulings mirror each other in some respects. But the Court assessed each case individually in its own right.

## BACKGROUND

The events giving rise to this action have been described at length elsewhere. *Usoyan v. Republic of Turkey* ("*Usoyan II*"), 6 F.4th 31 (D.C. Cir. 2021); *Usoyan v. Republic of Turkey* ("*Usoyan I*"), 438 F. Supp. 3d 1 (D.D.C. 2020); *Kurd v. Republic of Turkey* ("*Kurd II*"), 438 F. Supp. 3d 69 (D.D.C. 2020); *Kurd v. Republic of Turkey* ("*Kurd I*"), 374 F. Supp. 3d 37 (D.D.C. 2019). So, for background purposes, the Court repeats here only what is germane to this motion, with additional details layered into its analysis below as relevant to specific issues.

## I.    Factual Background[2]

On May 16, 2017, Turkish President Recep Tayyip Erdogan met with then-President Donald Trump at the White House. Across the street in Lafayette Square, a large group gathered to protest President Erdogan. The protesters held signs, voiced chants, and wore apparel that expressed their disagreement with President Erdogan and his treatment of the Kurdish people.

After the White House meeting, some of the protesters continued to President Erdogan's likely next location: the Turkish Ambassador's residence located at Sheridan Circle in Northwest D.C. Ultimately, around twenty people—*i.e.*, the anti-Erdogan group, which included Plaintiffs Usoyan, Doe I, and Doe II—gathered in protest on the Sheridan Circle sidewalk across from the Ambassador's residence. On the other side of the street, on the sidewalk directly in front of the Ambassador's residence and facing the protesters, a larger crowd of people gathered to support President Erdogan. This counterprotest—*i.e.*, the pro-Erdogan group—comprised both civilians

---

[2] The Court derives these facts from the declarations attached to Plaintiffs' motion for default judgment, as well as proffered video footage of the relevant events. The Court cites to the videos using the file names assigned by the parties (*e.g.*, "SC01") followed by the specific timestamps associated with the relevant footage (*e.g.*, "0:01–0:30"). Notably, Turkey itself introduced most of this video footage under seal with its original motion to dismiss (at Exhibit 6, ECF No. 56-6), and Plaintiffs point back to many of those same clips here. Finally, the Court considers—at Plaintiffs' request—some of the supporting evidence submitted by the parties in *Kurd*, which the Court denotes accordingly (*i.e.*, "*Kurd*, ECF No. ##").

and official Turkish security forces, including members of the Turkish presidential security detail and members of the Turkish national police. Each side voiced strong disagreement with the other. Between them stood law enforcement—including members of the D.C. Metropolitan Police Department, the U.S. Secret Service, and the U.S. Diplomatic Security Service—creating a barrier and attempting to keep the peace. (*Kurd*, ECF No. 241-2, Statement of Facts ("*Kurd* SoF") ¶ 28.)

*The First Altercation (Sheridan Circle)*. Before long, the two groups became increasingly agitated. Participants from both sides stepped off the sidewalk and into the street, and around 4:05 PM, a brief physical altercation broke out. (*See* Video, SC02 at 0:14–1:30.) Participants from both sides threw punches, kicks, and objects. (*See id.*) The scuffle was short-lived before law enforcement separated the groups and instructed them to remain on their respective sidewalks. (*See* Video, SC02 at 0:54–1:37 & SC03 at 0:00–0:37; *see also Kurd* SoF ¶ 25.)

Law enforcement then reconstituted their physical barrier, and additional officers on motorcycles arrived and formed a second barrier of police vehicles. (*See, e.g.*, Video, SC03 at 0:10–0:13, 0:31–35; SC12 at 20:26–20:41; *see also Kurd* SoF ¶ 29.) The anti-Erdogan group continued holding their signs, chanting, and generally expressing their disapproval of President Erdogan and of Turkey's treatment towards the Kurdish people. For the most part, they remained on the Sheridan Circle sidewalk. (Video, SC03 at 0:10–0:13, 0:28–0:35.) By contrast, the pro-Erdogan group—which, again, included Turkish security officials—started encroaching into the street once more, shouting at the protesters and urging law enforcement to remove them before President Erdogan arrived. (Video, SC09 at 0:50–2:15, 2:40–3:10.)

*The Second Altercation (Sheridan Circle)*. President Erdogan's vehicle pulled into the entrance of the Ambassador's Residence around 4:10 PM. (*See* SoF ¶ 47.) President Erdogan remained in the vehicle for a few moments and was seen speaking with the head of the Turkish

security force. Soon after, the pro-Erdogan crowd—with Turkish security officials among them—broke through the law enforcement barrier and rushed the protesters. (Video, SC02 at 2:36–2:50 & SC09 at 7:15–7:25; *see also Kurd* SoF ¶ 36.) Plaintiffs suggest, based on circumstantial evidence, that President Erdogan may have directed the attack. (*See* ECF No. 127 ("Pls.' Mot.") at 14; *see also Kurd* SoF ¶¶ 47–51.)[3] In any case, the protesters were on the Sheridan Circle sidewalk and behind a police barricade when the pro-Erdogan group suddenly charged them. (*Id.*) Some protesters immediately fell, while others attempted to run; none rushed forward. (*See* Video, SC02 at 2:45–5:03, SC08 at 0:25–2:26, SC09 at 7:29–7:40 & SC10 at 0:30–0:57.) The pro-Erdogan group—including members of the Turkish security forces—struck and kicked fallen protesters as they laid on the ground, and they chased and attacked other protesters as they ran and tried to flee. (*See id.*; ECF No. 127-4 ("Usoyan Decl.") ¶ 11; ECF No. 127-8 ("Doe I Decl.") ¶ 11; ECF No. 127-7 ("Doe II Decl.") ¶ 12.)

Law enforcement on the scene tried to protect the protesters. They ordered the attackers to cease (*see* Video, SC02 at 2:33–5:02 & SC08 at 0:20–2:30), and they put themselves between the attackers and the protesters (*see id.*, SC02 at 2:50–3:00; *Kurd*, ECF No. 241-4 at 87, Jane Doe II Decl. ¶ 15). But despite their efforts, they were unable to immediately halt the attack.

At some point during the fray, President Erdogan exited his parked vehicle, paused a moment seemingly to observe, and then entered the Ambassador's Residence. (Video, SC10 at 0:00–1:52.) At no point did the Turkish security forces "detain, question, search, or otherwise investigate any of the protesters before, during, or immediately after the attack." *Usoyan I*, 438 F. Supp. 3d at 9. Instead, the Turkish security forces, along with others in the pro-Erdogan crowd,

---

[3] Briefing citations are to the page numbers assigned by the Court's electronic case-filing system.

proceeded to collect and rip up the protesters' signs. (*See* Video, SC08 at 1:42–2:00.) Many of the protesters ended up in the hospital because of the attack.

*The Third Altercation (across from the Turkish Embassy)*. Plaintiff MacAuley was not at Sheridan Circle that afternoon. She opted instead to protest President Erdogan outside the Turkish Embassy, just a few blocks northwest on Massachusetts Avenue. MacAuley encountered a small police perimeter near the Embassy. Soon after she arrived, President Erdogan's official motorcade drove past, and one of the black vans in the motorcade stopped. From the black van, four Turkish security officials emerged and approached MacAuley as a group. (*See* Video, SC02 at 7:52–8:25.) One of them placed their hand over MacAuley's mouth; another grabbed MacAuley's wrist; and a third grabbed MacAuley's sign (which read "Erdogan = Fascist"), crumpled it, and threw it to the ground. (*See id.*; *see also* ECF No. 127-5 ("MacAuley Decl.") ¶¶ 10–11).) After law enforcement intervened, the Turkish agents stood down, and MacAuley left the scene.

## II.    Procedural Background

Plaintiffs filed suit against the Republic of Turkey on May 15, 2018. (ECF No. 1 ("Compl.").) In keeping with the procedure prescribed by 28 U.S.C. § 1608(a), Plaintiffs successfully served Turkey, after some effort, through diplomatic channels. (*See* ECF Nos. 19, 20, 25, 26 (status reports detailing service efforts); ECF No. 27 (return of service).)

Turkey then moved to dismiss, arguing that the Court lacked subject-matter jurisdiction over Plaintiffs' claims against it under the FSIA. (*See* ECF No. 56.) U.S. District Judge Colleen Kollar-Kotelly disagreed, ruling that "Plaintiffs' allegations [fell] within the tortious acts exception to immunity under the FSIA," 28 U.S.C. § 1605(a)(5). *See Usoyan I*, 438 F. Supp. 3d at 25.

On appeal, a panel of the U.S. Court of Appeals for the D.C. Circuit unanimously affirmed, agreeing that the FSIA's tortious acts exception conferred subject-matter jurisdiction over Turkey.

*Usoyan II*, 6 F.4th at 49. After the Circuit denied rehearing *en banc*, Turkey filed an unsuccessful petition for certiorari with the U.S. Supreme Court, and the case returned to District Court.

That same month, counsel for Turkey moved to withdraw and notified the Court that Turkey would no longer participate in this litigation. (*See* ECF No. 113.) Based on those developments—most notably, Turkey's affirmative decision to not respond to or defend against the lawsuit—Plaintiffs filed an affidavit requesting entry of default on November 9, 2022. (ECF No. 118.) The Clerk entered default against Turkey on November 22, 2022. (ECF No. 120.)

Now, Plaintiffs move for default judgment as to Turkey's liability on their claims (but do not yet seek a ruling on damages). (ECF No. 127.) Plaintiffs separately moved for a hearing on default judgment. (ECF No. 128.) The motions were subsequently referred to the undersigned for a report and recommendation. (Min. Order, Jan. 31, 2025.)[4]

## LEGAL STANDARDS

Federal Rule of Civil Procedure 55 establishes a two-step process to secure a default judgment. At the first step, when a party has "failed to plead or otherwise defend," the plaintiff can request that the Clerk of Court "enter the party's default." Fed. R. Civ. P. 55(a). At the second step, and only after the Clerk has entered default, a plaintiff must generally apply to the court for a default judgment. Fed. R. Civ. P. 55(b)(2).[5] Plaintiffs followed these two steps here.

But still, entry of a default judgment "is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (citation omitted). Rather, Plaintiffs must affirmatively demonstrate that the Court properly exercises subject-matter jurisdiction and personal jurisdiction over the dispute and the

---

[4] Because the issues are adequately presented by Plaintiffs' written submissions, the Court exercises its discretion to decide the matter without a hearing. *See* LCvR 7(f). As such, the Court will **DENY** Plaintiffs' motion for a hearing (ECF No. 128), which is likewise referred to the undersigned for resolution.

[5] The Rule empowers the Clerk to independently enter judgment if the "claim is for a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), but that provision is inapplicable here.

defendant. 28 U.S.C. § 1330(a)–(b). And plaintiffs must prove up the merits of their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). As the D.C. Circuit has explained, this is a relatively "lenient standard" that can be satisfied with a lesser "quantum and quality of evidence … than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citations and quotation marks omitted), *rev'd on other grounds sub. nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). The standard is met "when the plaintiff shows her claim has some factual basis, … even if she might not have prevailed in a contested proceeding." *Id.* (citation and quotation omitted). Plaintiffs may satisfy this showing through "uncontroverted factual allegations" supported by "documentary and affidavit evidence." *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012)); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) ("In evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence.") (citation and quotation marks omitted). And the Court retains discretion as to the evidence considered. *See Owens*, 864 F.3d at 785–86 ("Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion.").

## ANALYSIS

As previewed, based on Turkey's default, Plaintiffs now seek default judgment on their claims as to Turkey's liability. The Court begins with jurisdiction—both subject-matter and personal—before turning to the merits of the various claims that Plaintiffs press.

## I.    Jurisdiction

When presented with a motion for default judgment under the FSIA, the Court must first confirm "that it has subject matter jurisdiction over the claims [and] personal jurisdiction over the defendant." *Sterling Merch. Fin. Ltd. v. Republic of Cabo Verde*, 261 F. Supp. 3d 48, 50 (D.D.C. 2017); *see* 28 U.S.C. § 1330(a)–(b). The burden of establishing the Court's jurisdiction lies with the party seeking default judgment. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 190 (D.D.C. 2017). Plaintiffs successfully establish jurisdiction over Turkey here.

### A.    Subject-Matter Jurisdiction

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the statute, the Court has subject-matter jurisdiction over a (1) "nonjury civil action" (2) "against a foreign state" (3) "as to any claim for relief in personam," (4) provided that "the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a).

The first three conditions of Section 1330(a) are easily met. Plaintiffs do not request a jury in this civil action. (*See* ECF No. 1-1 at 2.) The Republic of Turkey is a foreign state. And Plaintiffs bring civil claims against Turkey as a foreign sovereign for *in personam* relief. So, the only remaining question is whether Turkey is entitled to immunity under the FSIA.

Foreign sovereigns are generally immune from lawsuits against them in the United States unless an FSIA exception applies. *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). Plaintiffs here principally invoke jurisdiction under 28 U.S.C. § 1605(a)(5), the FSIA's "tortious acts" exception.[6] Section 1605(a)(5) reads, in relevant part:

---

[6] In this case, Plaintiffs separately invoke jurisdiction under another FSIA exception: the "international terrorism" exception created by the Justice Against Sponsors of Terrorism Act ("JASTA"), 28 U.S.C. § 1605B. (*See* Pls.' Mot. at 51–64.) The Court discusses that theory separately below.

> A foreign state shall not be immune from the jurisdiction of courts of the United States in any case … in which [1] money damages are sought against a foreign state [2] for personal injury or death, or damage to or loss of property, [3] occurring in the United States and [4] caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state [5] while acting within the scope of his office or employment[.]

28 U.S.C. § 1605(a)(5) (alterations added). The tortious acts exception itself includes exceptions, including the "discretionary function" carveout. Under that carveout, the exception "shall not apply to any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused[.]" *Id.* § 1605(a)(5)(A).

Here, Plaintiffs treat as settled that the tortious-acts exception confers jurisdiction. (Pls.' Mot. at 25 ("The Court has ruled that this exception applies in this case.").) Judge Kollar-Kotelly, Plaintiffs highlight, already rejected Turkey's invocation of immunity on this basis, writing:

> The events at issue, including the use of force, occurred while the Turkish security forces were engaged in their employment of providing security for President Erdogan. And, as security forces, the use of some degree of force is not unexpected. Accordingly, *the Court concludes that the tortious acts exception to sovereign immunity applies to Defendant Turkey*[.]

*Usoyan I*, 438 F. Supp. 3d at 12 (emphasis added). The D.C. Circuit affirmed that ruling. *Usoyan II*, 6 F.4th 31. Plaintiffs likewise point to Judge Kollar-Kotelly's finding that the discretionary-function carveout does not preserve Turkey's sovereign immunity; as she put it:

> Defendant Turkey cannot rely on the discretionary function rule to maintain its immunity because Defendant Turkey's exercise of discretion relating to the violent physical attack on the protesters was not grounded in social, economic, or political policy and was not of a nature and quality that Congress intended to shield from liability.

*Usoyan I*, 438 F. Supp. 3d at 12. Once again, the D.C. Circuit affirmed that ruling. *Usoyan II*, 6 F.4th at 47 ("The nature of the challenged conduct was not plausibly related to protecting President Erdogan, which is the only authority Turkey had to use force against United States citizens and

residents."). So the implication, Plaintiffs suggest—but never expressly argue—is that the law-of-the-case doctrine applies to these rulings, such that they should not (and need not) be revisited.

"The law-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided by that court or a higher one in earlier phases." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) (cleaned up). As the D.C. Circuit summed it up, the doctrine "ensures that the same issue presented a second time in the same case in the same court should lead to the same result." *Id.* (cleaned up). But the Circuit likewise pointed out that the "doctrine" is not inflexible; it is "a principle that guides courts in the exercise of their discretion, not a binding rule." *Id.*

In *Wye Oak*, the court held that the law-of-the-case doctrine did not preclude it from revisiting whether an FSIA exception abrogated a foreign sovereign's immunity on the facts of that case. *See id.* at 697–700. As a general matter, the Circuit expressed concern about endorsing the doctrine's use in a way that would "constrain" a court's ability to revisit issues implicating subject-matter jurisdiction (as sovereign immunity does). *See id.* at 698–99. More specifically, though, the Circuit emphasized the very different procedural postures at which the sovereign-immunity question was presented there: a threshold determination on a Rule 12(b)(1) motion to dismiss on the front end, versus a post-trial assessment with "the benefit of a full adversarial hearing … and a developed factual record." *Id.* at 698; *see also id.* at 699–700 ("[T]he scant and unproven factual allegations in Wye Oak's complaint were no match for the trial record; the latter included extensive *evidence that both sides had presented* about Iraq's commercial activity[.]") (emphasis added). For this latter reason—*i.e.*, the post-pleadings development of a full record through a contested adversarial trial on the merits—the Circuit concluded it was not "being presented with the 'same

issue'" on sovereign immunity that had been previously decided, such that the law-of-the-case doctrine was not implicated. *Id.* at 700.

On the surface, *Wye Oak* could be read to suggest the Court should eschew the law-of-the-case doctrine here. After all, its application would likewise implicate jurisdictional questions of sovereign immunity, and this proceeding is now in a different posture than before, *i.e.*, default judgment versus a motion to dismiss. But on a closer look, this case is distinguishable because the record today is essentially the same record that was before the Court at the time of its prior ruling under Rule 12(b)(1). There certainly has been no "full adversarial hearing" with evidence from both sides. After all, Turkey chose to stop participating in this case altogether and defaulted. So, unlike in *Wye Oak*, the Court does not have before it any additional evidence (or even arguments) from Turkey that might prompt it to reach a different result. Indeed, the Court previously considered much of the same evidence Plaintiffs now present, including the extensive video footage of the day's events. Plus, the legal burden Plaintiffs must shoulder at each stage is functionally comparable: to overcome the presumption of sovereign immunity at the Rule 12(b)(1) stage "by producing evidence that an [FSIA] exception applies," *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013), and to provide "evidence satisfactory to the court" on that issue for purposes of default judgment, 28 U.S.C. § 1608(e).

The Court therefore deems it appropriate to apply the law-of-the-case doctrine to Judge Kollar-Kotelly's prior holdings—both affirmed by the Circuit—that the tortious acts exception to the FSIA *generally* abrogates Turkey's immunity for the overall events underlying Plaintiffs' claims, and that the discretionary-function carveout does not apply. Those prior holdings took a broad-brush approach due to the parties' earlier choice to brief immunity holistically rather than on a claim-by-claim basis. *Usoyan I*, 438 F. Supp. 3d at 7 ("The Court's approach to resolving the

issue of sovereign immunity in these cases has been informed by the parties' briefing," which focused on "blanket sovereign immunity for any and all of the acts which transpired on May 16, 2017."). Put another way, the Court wrestled with sovereign immunity as applied to Plaintiffs' claims from a 30,000-foot view, expressly leaving open the possibility that certain claims might someday meet a different fate down the line. *See id.* ("Sovereign immunity as to any specific claims … would require additional development of the record and additional argument from the parties."). The upshot is the Court *could* still conclude that certain of Plaintiffs' claims fall beyond the reach of the FSIA's tortious acts exception, on their specific facts, but it ultimately sees no basis to do so on the record presented.

That leaves one potential loose end on this topic. In ruling on the prior appeal, the Circuit observed that it was not reaching any conclusion as to "whether Turkey's actions were justifiable"; that issue, the court explained, presents "a merits question, not a jurisdictional one." *Usoyan II*, 6 F.4th at 47. Seemingly in response to that passage, Plaintiffs devote several pages in the jurisdictional section of their brief to arguing why "the actions of Turkish security forces were not 'justifiable.'" (Pls.' Mot. at 28–32.) But the undersigned does not read the Circuit to have been suggesting that the potential justifiability of Turkey's actions (or lack thereof) bears on the jurisdictional issue of sovereign immunity. To the contrary, the Circuit made a point to say that even if "the Turkish security detail's actions may have been justified in some circumstances," that possibility still would not bring the case "within the discretionary function exception." *Usoyan II*, 6 F.4th at 47. The Circuit's reference to justifiability was simply a recognition that, if Turkey could at some point demonstrate that the challenged acts of its security forces were justifiable, that would potentially give rise to a merits-based defense to Plaintiffs' claims. But that merits-based defense would be separate and apart from the Court's ability to exercise subject-matter jurisdiction over

Turkey for purposes of Plaintiffs' claims generally. And as for the merits, Turkey's decision to withdraw from this litigation means that ship has sailed.

*    *    *

In sum, the Court is satisfied that Plaintiffs have established subject-matter jurisdiction for their claims against Turkey under the FSIA's tortious acts exception.

### B.    Personal Jurisdiction

The Court next considers whether it properly exercises personal jurisdiction over Turkey. Under the FSIA, personal jurisdiction exists so long as plaintiffs properly complete service of process pursuant to 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b). Section 1608(a) outlines "four methods of service," and those methods must be followed "in descending order of preference." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Here, Plaintiffs pursued service of Turkey through all four methods, ultimately completing service via diplomatic note under Section 1608(a)(4). (*See* Min. Order, Jan. 4, 2019 (detailing the attempts); ECF No. 27 (return of service, served via diplomatic note).) And soon after, Turkey entered an appearance and filed its Rule 12(b)(1) motion to dismiss. (ECF No. 28.) Plaintiffs' completion of proper service means the Court has personal jurisdiction over Turkey under Section 1330(b) as to any claims that fall within an FSIA exception. *See CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572, 1580 (2025) ("[T]he most natural reading of § 1330(b) is that personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'") (citation omitted).

## II.    Plaintiffs' Claims Under Section 1605(a)(5)

The Court turns next to issues of liability. As discussed, Section 1605(a)(5) strips Turkey of immunity for injuries that occurred in the United States "caused by the tortious act" of Turkey's

agents. Plaintiffs—in varying combinations—contend that Turkey is liable under Section 1605(a)(5) on seven claims: (1) civil assault, (2) civil battery, (3) negligent infliction of emotional distress, (4) intentional infliction of emotional distress, (5) civil conspiracy, (6) bias-related offenses under D.C. Code § 22-3704, and (7) loss of consortium. (Pls.' Mot. at 33.) The Court discusses each claim in turn, after first pausing to address two overarching points.

One, Judge Kollar-Kotelly already held that "[t]he events at issue, including the use of force, occurred while the Turkish security forces were engaged in their employment of providing security for President Erdogan." *Usoyan I*, 438 F. Supp. 3d at 12. In other words, the actions of the Turkish security forces during the incidents in question are imputable to Turkey. The Court sees no basis to depart from that prior determination. Among other things, the video evidence proffered by Plaintiffs reflects that many of the assailants at Sheridan Circle were uniformed members of the Turkish security force, many of whom wore radio earpieces and at least some of whom were armed with weapons. (*See, e.g.*, Video, SC02 at 3:18–3:19 (showing Usoyan on the ground being kicked by dark-suited agent); *id.*, SC08 at 0:30–0:31 (showing Doe I being hit by individual wearing an olive-green jacket and khaki pants); *see also Kurd* SoF ¶ 15.) Plaintiffs' declarations bear this out, too. (*See, e.g.*, Usoyan Decl. ¶ 7 (identifying "officials and security officers for the Turkish government"); Doe I Decl. ¶ 11 (identifying "a wave of Turkish officials" running at him).) As for the individuals who engaged with MacAuley, they exited a van that was part of the official motorcade escorting President Erdogan, and the video record likewise shows that they dressed in the same dark suits as many of the officials at Sheridan Circle. (*See* Video, SC02, at 7:54–8:18.) For at least these reasons, the Court finds Plaintiffs have shown with "satisfactory" evidence, 28

U.S.C. § 1608(e), that the perpetrators of the attacks against them were official members of the Turkish security detail, which means those acts are imputable to Turkey under the FSIA.[7]

Two, Plaintiffs advocate for the application of District of Columbia law to their claims "because the torts occurred in the District of Columbia and because the District of Columbia's policy would be most advanced by having its law applied to the facts of this case." (Pls.' Mot. at 34.) The Court generally agrees with this assessment, *see Jones v. Clinch*, 73 A.3d 80, 82 (D.C. 2013) (outlining D.C. choice-of-law considerations), except as to the loss of consortium claim brought by Plaintiff Yuskel—an issue the Court discusses separately below.

With these two points in mind, the Court turns next to its claim-by-claim analysis.

### A.     Assault

Plaintiffs Usoyan, Doe I, Doe II, and MacAuley all press claims for assault. (*See* Pls.' Mot. at 34–37; Compl. ¶¶ 115–19 (Count I).) Assault, in the civil context, is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim." *Evans-Reid v. Dist. of Columbia*, 930 A.2d 930, 937 (D.C. 2007); *accord Hall v. Dist. of Columbia*, 867 F.3d 138, 158 (D.C. Cir. 2017). To establish a claim for assault, a plaintiff must show they (1) "suffered apprehension of harmful or offensive contact" and (2) "that a reasonable person in [their] position would have experienced such apprehension." *Kurd I*, 374 F. Supp. 3d at 46 (citing *Collier v. Dist.*

---

[7] In fact, in its prior filings—before it chose to stop participating in the litigation—Turkey conceded this point several times over. In Turkey's motion to dismiss, its invocation of immunity was directly premised on the fact that the challenged acts were committed by "Turkish security officers" exercising their "discretion" to protect President Erdogan as part of their official duties. (*See* ECF No. 56 at 56 ("[T]he Turkish security officers had to undertake the necessary risk assessment calculations to carry out their mission to protect their head of state."); *id.* at 57 ("[T]he conduct challenged by Plaintiffs is the product of risk management decisions made by Turkish security officers about how best to protect not only their official diplomatic residence, but also their President and his senior ministers traveling with him."); *id.* at 62 (describing "the Turkish security officers' momentary attempt to assess the motives of and quell an angrily screaming MacAuley outside the Embassy").) This was likewise true on appeal. (*See* Brief for Defendant-Appellant at 25, *Usoyan II*, 6 F.4th 31 (D.C. Cir. 2021) (No. 20-7017) (asserting that "the Turkish Security Detail took measured actions to protect their President") (cleaned up).) Turkey's repeated and express acknowledgements of this point amply reinforce the Court's conclusion.

*of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014)) (alterations added); *Madden v. D.C. Transit Sys., Inc.*, 307 A.2d 756, 757 (D.C. 1973); *see also* RESTATEMENT (SECOND) OF TORTS § 21. Plaintiffs carry their burden here.

### 1.    Sheridan Circle

Plaintiffs Usoyan, Doe I, and Doe II were all part of the protest at Sheridan Circle. They contend that "Turkish security forces assaulted [them] when they threatened the Plaintiffs with physical harm and then followed through on those threats." (Pls.' Mot. at 34.) The Court agrees.

The relevant video evidence generally reflects Turkish security forces shouting at the protesters, gesturing at the protesters in threatening and provocative ways, and making verbal threats of harm toward the protesters. (*See* Video, SC06 at 0:00–0:38.) And Plaintiffs' sworn declarations, on a person-by-person basis, bear out the same. Usoyan attests that she saw "five or six people with dark sunglasses and military style boots running at [her]." (Usoyan Decl. ¶ 11 ("I froze in horror as the armed men came running across the street shouting at us. I thought they were going to kill us.").) Doe I avers that "three or four" Turkish officials "came at [him]" and started "chas[ing] [him]" after he tried to help another protester they had been kicking and punching. (Doe I Decl. ¶ 11.) And Doe II recounts that Turkish security officers "charged toward [him]," even as he fled. (Doe II Decl. ¶ 12; *id.* ¶ 11 ("I saw a bunch of armed security officers break through the police line and run towards all of us protestors. I was terrified[.]").) These individual accounts are likewise substantiated by the video footage. (*See* Video, SC02 at 2:36–2:50 & SC09 at 7:15–7:25.)

The verbal and physical threats that Plaintiffs recount—serious and concrete threats corroborated by other evidence—were intentional. There is no basis for the Court to find otherwise. And a reasonable person in Plaintiffs' position would have reasonably experienced apprehension

of imminent harm as a result. These Plaintiffs certainly did. (*See* Usoyan Decl. ¶ 11; Doe I Decl. ¶ 11; Doe II Decl. ¶ 11.) Together, these ingredients add up to assault.

### 2. Outside the Turkish Embassy

Plaintiff MacAuley, unlike the others, did not participate in the Sheridan Circle protest. Instead, as described above, she was a lone protester outside of the Turkish Embassy, holding a sign that read "Erdogan = Fascist" when four members of the Turkish security detail exited a black van that was part of President Erdogan's passing motorcade and approached her. (MacAuley Decl. ¶¶ 8–11; *see* Video, SCO2 at 7:30–8:25.) On seeing them, MacAuley avers that she felt scared, pictured the worst-case scenario, and even started "bracing [her]self for the pain and impact." (MacAuley Decl. ¶¶ 8–9.) Then, according to MacAuley's sworn declaration, one Turkish agent "came towards [her] and told [her] to stop," and then "grabbed [her] wrist, put her finger in [MacAuley's] face, and told [her] again to stop." (*Id.* ¶ 10.) The others all stood around MacAuley. One proceeded to "snatch[] the sign out of [her] hands"; another "clamped her hand over [MacAuley's] mouth so that [she] could not shout and pushed [her] head back"; and another "grabbed at [her] arm." (*Id.* ¶ 11.) These statements are fairly corroborated by the video footage. (*See* Video, SCO2 at 7:40–8:18.) Moreover, as above, the actions of the Turkish security forces were objectively intentional, and those actions placed MacAuley in reasonable apprehension of harmful or offensive contact. This constitutes civil assault under D.C. law.

### B. Battery

Plaintiffs Usoyan, Doe I, and MacAuley (but not Doe II) press claims against Turkey for battery. (*See* Pls.' Mot. at 37–39; Compl. ¶¶ 120–27 (Count II).) Battery, in the civil context, is "an intentional act that causes harmful or offensive bodily contact." *Evans-Reid*, 930 A.2d at 937; *accord Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012). To establish a claim for battery,

a plaintiff must show that the defendant (1) acted "intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact," and (2) a harmful or offensive "contact with the person of the other directly or indirectly results." RESTATEMENT (SECOND) OF TORTS §§ 13, 18; *Saberi v. Gov't of the Islamic Republic of Iran*, 541 F. Supp. 3d 67, 82 (D.D.C. 2021). Plaintiffs have done so here "by evidence satisfactory to the court." 28 U.S.C. § 1608(e).

### 1.    Sheridan Circle

As to Plaintiffs Usoyan and John Doe I, the video footage shows that Turkish security forces pushed through the police barrier at Sheridan Circle and attacked the protesters. During the fray, Usoyan is seen lying prone on the ground with Turkish security force members hitting her. (*See* Video, SC02 at 2:45–3:56.) And Doe I can be seen being punched and kicked by Turkish security forces as he attempted to aid another protester. (*Id.*, SC08 at 0:30–0:31.) Plaintiffs' declarations further substantiate these facts. Usoyan avers that several members of the Turkish security detail "were on [her], kicking and punching." (Usoyan Decl. ¶ 11 ("I remember falling to the ground and feeling them kick me in the back and in the head.").) The same is true for Doe I, who attested that after he "slipped and fell," "the men chasing me started kicking and punching me." (Doe I Decl. ¶ 11 ("They kicked and punched me in the head, face, and back as I struggled to get away."). The assailants can be identified as Turkish security forces by their similar uniforms—*i.e.*, either dark suits or khaki pants and olive-green jackets. (*See* Video, SC02 at 2:46–2:56.) The actions of the Turkish officials were demonstrably intentional and caused harmful and offensive body contact to Plaintiffs, and so their actions amount to civil battery under D.C. law.

### 2.    Outside the Turkish Embassy

For her part, Plaintiff MacAuley was protesting outside the Turkish Embassy when four Turkish security officials exited a passing van and approached her as a group. (MacAuley Decl. ¶¶ 6–11.) As the video shows, one of them grabbed MacAuley's wrist and placed their hand over her mouth; another grabbed her arm; and another grabbed her wrist. (*See* Video, SC02 at 7:52–8:25.) MacAuley's sworn declaration attests to these same underlying facts. (MacAuley Decl. ¶ 10 ("The … woman came towards me and … grabbed my wrist very hard."); *id.* ¶ 11 ("Then, the woman clamped her hand over my mouth," "another one grabbed at my arm …. I recall that they had control of both my wrists …. I remember the feeling as they simultaneously pushed me one way and pulled me another. I remember feeling terrified[.]").) These acts of physical contact against MacAuley were both intentional and offensive, so she likewise establishes a claim for battery.

### C.    Negligent Infliction of Emotional Distress

Plaintiffs Usoyan, Doe I, Doe II, and MacAuley claim Turkey is liable for negligent infliction of emotional distress or "NIED." (*See* Pls.' Mot. at 39–42; Compl. ¶¶ 128–32 (Count III).) Under D.C. law, a plaintiff can pursue an NIED claim under two different theories: the "zone of physical danger" theory or the "special relationship" theory. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 802, 810–11 (D.C. 2011) (en banc). Plaintiffs invoke the former. To prevail, each plaintiff must show "(1) [they were] in a zone of physical danger, which was (2) created by the defendant's negligence, (3) [they] feared for [their] own safety, and (4) the emotional distress so caused was serious and verifiable." *Cornish v. Dist. of Columbia*, 67 F. Supp. 3d 345, 363 (D.D.C. 2014); *see also Williams v. Baker*, 572 A.2d 1062, 1067 (D.C. 1990) (en banc).

Although Plaintiffs insist they satisfy these elements, they all run aground on the same core problem: their claims are all premised on *intentional* conduct by the Turkish security officials, and

*intentional* conduct cannot support an NIED claim under District of Columbia law. *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759 n.9 (D.C. 2001) ("[S]ince the conduct alleged … is not negligence but an intentional tort, appellant cannot recover damages for negligent infliction of emotional distress based on that conduct.") (citing *Williams*, 572 A.2d at 1067); *see also, e.g.*, *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 208 (D.D.C. 2025) (granting summary judgment on NIED claim on this basis: "[Plaintiff] cannot sustain a claim for negligence based solely on allegations of intentional conduct."); *Lovett v. United States*, 2024 WL 4286054, at *11 (D.D.C. Sept. 25, 2024) ("[R]eckless and intentional conduct cannot make out a claim for *negligent* behavior. So for that reason alone, [the] NIED claim … must fail."); *Rynn v. Jaffe*, 457 F. Supp. 2d 22, 25 (D.D.C. 2006) ("In essence, plaintiffs point to the same intentional acts that underlie their other tort claims, but they append the word 'negligently.' This is insufficient[.]").

The conduct underlying Usoyan's NIED claim, for instance, is that "a mob of Turkish security officers … carr[ied] weapons," "act[ed] menacingly," and "attacked" her. (Pls.' Mot. at 39.) Doe I's claim rests on the proposition that he was "rushed by a hoard of Turkish security forces," who proceeded to "punch[]" and "kick[]" him "in the head, face, chest, back, and knees." (*Id.* at 40.) And Doe II's claim springs from the Turkish security forces' actions in "suddenly attack[ing]" the protesters and their "pursu[ing]" Doe II as he tried to run. (*Id.* at 41.) The same sort of theory is pressed by MacAuley: she focuses on the actions of the Turkish security forces when they "surrounded her," "seized her wrist and placed [a] hand over MacAuley's mouth," and "grabbed her wrist and arm." (*Id.*). In other words, the wrongful conduct supporting Plaintiffs' NIED claims is the same wrongful conduct supporting their assault and battery claims. And those types of intentional actions cannot support a claim for NIED. *See Dist. of Columbia v. Chinn*, 839

A.2d 701, 708 (D.C. 2003) ("[I]t is impossible to negligently commit assault and/or battery as the states of mind are separate and incompatible.").

Whether the same facts can support claims for *intentional* infliction of emotional distress—or IIED—is a separate question, of course, and one the Court addresses next. But Plaintiffs' NIED claims fail under controlling D.C. law.

### D.    Intentional Infliction of Emotional Distress

Next, Plaintiffs Usoyan, Doe I, Doe II, and MacAuley claim that Turkey is liable for intentional infliction of emotional distress, or "IIED." (*See* Pls.' Mot. at 42–45; Compl. ¶¶ 133–36 (Count IV).) To prevail on an IIED claim, a plaintiff must prove "(1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress." *Robertson v. Dist. of Columbia*, 269 A.3d 1022, 1033 (D.C. 2022); RESTATEMENT (SECOND) OF TORTS § 46; *see* 28 U.S.C. § 1608(e).

As the D.C. Court of Appeals has explained, the first element requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991) (quotation marks omitted). On the second element, "[i]t is possible to infer the existence of … intent or recklessness … from the very outrageousness of a defendant's conduct." *Kotsch v. Dist. of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007). Courts can also infer intent "when the circumstances are such that any reasonable person would have known that emotional distress and physical harm would result," *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980) (cleaned up), or "from accompanying threats of physical violence," *id.* Finally, the third element requires "severe" emotional distress, which is a "high standard" to meet. *Ortberg v. Goldman Sachs Group*, 64 A.3d 158, 164 (D.C. 2013). Generalized "mental anguish,"

"stress," or conclusory assertions of "severe emotional distress" is not enough. *Futrell v. Dep't of Lab. Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003); *Ortberg*, 64 A.3d at 165.

### 1.    Sheridan Circle

To start, the Sheridan Circle Plaintiffs—Usoyan, Doe I, and Doe II—successfully carry their burden to establish IIED claims against Turkey.

According to Plaintiffs, "a brutal, physical mob attack by a group of highly trained security officers carrying weapons against a small group of people constitutes utterly atrocious behavior." (Pls.' Mot. at 42.) That is a fair assessment, especially when viewed against the broader context. *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) ("[I]n determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred.") (citation omitted). As Judge Kollar-Kotelly put it, this attack was carried out by "Turkish government agents" in "America's capital" to "stifle the First Amendment rights of people protesting the treatment of a minority group in Turkey." *Kurd I*, 374 F. Supp. 3d at 53.

While a use of force in the protest context does not, in and of itself, always rise to the level of outrageousness necessary to sustain an IIED claim, *see, e.g.*, *Black Lives Matter D.C. v. United States*, 775 F. Supp. 3d 241, 264–65 (D.D.C. 2025) (rejecting IIED claim involving use of force by law enforcement officers) (collecting cases), the facts here are meaningfully distinguishable from the types of cases rejecting such claims. Here, the protesters were already contained and controlled by U.S. law enforcement, who separated them from the Turkish Ambassador's residence (and President Erdogan). But still, the Turkish security forces broke through the police cordon, chased down protesters, and physically attacked them even as they fled or lay prone on the ground. The well-known test that all first-year law students learn to determine whether conduct is "extreme and outrageous" is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

RESTATEMENT (SECOND) OF TORTS § 46 cmt. d; *accord Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998). Especially in context, the conduct here surely passes that test. *Cf. Ortberg*, 64 A.3d at 163–64 (finding mere "oblique threats" chanted by protesters insufficiently "outrageous").

On the second element, Plaintiffs argue that "intent can be inferred given that the Turkish security forces deliberately ignored U.S. law enforcement commands and launched a coordinated attack on the Protesters." (Pls.' Mot. at 43–44.) The Court agrees. Given the egregiousness of the physical violence against the protesters, "any reasonable person would have known that emotional distress and physical harm would result." *Waldon*, 415 A.2d at 1077 (cleaned up).

Finally, on the third element, Plaintiffs each adduce evidence of "severe" emotional distress they attribute to the attacks. Usoyan describes depression, panic attacks, nightmares, memory loss, vertigo, and paranoia that she now suffers. (Usoyan Decl. ¶¶ 19–23.) Indeed, she attests that a doctor deemed her symptoms "consistent with post-traumatic stress disorder." (*Id.* ¶ 24.) Doe I recounts much of the same. He suffers from post-traumatic stress disorder, anxiety, depression, loss of sleep, nightmares, and loss of productivity at work, all of which followed the events on May 16, 2017. (*See* Doe I Decl. ¶¶ 19–21.) And Doe II similarly attests to sleep disorders, nightmares, breathing issues, depression, and a diagnosis of post-traumatic stress disorder. (*See* Doe II Decl. ¶¶ 16–19, 22.)

These symptoms and injuries rise to the level of severity required to sustain an IIED claim. *See Hammons v. Islamic Republic of Iran*, 2023 WL 5933340, at *20 (D.D.C. July 24, 2023) ("Severe emotional distress may include panic attacks, loss of sleep, anxiety, depression, inability to work, and the creation of new phobias."), *report and recommendation adopted*, 2023 WL 6211248 (D.D.C. Sept. 25, 2023).

Plaintiffs Usoyan, Doe I, and Doe II established liability on their IIED claims.

### 2.    Outside the Turkish Embassy

Plaintiff MacAuley likewise establishes an IIED claim against Turkey. Although she was not victim to the same level of violence wrought against the protesters in Sheridan Circle earlier that afternoon, the actions of the Turkish security officials toward MacAuley were still outrageous in their own right. MacAuley was peacefully protesting alone on a public street in Washington, D.C., next to a group of U.S. law enforcement officers, when a black van in President Erdogan's passing motorcade abruptly stopped and four security officials in dark suits emerged. They approached her as a group, grabbed at her wrists, covered her mouth, pushed and pulled her in different directions, and snatched her property away from her. (MacAuley Decl. ¶¶ 8–11; *see* Video, SC02 at 7:52–8:15.) This conduct, especially considered in the broader context—foreign security officials peeling off an official motorcade to accost a single peaceful protester, even while standing next to uniformed police officers—rises to the level of outrageousness.

The requisite intent can be inferred. Given the collective and heavy-handed show of force by the Turkish security forces against MacAuley, it is reasonable to infer that one of their objectives was to seriously frighten and intimidate her, presumably so she would be fearful of protesting against President Erdogan again. At a minimum, their behavior was certainly reckless. And finally, MacAuley attests to symptoms of "severe" emotional distress that followed from the encounter sufficient to satisfy the final IIED element, including "post-traumatic stress," "depression," "anxiety," "paranoia," "constant nightmares," and more. (MacAuley Decl. ¶ 22.)

MacAuley establishes her claim for IIED against Turkey.

### E.    Civil Conspiracy

Plaintiffs Usoyan, Doe I, Doe II, and MacAuley pursue claims against Turkey for "civil conspiracy." (Pls.' Mot. at 45–46; Compl. ¶¶ 137–41 (Count V).) They argue that "Turkey, through

its security forces, conspired to assault and batter the Protesters" and insist that there is enough "circumstantial evidence from which to infer that the [Turkish security officials] were acting pursuant to a common scheme." (*Id.* at 45.) For at least a few reasons, the Court concludes that entry of default judgment against Turkey on these civil conspiracy claims would be improper.

For one, under D.C. law, "[c]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007) (quotation marks omitted); *see also Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (same); *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 446 (D.C. 2013) (explaining that "civil conspiracy is not independently actionable" but rather hinges on "some underlying tortious act") (cleaned up). Plaintiffs seem to acknowledge as much. Their briefing argues that Turkey should be liable for conspiracy because it "participated in the unlawful acts of assault and battery" against Plaintiffs. (Pls.' Mot. at 45.) But Plaintiffs separately seek to hold Turkey *directly* liable on their claims on assault and battery. And, as discussed, the Court concludes that Plaintiffs proved up those claims of *direct* liability. So it makes little sense for Plaintiffs to press claims of *vicarious* liability against Turkey for those same underlying torts.

More, a claim for civil conspiracy requires that Plaintiffs prove, among other elements, "an agreement between two or more persons." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000). Yet Plaintiffs' theory is essentially that Turkey conspired with itself: they argue that "the Turkish security forces acted by agreement and pursuant to a common scheme." (Pls.' Mot. at 46.) By Plaintiffs' invocation of the FSIA, their entire theory of the case is that the Turkish security forces are functionally equivalent to Turkey, and Turkey is functionally equivalent to the Turkish security forces. In other words, at least in this context, the Turkish security forces and Turkey are the same actor—not multiple separate actors. And allowing a claim

for civil conspiracy on this theory would run headlong into the notion that a principal "and its agents constitute a single legal entity that cannot conspire with itself, just as it is impossible for an individual person to conspire with himself or herself." *Tabb v. Dist. of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007); *accord Rawlings v. Dist. of Columbia*, 820 F. Supp. 2d 92, 104 (D.D.C. 2011) (recognizing that, in such a scenario, "all of their acts are considered to be those of a single legal actor, negating the multiplicity of actors necessary to conspiracy"). Otherwise, Plaintiffs fail to otherwise explain how they believe they have proven up a conspiracy "between two or more persons" for which they seek to hold Turkey vicariously liable.[8]

The Court should decline to enter default judgment on Plaintiffs' conspiracy claims.

### F.    Bias Related Crime – D.C. Code § 22-3704

Next, Plaintiffs Usoyan, Doe I, Doe II, and MacAuley bring a claim under the D.C. Bias Related Crime Act ("DCBRCA"), D.C. Code § 22-3704. (Pls.' Mot. at 46–49; Compl. ¶¶ 142–44 (Count VI).)

The DCBRCA was enacted by the D.C. Council in 1990 to "provide[] enhanced criminal penalties for persons who commit bias-related crimes," *Lucas v. United States*, 240 A.3d 328, 335 (D.C. 2020), but the statute also authorizes a private civil claim for "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived race, ... national origin, … or political affiliation of a

---

[8] At most, Plaintiffs mention in a footnote "two civilian[] co-conspirators who joined in the attack." (Pls.' Mot. at 45 n.19.) Those two individuals could theoretically be separate parties capable of conspiring with Turkey. But even construing Plaintiffs' claims through that lens, it would not change the Court's assessment. For starters, Plaintiffs do not present any argument that would allow the Court to find "an agreement" between Turkey and those civilian individuals. Plaintiffs focus on why they believe there is circumstantial evidence as to why the Turkish security forces were acting collectively by agreement; they say nothing about civilians. (Pls.' Mot. at 45–46.) Moreover, to return to the first point above, the pursuit of a civil conspiracy claim to hold Turkey indirectly liable on assault and battery claims would still be superfluous because Plaintiffs contend (and the Court agrees) that Turkey is directly liable on those same claims.

victim of the subject designated act," D.C. Code § 22-3704(a); *see Navarrete v. Whole Foods Mkt. IP, Inc.*, 2025 WL 343122, at *1 (D.D.C. Jan. 30, 2025). The statute defines "designated act" to mean a "criminal act, including ... assault," D.C. Code § 22-3701(2), but it broadly encompasses "any criminal act recognized under D.C. law," *Aboye v. United States*, 121 A.3d 1245, 1250 (D.C. 2015). And civil liability under the DCBRCA is not contingent on a criminal prosecution, let alone a conviction. D.C. Code § 22-3704(a) (allowing for liability "[i]rrespective of any criminal prosecution or the result of a criminal prosecution"); *see also Kurd I*, 374 F. Supp. 3d at 56.

Plaintiffs argue that "Turkey is liable under this statute because its agents committed criminal acts that demonstrated their prejudice based on Plaintiffs' actual or perceived national origins and political affiliations." (Pls.' Mot. at 46.) According to Plaintiffs, the "most obvious" criminal acts carried out by the Turkish security forces were assault and battery, based on the same facts discussed already. (*Id.* at 47.) And Plaintiffs argue, more specifically, that the Turkish security forces carried out these actions "based on [their] Kurdish identity and anti-Erdogan political affiliation." (*Id.* at 48.) The Court addresses the two different factual settings in turn.

### 1. Sheridan Circle

Starting with Usoyan, Doe I, and Doe II, the Court finds that they proved a claim under the DCBRCA based on the assaults carried out by the Turkish security forces on the basis that they were motivated by the Kurdish national origin (or perceived national origin) of the protesters.

To begin, for the same reasons that support their civil assault and battery claims, Plaintiffs establish they suffered injury from a "designated act" carried out by Turkey's agents. "Assault" is expressly included in statute's illustrative list of designated acts. D.C. Code § 22-3701(2). The D.C. Court of Appeals recognizes "two distinct" categories of criminal assault: attempted-battery assaults and intent-to-frighten assaults. *See Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986). The former, as the D.C. Court of Appeals recently clarified, may be committed through

even "an offensive touching, performed with minimal force[,]" *Perez Hernandez v. United States*, 286 A.3d 990, 993 (D.C. 2022) (en banc), provided the conduct was committed purposely or knowingly, *id.* at 1002–03. The latter category of assault requires, in simplified terms, threatening conduct purposefully designed to "engender fear" or "create apprehension," where such conduct "would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Powell v. United States*, 238 A.3d 954, 957–58 (D.C. 2020) (citation and quotation marks omitted). As described above, the actions of the Turkish security officials fall comfortably within these categories of criminal assault. The record is replete with satisfactory evidence to establish that the Turkish agents' threatening and physical behavior towards Plaintiffs was intentional and designed to "engender fear"—and then some—in Plaintiffs.[9]

Moreover, Plaintiffs adduce ample evidence to show that the attacks were motivated by prejudice based on national origin. Among other factors, the use of slurs against a victim before or during an assault can be sufficient evidence of prejudice. *See, e.g.*, *Lucas*, 240 A.3d at 348 (sufficient evidence of bias included "the volume and duration of homophobic taunts, the temporal proximity between the comments and the assault, and the gravity of the physical encounter"); *Aboye*, 121 A.3d at 1251–52 (similar, basing conviction on evidence that assailant repeatedly used the word "f***ot" toward the victims); *Shepherd v. United States*, 905 A.2d 260, 263 (D.C. 2006) (finding this element "amply supported by evidence" that the perpetrator "accompanied his assaults on the two women with a verbal stream of homophobic insults"). And importantly, bias need not be the only motivation behind the challenged acts; "additional motives like anger or revenge" can properly coexist. *Lucas*, 240 A.3d at 342 (interpreting the DCBRCA to require that

---

[9] As noted already, whether criminal prosecutions or convictions followed is immaterial for purposes of imposing civil liability under the statute. Nonetheless, Plaintiffs highlight that the U.S. Attorney's Office secured several indictments against individual members of the Turkish security forces based on their actions toward the protesters (including Plaintiffs) in Sheridan Circle that fateful afternoon.

"a defendant's bias against a victim due to the victim's protected characteristic must be a but-for cause of the defendant's underlying criminal act," but "need not be the sole cause, or even the primary cause").

Here, Plaintiffs present evidence demonstrating that they and other protesters at Sheridan Circle were clearly expressing their support for the Kurdish minority in Turkey, including by carrying Kurdish flags, displaying apparel in traditional Kurdish colors, and more. (Usoyan Decl. ¶ 6 ("Our group displayed Kurdish flags and shawls in the traditional colors associated with ethnic Kurds."); Doe I Decl. ¶ 5 ("My protest sign depicted the ruins of Cizre, a Kurdish city that was destroyed by Turkish troops … At the bottom, it read, 'Erdogan is a war criminal.'")); Doe II Decl. ¶ 7 (describing sign referencing a Kurdish leader).) Their evidence further demonstrates that the pro-Erdogan group (including Turkish security forces) were shouting Kurdish-infused smears and threats at Plaintiffs and other protesters. (*See, e.g.*, Doe I Decl. ¶ 9 (describing "personal" and "obscene" threats, including "PKK terrorists," "Kurdish terrorists," and more); *see also Kurd* SoF ¶ 19 (recounting slurs and threats by the Turkish security forces, including "die, fucking Kurds," "fuck you, Kurds," "Kurdish sons of bitches," "traitors," "dogs," and more).) Taken together, certainly, Plaintiffs' prominent display of Kurdish support coupled with the Kurdish-related slurs shows that the surrounding assaults were motivated by prejudice based on Plaintiffs' actual or perceived Kurdish national origin. Indeed, this is a particularly easy conclusion for the Court to reach without any evidence or argument being presented by Turkey to the contrary.

For these reasons, these Plaintiffs established their DCBRCA claims.[10]

---

[10] The Court pauses to explain why Plaintiffs' DCBRCA claim fits within the FSIA's "tortious acts" exception. Recall that the statute applies to any case "in which money damages are sought against a foreign state for personal injury or death … occurring in the United States and caused by the tortious act or omission … of any official or employee of that foreign state while acting within the scope of his office or employment[.]" 28 U.S.C. § 1605(a)(5). Plaintiffs' claims here are grounded on tortious acts—claims of assault and battery—that happen to play double duty as "designated acts" for purposes of the DCBRCA,

### 2. Outside the Turkish Embassy

Plaintiff MacAuley's bias-related claim is another story.

On the first element, MacAuley successfully demonstrates that she suffered injury because of a "designated act" within the meaning of the statute. After all, she proved a claim of at least simple criminal assault against Turkey based on the offensive acts the Turkish security force members took against her while protesting on the street across from the Turkish Embassy.

But in contrast with the other Plaintiffs, MacAuley does not adduce any evidence to show that those acts were motivated by a Kurdish-related prejudice against her. Unlike the protesters at Sheridan Circle, Plaintiffs' evidence does not identify any demonstrable indication that MacAuley was engaging in a pro-Kurdish protest rather than simply voicing discontent with President Erdogan generally. And unlike the protesters at Sheridan Circle who attested to anti-Kurdish slurs and smears shouted at them by Turkish security forces, MacAuley does not allege anything of the sort; according to MacAuley's declaration, one of the Turkish security agents simply "told [her] to stop," while grabbing her wrists and wresting her sign away. (MacAuley Decl. ¶¶ 9–11.)

Perhaps because of this, Plaintiffs suggest the assault against MacAuley was motivated by prejudice based on her "political affiliation," which is a separate protected characteristic under the law. (Pls.' Mot. at 49.) Plaintiffs' briefing on this issue is scant, to say the least. They fail to even articulate what specific "political affiliation" they contend was the basis for the attackers' prejudice, other than highlighting the fact that MacAuley was holding a sign reading "Erdogan = Fascist." (*Id.*) That is, Plaintiffs seem to imply MacAuley was targeted because of her "anti-Erdogan" views. Beyond that, though, Plaintiffs fail to develop the argument whatsoever. Even

---

which in turn authorizes statutory damages for those acts if Plaintiffs can prove the requisite prejudice-focused intent. This is not to say that every statutory damages claim would fall within the ambit of the FSIA's "tortious acts" exception, but, at least on the specific facts here, Plaintiffs' claims fit the bill.

though the statute does not define the term "political affiliation," Plaintiffs fail to offer any caselaw or other authority to establish that this viewpoint would qualify. The Court's independent research, however, suggests a narrower reading of the statute than Plaintiffs' claim suggests.

In *Thompson v. Trump*, for example, the court in construing the DCBRCA looked to the "ordinary meaning" of the term "affiliation," *i.e.*, "the state of belonging to a particular religious or political group." 590 F. Supp. 3d 46, 120 (D.D.C. 2022) (quoting Merriam-Webster's Dictionary). Based on that understanding, the court expressed skepticism that "[o]pposing" a single political figure—there, President Trump—would qualify. *See id.*; *see also Smith v. Trump*, 2023 WL 417952, at *8 (D.D.C. Jan. 26, 2023), *aff'd*, 2023 WL 9016458 (D.C. Cir. Dec. 29, 2023) (rejecting DCBRCA claims where wrongful acts were premised on a politically-tinged viewpoint—namely, that the 2020 "presidential election had been stolen"—because the defendants' conduct was directed at both Democrats and Republicans alike, rather than at one political affiliation).[11] Under that logic, and particularly absent any contrary authority from Plaintiffs, the Court does not believe that one's stance of being "anti-Erdogan" is itself a political affiliation, just as being "anti-Trump" or "anti-Biden" is not itself a political affiliation in the context of U.S. politics; there are plenty of Republicans who fall into the former camp and plenty of Democrats who fall into the latter. And beyond suggesting that MacAuley was "anti-Erdogan," Plaintiffs fail to offer any cogent argument—let alone one supported by caselaw—to demonstrate how she was targeted based on a "political affiliation," or how the evidence shows that the Turkish

---

[11] Cases construing "political affiliation" under the D.C. Human Rights Act point to a similarly limited definition. *See Blodgett v. Univ. Club*, 930 A.2d 210, 221–22 (D.D.C. 2007) (holding plaintiffs could not establish a claim of DCHRA discrimination for "political affiliation" by focusing on "political reasons" or "politics generally"); *see also Donner v. Fox News Network, LLC*, 2024 WL 1758689, at *7 (D.D.C. Apr. 24, 2024) (similarly holding that plaintiff failed to state a plausible "political affiliation" claim under the DCHRA by alleging termination because of his political objections to his employer's programming rather than because of his affiliation with any political party).

security officials were motivated in their actions against her by prejudice based on any such political affiliation regardless. *See Chen v. ICS Protective Servs.*, 2024 WL 4103700, at *4 (D.D.C. Sept. 5, 2024) (dismissing DCBRCA claim absent allegation that defendants "made any statement expressing prejudice toward him or … had any knowledge of [his] political affiliation").

All told, MacAuley fails to prove that the actions taken against her were motivated by bias against a statutorily protected characteristic, whether national origin, political affiliation, or otherwise. The evidence suggests, instead, that the Turkish officials were generally motivated in that instance to quash any public criticism of President Erdogan, irrespective of the source. While still troubling, especially on the facts here, that set of circumstances does not support a claim under the DCBRCA. The Court should decline to find liability on MacAuley's DCBRCA claim.

### G.    Loss of Consortium

Finally, Plaintiff Mehmet Yuksel is differently situated from the other plaintiffs. He did not participate in the protests at Sheridan Circle or outside the Embassy, and he was not personally victimized during those altercations. Instead, he is married to Plaintiff Usoyan, and he brings a claim for loss of consortium based on injuries to his marriage that he attributes to the harm Turkey inflicted on his wife. (Pls.' Mot. at 49–51; *see* Compl. ¶¶ 149–52 (Count VIII).)

Under D.C. law, "loss of consortium" is "a distinct cause of action for injury to the marriage itself." *Massengale v. Pitts*, 737 A.2d 1029, 1032 (D.C. 1999) (quotation marks omitted). To prevail under D.C. law, a plaintiff must prove "an actual loss of society incident to the marriage result[ing] from tortious conduct of another." *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1175 (D.C. 1997). But Plaintiffs Yuksel and Usoyan live in the Commonwealth of Virginia (Pls.' Mot. at 50; *see* ECF No. 127-9 ("Yuksel Decl.") ¶ 2), and "Virginia does not recognize a claim for

loss of consortium," *Cardenas v. Muangman*, 998 A.2d 303, 311 (D.C. 2010); *see* VA. CODE ANN. § 55.1-201 (formerly VA. CODE ANN. § 55-36). So, which law applies?

Yuksel argues the Court should apply D.C. law to this claim because "D.C.'s interest in protecting the rights of those who exercise their right to protest on D.C. soil outweighs Virginia's interest in regulating the rights of married couples domiciled in Virginia." (Pls.' Mot. at 50.) This argument fails, and the D.C. Court of Appeals' decision in *Cardenas* shows why.

In *Cardenas*, the court was faced with the same choice-of-law question presented here: whether a spouse of someone injured in D.C. can pursue a loss-of-consortium claim under D.C. law despite being domiciled (and married) in Virginia. *See* 998 A.2d at 311–12. *Cardenas* supplied a simple answer. Relying on *Stutsman v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.*, 546 A.2d 367 (D.C. 1998), the court reiterated that "an action for loss of consortium is governed by the law of the state where the marriage is domiciled." *Id.* at 312 (quoting *Stutsman*, 546 A.2d at 374). This straightforward principle meant Virginia law controlled. But to unpack things a bit more, *Cardenas* explained that under "a governmental interest analysis," Virginia "ha[d] an obvious interest in regulating the legal rights of married couples domiciled in Virginia," especially considering that the "Virginia statute is 'tailored'" specifically "to abolish" the cause of action at issue. *See id.* (quoting *Stutsman*, 546 A.2d at 374–75). And even though the underlying wrongful conduct may have occurred in D.C., the District's interest in punishing and deterring that conduct was "satisfied by applying the District's substantive tort law to the wrongful conduct itself[.]" *See id.*

Through a footnote, Yuksel argues for the opposite result. He strives to distinguish *Cardenas* because the underlying injury to Usoyan here "occurred at a protest in D.C." (Pls.' Mot. at 50 n.23.) He invokes D.C. Code § 5-331.03, which provides: "It is the declared public policy of

the District of Columbia that … persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia[.]" Yuskel insists the District's interest in protecting protesters is especially heightened given its status as "the nation's capital," where so many protests—both nationally and globally focused—take place. (*See id.*) This argument misses the mark. Just as here the District has an interest in protecting the safety of protesters, in *Cardenas* the District had an interest in protecting those receiving medical treatment in D.C. from malpractice. And in both cases, the underlying injuries occurred in D.C., not Virginia. Thus, although Yuskel rightly argues that the District "has an interest in ensuring that people who come into the District … are safe during these protests" (Pls.' Mot. at 50 n.23), that interest is vindicated "by applying the District's substantive tort law to the wrongful conduct itself." *Cardenas*, 998 A.2d at 312.

The Court must follow D.C. Court of Appeals precedent on this choice-of-law issue. *Cardenas* governs, and it precludes Yuskel's loss-of-consortium claim.

## III.    Plaintiffs' Claims Under The JASTA Exception: 28 U.S.C. § 1605B

Plaintiffs separately seek default judgment against Turkey under another FSIA provision: the "international terrorism" exception under 28 U.S.C. § 1605B. (Pls.' Mot. at 51–64; Compl. ¶¶ 145–48 (Count VII).) As Plaintiffs describe it, "[t]he violent attacks against Plaintiffs and other peaceful [p]rotesters qualify as acts of 'international terrorism'" for purposes of Section 1605B. (Pls.' Mot. at 51). After careful review of the governing statute, the relatively limited caselaw applying it, and the specific evidence put forward by Plaintiffs here, the undersigned concludes that the FSIA's "international terrorism" exception provides an additional basis for FSIA

jurisdiction over the actions of the Turkish security forces at Sheridan Circle that afternoon, but determines that only Usoyan can bring a separate claim for damages on this basis.[12]

## A.    Section 1605B(b) Jurisdiction

In 2016, Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), adding a new exception—codified at 28 U.S.C. § 1605B—to the FSIA. It provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>> (1) an act of international terrorism in the United States; and
>> (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

28 U.S.C. § 1605B(b).[13] If these elements are met, "a national of the United States may bring a claim against a foreign state in accordance with [18 U.S.C. § 2333]." *Id.* § 1605B(c).

In the decade or so since Congress enacted Section 1605B, only a few courts have substantively engaged with the exception, beyond simply dismissing it out of hand as inapplicable. *Cf. Yirenkyi v. U.S. Cent. Intel. Agency*, 656 F. Supp. 3d 241, 250 (D.D.C. 2023) (rejecting the "passing" invocation to Section 1605B jurisdiction over an attack outside the U.S.); *Bloomfield v.*

---

[12] Although it is normally accepted that the Court need not consider more than one theory of jurisdiction when one has been established, *see, e.g.*, *Usoyan I*, 438 F. Supp. 3d at 25 (declining to examine jurisdiction under JASTA having found jurisdiction under FSIA's "tortious acts" exception under Rule 12(b)(1)), the Court cannot avoid at this stage addressing whether Turkey can be held liable under Section 1605B because that finding would open the door to a distinct cause of action with distinct remedies. Section 1605B(c) provides that a "national of the United States" who establishes jurisdiction under this exception "may bring a claim" under 18 U.S.C. § 2333. And Section 2333 provides for recovery of "threefold the damages he or she sustains," plus "the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a). Those remedies are more expansive than the remedies available for claims arising under the "tortious acts" exception. Meaning, Section 1605B serves as both another means of jurisdiction and a distinct theory of liability.

[13] Though not relevant here, the JASTA exception cabins the meaning of "tortious act" to expressly preclude jurisdiction based on "an omission or a tortious act or acts that constitute mere negligence." § 1605B(d).

*Kingdom of Saudi Arabia*, 2021 WL 3640716, at *2–3 (S.D. Tex. June 1, 2021) (similar); *Kaldawi v. State of Kuwait*, 2017 WL 6017293, at *9 (C.D. Cal. Mar. 17, 2017) (similar).[14] Only one case, based on the Court's independent research, found JASTA jurisdiction viable in this context. *See In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018) (finding JASTA exception in Section 1605B provided jurisdiction over claims against Saudi Arabia based on the conduct of its agents in relation to the September 11 attacks on the World Trade Center).[15] Another case held otherwise. *See Watson v. Kingdom of Saudi Arabia*, 2023 WL 4047586, at *5–13 (N.D. Fla. May 11, 2023), *report and recommendation adopted*, 2024 WL 1344643 (N.D. Fla. Mar. 30, 2024) (rejecting Section 1605B jurisdiction over Saudi Arabia for an attack by a member of the Royal Saudi Air Force against U.S. Navy servicemembers on the basis that the perpetrator was not acting with the scope of his employment for Saudi Arabia in carrying out the attack).

Both of those cases, though, recognize a common set of elements to establish Section 1605B's applicability: "(1) [physical] injury … within the United States; (2) an act of international terrorism in the United States; (3) a tortious act by the foreign state or by its official, employee, or agent acting within the scope of that office, employment, or agency; (4) causation; and (5) resulting damages." *Watson*, 2024 WL 1344643, at *6; *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 642 (identifying the same component elements but combining elements 2 and 3).

---

[14] In other words, there are very few cases that involve claims seeking to hold a foreign sovereign liable for the direct physical injuries caused by an act of international terrorism in the U.S. perpetrated by that sovereign's agents. That said, JASTA separately amended part of the Anti-Terrorism Act, 18 U.S.C. § 2333, to include aiding-and-abetting liability for terrorist acts. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Most of the cases addressing JASTA arise in this latter context, rather than the direct-liability context implicated here. *See, e.g.*, *Retana v. Twitter, Inc.*, 1 F.4th 378, 382 (5th Cir. 2021) (holding JASTA jurisdiction inapplicable to the acts of a "self-radicalized shooter" of Dallas police officers, despite alleged online influence by Hamas).

[15] The Southern District of New York recently reaffirmed this holding. *See In re Terrorist Attacks on Sept. 11, 2001*, 2025 WL 2485427 (S.D.N.Y. Aug. 28, 2025).

Here, the Court's earlier analysis shows how the latter three elements are met. The Court already determined that the Turkish security forces committed intentional tortious acts while acting in the course and scope of their employment, and those tortious acts caused damages to Plaintiffs. So that leaves two remaining issues for analysis. First, Section 1605B only allows jurisdiction for claims against a foreign state based on "physical injury." And second, Section 1605B requires injuries caused by "an act of international terrorism in the United States."

### 1.    Physical Injury

Start with the former element. Section 1605B allows claims against a foreign state for "physical injury." 28 U.S.C. § 1605B(b). Plaintiffs Usoyan, Doe I, and MacAuley, through their sworn declarations, offer evidence that straightforwardly satisfies the "physical injury" element. (*See* Usoyan Decl. ¶ 16 ("The doctors diagnosed me with a traumatic brain injury, concussion and post-concussive syndrome, contusion of my jaw, and abrasions on my head."); Doe I Decl. ¶ 13 ("I suffered wounds on my back near my shoulder and along my spine. I also had a cut on my lip where I was punched in the face."); MacAuley Decl. ¶ 17 ("[M]y wrist was injured[, and] I felt numbness and tingling in my wrist, hand, and arm.").)

But Doe II is differently situated. He was able to run away from the attacks in Sheridan Circle without being physically victimized, which explains why he does not pursue a claim for battery like his co-Plaintiffs. And while his declaration recounts various mental and emotional injuries that he attributes to the events of that afternoon, he does not identify the same types of *physical* injuries as the others. (*See* Doe II Decl. ¶¶ 16–22.)

The statute does not define "physical injury," but the phrase generally means "damage to a person's body." *Physical Injury*, Black's Law Dictionary (10th ed. 2014); *see also Physical*, Black's Law Dictionary (10th ed. 2014) (defining "physical" as "[o]f, relating to, or involving

someone's body as opposed to mind."). In this way, the term is narrower than the related term "personal injury," which more broadly encompasses both "bodily injury" as well as "mental suffering." *See Personal Injury*, Black's Law Dictionary (10th ed. 2014). Importantly, Congress used that broader term elsewhere in the FSIA. For instance, the statute authorizes the pursuit of claims for "personal injury" under the "tortious acts" exception, *see* 28 U.S.C. § 1605(a)(5), as well as the FSIA's original "terrorism exception," *id.* § 1605A(a)(1).[16] But Congress used different and more restrictive language in drafting Section 1605B, limiting jurisdiction to claims for "physical injury." And the Court must presume that difference carries meaning. *See, e.g.*, *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("[W]hen we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning.") (citing *Loughrin v. United States,* 573 U.S. 351, 358 (2014)). Relatedly, the Court must adhere to another "'cardinal principle' of interpretation" to "give effect, if possible, to every clause and word of a statute." *Loughrin*, 573 U.S. at 358 (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). And here the word "physical" expressly delineates the type of "injury" encompassed by the statute. If Congress wanted to authorize jurisdiction under Section 1605B for all injury—physical or otherwise—it surely knew how to write the statute in that way. But it did not, and the Court must apply the statute as Congress wrote it. This means Doe II's claims of mental and emotional injuries, but not *physical* injuries, fall outside the reach of Section 1605B.

## 2.    International Terrorism

The next issue is more involved. For purposes of Section 1605B, the term "international terrorism" draws its meaning from the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331. *See* 28

---

[16] Courts have regularly construed Section 1605A's "personal injury" language such that "[j]urisdiction is not restricted to physical injury suffered directly by each claimant," but includes claims of "emotional injuries." *See, e.g.*, *Baxter v. Islamic Republic of Iran*, 2019 WL 13565511, at *10 (D.D.C. Sept. 27, 2019).

U.S.C. § 1605B(a)(1). Under the ATA, for an activity to qualify as "international terrorism," it must (A) "involve violent acts or acts dangerous to human life that are a violation of criminal laws of the United States or of any State …"; (B) "appear to be intended … (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping"; and (C) "transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1)(A)–(C).[17]

As an initial matter, Plaintiffs fail to develop any argument as to how the conduct directed at MacAuley outside the Turkish Embassy satisfies the latter two prongs of the statutory test. (*See* Pls.' Mot. at 54–61 (discussing the second element only in relation to the events at Sheridan Circle); *id.* at 61–64 (same for third element); *see also id.* at 64 (concluding: "Turkey's Sheridan Circle attack thus satisfies all three prongs[.]").) In fact, the only mention of MacAuley within this section of Plaintiffs' briefing is relegated to a footnote that simply argues "Turkish security forces also violently attacked Plaintiff MacAuley." (*See* Pls.' Mot. at 52 n.25.) That statement alone says nothing about whether the conduct toward MacAuley satisfies the other necessary elements. And the Court declines to independently embark on an analysis that Plaintiffs chose to leave undeveloped, particularly on an issue as sensitive and scarcely litigated as this one.

Instead, the Court follows Plaintiffs' lead and considers only whether the activities that took place at Sheridan Circle satisfy JASTA's definition of "international terrorism."

---

[17] Because Section 1605B borrows the meaning of "international terrorism" from the ATA, 18 U.S.C. § 2331(1), the Court at certain points looks to caselaw interpreting that phrase under the ATA.

### a.    Violent And Criminal Acts

Start with whether the conduct of the Turkish security forces toward Plaintiffs that afternoon "involve[d] violent acts … that are a violation of the criminal laws of the United States or of any State" 18 U.S.C. § 2331(1)(A). There are two sub-issues embedded in that question: whether the conduct involved "violent" acts, and, assuming so, whether those violent acts would amount to a violation of federal or state criminal law.

On the first, the Court has no trouble concluding that the actions of the Turkish security forces in Sheridan Circle that afternoon were violent. One need only watch a few seconds of the video footage to see why. (*See* Video, SC02 at 2:45–5:03; SC08 at 0:25–2:26; SC09 at 7:29–7:40; SC10 at 0:30–0:57.) The attacks they carried out against the protesters were brutally violent: a barrage of kicking, punching, stomping, and more. And if the videos were not enough, Plaintiffs' declarations bear all that out, too. (*See* Usoyan Decl. ¶ 11 (describing Turkish security official "kicking and punching" her, and after falling to the ground, "feeling them kick [her] in the back and in the head"); Doe I Decl. ¶ 11 ("As I ran, I slipped and fell and the men chasing me started kicking and punching me. Their shoes felt like they were made of steel so the kicks were incredibly painful. They kicked and punched me in the head, face, and back as I struggled to get away.").) Although the statute does not define the term "violent," the Turkish security forces' conduct at Sheridan Circle fits comfortably within any commonly understood meaning of the term.[18]

On the second, Plaintiffs argue that the Court can easily deem the relevant conduct criminal because several members of the Turkish security forces were criminally indicted on charges under the D.C. Code for their role in those events. (*See* Pls.' Mot. at 53–54). Plaintiffs place near-

---

[18] For instance, at the time Section 2331 was enacted in the 1990s, relevant dictionaries defined "violent" to describe conduct involving "strong physical force," *Violent*, Black's Law Dictionary (7th ed. 1999), and "characterized by the exertion of great physical force or strength," 19 Oxford English Dictionary 656 (2d ed. 1989). These definitions map easily onto the conduct at issue here.

dispositive reliance on those indictments. The Court, however, is reticent to hinge its analysis on those indictments alone because indictments are merely charges of a crime, not evidence sufficient to establish that the criminal conduct occurred. *See, e.g.*, *Jordan v. Medley*, 711 F.2d 211, 218 (D.C. Cir. 1983) (Scalia, J.) (warning against the use of a criminal charge "to establish the actual occurrence of the offense to which the arrest or charge pertained").[19] The indictments aside, though, Plaintiffs have presented "evidence satisfactory to the court," 28 U.S.C. § 1608(e)— including detailed declarations and contemporaneous video evidence—to show that the Turkish officials' attacks against them in Sheridan Circle on that May afternoon constituted criminal assault under federal law. *See* 18 U.S.C. § 113(a) (criminalizing assault within the "territorial jurisdiction of the United States"). The U.S. Code penalizes several different categories of assault, including "[a]ssault by striking, beating, or wounding," "[s]imple assault," and "[a]ssault resulting in serious bodily injury," among other categories. *See id.* And courts have interpreted the term "assault" in this context as tantamount to common-law "battery" and "assault." *See, e.g.*, *United States v. Watts*, 798 F.3d 650, 652–53 (7th Cir. 2015) ("In 18 U.S.C. § 113(a), 'assault' primarily means common law 'battery,' although it could include a common law 'assault[.]'"). Under these statutes, and for

---

[19] Reliance on the indictments alone would raise still another thorny interpretative question, insofar as the indictments charged violations of D.C. law and not federal law. Because Section 2331 requires that the predicate violent acts be a "violation of the criminal laws of the United States or of any State," the Court would need to conclude that statute's use of the term "State" encompasses D.C. But the District of Columbia is famously not a state. Congress is frequently explicit when it intends to include D.C. within this sort of state-focused statutory scheme, either by specifically referencing D.C. in the relevant statutory provision itself, or by defining "State" elsewhere in the statute to include the District of Columbia. *See, e.g.*, 9 U.S.C. § 1 (defining "commerce" under the Act as "commerce … between the District of Columbia and any State or Territory or foreign nation," among other categories); 18 U.S.C. § 232(2) (similarly defining "commerce" as commerce "between any State or the District of Columbia," among other categories); 42 U.S.C. § 1983 (describing "any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia"); *see also* 18 U.S.C. § 2510 (defining "State" to mean "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States"); 42 U.S.C. § 18024(d) (similarly defining "State" to "mean[ ] each of the 50 States and the District of Columbia"). Neither scenario is true here. Plaintiffs offer nothing helpful on this point, but, ultimately, the Court need not resolve this question because Plaintiffs satisfy the element on another basis.

the same reasons applicable to Plaintiffs' DCBRCA claims above, the challenged conduct here fairly amounts to criminal assault in violation of federal law.

### b.    Intended To Coerce

Next, Plaintiffs argue that the underlying conduct against them "appear[ed] to be intended … to intimidate or coerce a civilian population," namely, "opponents of the Erdogan regime." (Pls.' Mot. at 54 (section header).) The Court agrees that the evidence supports that takeaway.[20]

As an initial matter, this piece of the statute is not "concerned with" a defendant's "actual subjective intent." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48–49 (D.D.C. 2010). It focuses instead on "the objective appearance of intent." *Id.* at 49. To borrow Judge Royce Lamberth's framing of the issue, the question is whether "an objective observer could conclude" that the defendant "intended to intimidate or coerce" a civilian population. *See id.*; *see also Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) (explaining similarly that Section 2331(1)(B) looks to "a matter of external appearance rather than subjective intent"). Plaintiffs say this standard is met here because the objective evidence—evidence the Court already described at some length—demonstrates that the actions of the Turkish security forces were consistent with "their pattern of intimidating anti-Erdogan dissidents in Turkey and abroad," including dissidents focused on advocating for the rights of the Kurdish people. (Pl.'s Mot. at 59–60.) And they insist that any suggestion that Turkey was acting based on legitimate security concerns, whether to protect President Erdogan or otherwise, is pretextual because the Turkish

---

[20] Plaintiffs separately gesture at an argument that Turkey's actions were also intended "to *influence the policy of a government* by intimidation or coercion." (Pls.' Mot. at 55, 60 (emphasis added).) But Plaintiffs fail to develop that argument beyond simply mentioning it, so the Court need not dwell on it. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work[.]'") (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)). Plus, the Court finds this element satisfied on other grounds.

officials were simply engaged "in a pattern of message-sending violence." (*Id.* at 56–58.) These characterizations are supported by "evidence satisfactory to the court." 28 U.S.C. § 1608(e).

Without belaboring the facts already discussed, the evidence shows that the Turkish security forces shouted a barrage of Kurdish-focused slurs and insults at the protesters, forced their way through a considerable law-enforcement barrier, and then physically attacked and chased down the protesters, continuing to violently kick and assault them even after they fell to the ground defenseless. (Video, SC02 at 2:45–3:56; SC08 at 1:42–2:00.) More, many attackers then proceeded to tear up and destroy the protesters' signs and messaging (*see id.*), which plainly appears to have been intended to intimidate those protesters and future protesters from publicly criticizing President Erdogan. Surely an objective observer could easily reach that conclusion.

### c.    Transcending National Boundaries

That leaves the issue of whether the challenged actions here "transcend[ed] national boundaries" within the meaning of the statute. Plaintiffs argue they did, both because of "the persons they appear intended to intimidate or coerce" and "the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1)(C). The Court agrees on both points.

On the first point, Plaintiffs argue that President Erdogan "meant the trip to be consumed by the Turkish domestic audience, whether by rallying nationalists or intimidating his political opposition" at home. (Pls.' Mot. at 61–62.) In other words, the attacks at Sheridan Circle were directed not only at the protesters themselves, but at "his Kurdish opposition" more broadly. (*Id.* at 62.) Based on the facts already described, that conclusion is supported by the contemporaneous evidence reflecting and recounting the actions of the Turkish security forces that afternoon.

But Plaintiffs offer more. They proffer expert testimony that explains the point in far greater detail. (*See* ECF No. 70-4, Decl. of Dr. Steven A. Cook, Senior Fellow for Middle East and Africa

Studies at the Council on Foreign Relations.) Dr. Cook opines that the violence that day was meant to send "a chilling message to Erdogan's opponents at home." (*See id.* ¶ 9.) More specifically, he explains that if Erdogan's "security team can beat and injure protesters in the capital of the United States, where rule of law prevails, demonstrators in Turkey can expect [at] least as much violence from security forces at home." (*Id.*; *see also id.* ¶ 65 ("[T]he guards' dogged efforts to attack not only the protestors but their signs [and] posters … all show how the attack at Sheridan Circle mimics similar attacks throughout Turkey carried out by government agents … to squelch any freedom of expression that criticizes Erdogan and his government's policies.").

More still, Plaintiffs note that a few months after the conflict at Sheridan Circle, the Turkish Foreign Minister made a personal visit to two U.S. civilians being detained on criminal charges stemming from the attacks, taking "jailhouse photos" with them and publicizing his visit back home on Turkish news outlets. (Pls.' Mot. at 63–64.) According to Dr. Cook, this visit was intended, at least in large part, to send "a message to opponents of President Erdogan … that Turkish officials supported the use of violence against them no matter where they resided." (ECF No. 127-3, Second Decl. of Dr. Steven A. Cook ¶ 8; *id.* ¶ 14 (opining that these efforts "are part of a pattern of behavior on the part of Turkish officials to intimate Kurds and non-ethnic Turks at home and abroad").) He explains that the visit shows that the attack "had a domestic political goal and meaning, to once again demonstrate that Erdogan … will crush the Kurdish political opposition in Turkey, or anywhere else." (*Id.* ¶ 16.) This evidence, especially when taken together, satisfactorily establishes that the target audience for the Sheridan Circle attacks was not limited to protesters here in Washington, D.C. or even across the United States more broadly. Instead, that audience included—perhaps predominantly even—President Erdogan's dissidents at home.[21]

---

[21] These facts set this case apart from other ATA cases that have rejected a "transcending national boundaries" argument on this basis. *See, e.g.*, *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1221 (11th Cir. 2021)

On the second point, Plaintiffs argue that the Sheridan Circle attack transcends national boundaries on the separate basis of "the locale in which [the] perpetrators operate or seek asylum." This argument likewise carries. Setting aside the question of "asylum,"[22] the Turkish security forces plainly "operate" on a regular basis outside the United States, in a different international location from where they committed these attacks, whether at home in Turkey or in other international locations abroad. *Cf. Colon*, 14 F.4th at 1221 (finding this statutory component unmet because the perpetrator "lived in Florida and carried out his murderous spree in the same state"). Indeed, a central responsibility of those Turkish security forces was to travel internationally with President Erdogan, including to the United States during his visit in May 2017. In these ways, the "locale" in which the perpetrators "operate" transcends national boundaries under the statute.

*     *     *

For these reasons, the Court concludes that certain Plaintiffs established the necessary elements to allow the Court to exercise jurisdiction over certain claims against Turkey under JASTA and the FSIA's "intentional terrorism" exception, 28 U.S.C. § 1605B. This is not a holding the Court reaches lightly. But the Court is duty-bound to apply the law as written by Congress to the facts as presented by the parties. And here, Plaintiffs adduced substantial evidence to demonstrate that the actions of the Turkish security forces in Sheridan Circle that May afternoon meet the governing test, including the "international terrorism" element as defined by Congress.

---

(concluding, in the context of claims brought under the ATA, that the tragic Pulse nightclub shooting in Orlando, Florida did not transcend national boundaries in terms of the persons it was intended to intimidate or coerce, reasoning that "[t]he plausible inference" was that "a mass shooting on United States soil is meant to terrorize American citizens and residents[,]. and that [t]o come to the contrary conclusion [the Court] would have to say (or infer) that any act of domestic terrorism, anywhere in the world, is meant to intimidate or coerce all of humankind.").

[22] Plaintiffs only mention "asylum" in passing, so the Court declines to rule on that basis, especially since "asylum"—at least in the legal sense—typically contemplates an act of seeking refuge *outside* of one's home country, and here Plaintiffs suggest that the Turkish security forces simply fled back to Turkey.

The Court also reiterates that Turkey elected to forgo any opportunity to contest this finding. After losing the first round on sovereign immunity, Turkey simply folded its hand and withdrew from the case altogether. Given that, Turkey can hardly be heard to complain about this result.

In any case, the Court properly exercises jurisdiction over some of Plaintiffs' claims under 28 U.S.C. § 1605B, which means that it next considers whether and to what extent Plaintiffs can pursue a claim for damages under 18 U.S.C. § 2333.

### B.    Claims Under 18 U.S.C. § 2333

Where all the elements of Section 1605B(b) are satisfied, "a national of the United States may bring a claim against [the] foreign state in accordance with [18 U.S.C. § 2333]." 28 U.S.C. § 1605B(c). As discussed, the Court finds that Plaintiffs Usoyan and Doe I—but not Doe II or MacAuley—have shown the Court properly exercises jurisdiction over their claims under Section 1605B. But the evidence demonstrates that only Usoyan—not Doe I—is a "national of the United States." (*Compare* Usoyan Decl. ¶ 2 (attesting that she is "a United States citizen"), *with* Doe I Decl. ¶ 2 ("I am a Turkish citizen legally residing in the Commonwealth of Virginia as a refugee asylee").) For this reason, only Usoyan can bring a claim under Section 2333, not Doe I.[23]

Because Usoyan successfully establishes jurisdiction under the FSIA's "international terrorism" exception, the Court should find that she has a valid claim under 28 U.S.C. § 1605B(c) and is entitled to recovery pursuant to 18 U.S.C. § 2333.

### CONCLUSION AND RECOMMENDATION

For the reasons explained, the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** Plaintiffs' motion for default judgment (ECF No. 127).

---

[23] Plaintiffs fail to engage with this point whatsoever, whether as to Doe I or otherwise.

Specifically, the Court should find that it properly exercises jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1605(a)(5) and grant judgment on liability as to the claims for: (1) assault by Usoyan, Doe I, Doe II, and MacAuley; (2) battery by Usoyan, Doe I, and MacAuley; (3) IIED by Usoyan, Doe I, Doe II, and MacAuley; and (4) violation of the DCBRCA—on the basis of actual or perceived Kurdish national origin—by Usoyan, Doe I, and Doe II. The Court should deny liability, however, as to the claims for: (1) NIED by all Plaintiffs; (2) civil conspiracy by all Plaintiffs; (3) violation of the DCBRCA by MacAuley; and (4) loss of consortium by Yuksel. Finally, the Court should conclude that it properly exercises jurisdiction over the claims of Usoyan and Doe I under 28 U.S.C. § 1605B, but that only Usoyan is entitled to pursue damages based on a corresponding claim under 18 U.S.C. § 2333.

Dated: September 15, 2025

_____
MATTHEW J. SHARBAUGH
United States Magistrate Judge

\* \* \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).